## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

WILDEARTH GUARDIANS
301 N. Guadalupe St.
Santa Fe, NM 87501,

WESTERN WATERSHEDS PROJECT
126 S Main St., Suite B
P.O. Box 1770
Hailey, ID 83333, and

ROCKY MOUNTAIN WILD
1536 Wynkoop St., Suite 900
Denver, CO 80202,

     Plaintiffs,

  v.

U.S. FISH AND WILDLIFE SERVICE
1849 C Street, N.W.
Washington, DC 20240

MARTHA WILLIAMS, Acting Director,
U.S. Fish and Wildlife Service
1849 C Street, N.W.
Washington, DC 20240, and

DEB HAALAND, Secretary,
U.S. Department of the Interior
1849 C Street, N.W.
Washington, DC 20240,

    Defendants.

Case No. 21-2864

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.    The black-footed ferret (*Mustela nigripes*) is perhaps the rarest, most imperiled

mammal in North America. A "Lazarus species," it was widely believed to be extinct until 1981,

when a ranch dog discovered the last remnant population near Meeteetse, Wyoming. This

population too would flicker out, but not before biologists trapped the final few animals to use for captive breeding. Ever since, the fate of the species has depended on the successful reintroduction of their captive-bred descendants.

2.      In Wyoming, however, the U.S. Fish and Wildlife Service (the "Service"), the federal agency responsible for the ferret's recovery under the Endangered Species Act ("ESA"), abdicated its duty to reintroduce and recover the species to the State and its agencies under the guise of providing maximum regulatory flexibility to private landowners. Instead of relying on the best available science, as the ESA requires, the Service acceded to the demands of the State: designating all prospective ferret reintroductions in Wyoming "nonessential" to the species' survival and recovery—effectively precluding the substantive protections of the ESA. Further, the Service granted the State's fish and wildlife agency, the Wyoming Game and Fish Department ("WGFD"), sweeping and unprecedented control over all ferret reintroductions in the State, including the ability to veto proposed reintroductions——even on federal public lands—in derogation of the Service's and federal land management agencies' duty under the ESA to further the recovery of federally listed species. Because of the Service's flawed statewide "nonessential" designation and abdication of its duty to recover this critically imperiled species, ferret reintroductions in the State have stalled and ferret numbers continue to decline.

3.      Plaintiffs WildEarth Guardians, Western Watersheds Project, and Rocky Mountain Wild (collectively, "Guardians") file this civil action against Defendants the U.S. Fish and Wildlife Service, Martha Williams in her in her official capacity as acting Director of the U.S. Fish and Wildlife Service, and Deb Haaland in her official capacity as Secretary of the U.S. Department of the Interior (collectively, "Service" or "Defendants") for violations of the ESA,

16 U.S.C. § 1531 *et seq.*, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*

4.      The Service has violated, and continues to violate, the ESA, NEPA, and the APA through the promulgation of its final rule designating the State of Wyoming as a nonessential experimental population area for black-footed ferrets under ESA § 10(j), 16 U.S.C. § 1539(j) (the "Wyoming 10(j) rule" or "the Rule") as well as the associated Environmental Assessment ("EA")/Finding of No Significant Impact ("FONSI"), and the 2015 Final Intra-service Biological Opinion on the Issuance of a New Federal Rule to Designate the Black-footed Ferret as a Non-Essential Experimental Population in the State of Wyoming under ESA § 10(j) (the "2015 BiOp").

5.      In view of the fatal flaws in both the process and the substance of the statewide Wyoming § 10(j) rule, Plaintiffs ask the Court to set aside the challenged Rule and its associated analyses and remand them to the Service for a new rulemaking that fully complies with the ESA, NEPA and the APA.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction pursuant to the ESA's citizen suit provision, 16 U.S.C. § 1540 ("The several district courts of the United States… shall have jurisdiction over any actions arising under this Act."). The Court also has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1346 (the United States is a defendant).

7.      This Court has the authority to review the Service's actions complained of herein and grant the requested relief pursuant to 16 U.S.C. § 1540(g), 28 U.S.C. §§ 2201 (declaratory judgment), and 2202 (injunctive relief), and 5 U.S.C. §§ 704 and 706 (APA).

8.    Guardians sent notice of its intent to sue the Service for the ESA violations described in this complaint more than 60 days ago, as required by 16 U.S.C. § 1540(g)(2)(C). The Service received the notice of intent to sue more than 60 days ago. The violations have not been remedied.

9.    Venue is proper in the United States District Court for the District of Columbia pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e) because Defendants reside in the district and a substantial part of the events giving rise to Guardians' claims occurred in this district.

## PARTIES

10.    Plaintiff WILDEARTH GUARDIANS is a West-wide non-profit organization whose mission is to protect and restore the wildlife, wild places, wild rivers, and health of the American West. WildEarth Guardians has over 190,000 members and supporters, including those who live, work and recreate in Wyoming. For over 30 years, WildEarth Guardians has worked to restore and protect imperiled species including black-footed ferrets and prairie dogs, the ferret's obligates. WildEarth Guardians works to protect prairie dog habitat across the West, promote non-lethal prairie dog management to benefit both ferret reintroductions and the health of grassland ecosystems, and advocates for protecting ferrets to the fullest extent possible under the ESA.

11.    Plaintiff WESTERN WATERSHEDS PROJECT is a non-profit conservation organization founded in 1993 with the mission of protecting and restoring western watersheds and wildlife through education, public policy initiatives, and litigation. Headquartered in Hailey, Idaho, Western Watersheds Project has over 12,000 members and supporters and works in eleven states across the West, including Wyoming.

12.     Plaintiff ROCKY MOUNTAIN WILD ("RMW") is a Denver based non-profit conservation organization that protects, connects, and restores wildlife populations and wildlands in the Southern Rockies region. RMW believes that public lands are fundamental for the protection of biodiversity in the Southern Rockies region, and RMW actively engages in land planning processes, scientific research, public education, and advocacy to protect key habitats and wildlife movement corridors on Forest Service-managed lands. RMW has advocated for the recovery of the black-footed ferret, protection of prairie dog habitat, and protection of areas essential for the survival of both species.  RMW also fights for lawful application of environmental statutes such as the ESA.

13.     Plaintiffs' members, staff, and supporters are dedicated to ensuring the long-term survival and recovery of the black-footed ferret throughout its historic range.

14.     Plaintiffs' members, staff, and supporters live and/or recreate in or near areas historically occupied by black-footed ferret and the 2015 Wyoming nonessential experimental population area, and use the area for purposes of hiking, camping, observing wildlife such as the black-footed ferret, bird watching, and other recreational and professional pursuits.

15.     Plaintiffs' members, staff, and supporters enjoy observing, attempting to observe, and studying black-footed ferrets in the wild, including within the 2015 Wyoming nonessential experimental population area.

16.     Plaintiffs' members, staff, and supporters derive aesthetic, recreational, scientific, inspirational, spiritual, educational, and other benefits from these activities and from working to restore black-footed ferrets in Wyoming. Plaintiffs' members, staff, and supporters have an interest in knowing that black-footed ferrets are present and recovering in Wyoming.

17.     The interest of Plaintiffs' members, staff, and supporters, as well as the organizational interests of Plaintiffs, have been, are being, and—unless the requested relief is granted—will continue to be harmed by the Service's actions challenged in this complaint. If the Court issues the relief requested, the harm to Plaintiffs' members, staff, and supporters' interests will be redressed and/or alleviated.

18.     Defendant U.S. FISH AND WILDLIFE SERVICE is a federal agency within the U.S. Department of the Interior with delegated primary authority for administration of the ESA with respect to terrestrial species. 50 C.F.R. § 402.01(b).

19.     Defendant MARTHA WILLIAMS is the principal deputy director and acting Director of the U.S Fish and Wildlife Service and is charged with ensuring agency decisions comply with the law. Plaintiffs sue Defendant Williams in her official capacity.

20.     Defendant DEB HAALAND is the Secretary of the U.S. Department of the Interior, has the ultimate responsibility to administer and implement the provisions of the ESA and all other federal laws applicable to the Department. Plaintiffs sue Defendant Haaland in her official capacity.

## STATUTORY AND REGULATORY FRAMEWORK

### I. The Endangered Species Act and Section 10(j) Experimental Reintroductions

21.     Congress passed the ESA "to provide a program for the conservation of . . . endangered species and threatened species," and to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b). Further, the ESA "declare[s] [it] to be the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter." *Id.* § 1531(c)(1).

22.     The Secretaries of Interior and Commerce share responsibility for administering the ESA, and have delegated that responsibility to the U.S. Fish and Wildlife Service (for terrestrial species and non-anadromous fish) and National Marine Fisheries Service (for marine species and anadromous fish), respectively. 50 C.F.R. § 402.01(b).

23.     The goal of the ESA is not simply to prevent extinction, but to proactively recover threatened and endangered species. The ESA defines "conserve" and "conservation"—terms found throughout the Act—to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." 16 U.S.C. § 1532(3). As the Supreme Court has stated, "[t]he plain intent of Congress in enacting this statute was to halt *and reverse* the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978) (emphasis added).

24.     To receive the full protections of the ESA, a species must first be listed by the Secretary of the Interior as "endangered" or "threatened" pursuant to ESA section 4. *Id.* § 1533. The ESA defines an "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

25.     Once a species is listed, an array of statutory protections applies. For example, section 7 of the ESA directs federal agency actions to conserve endangered and threatened species. Section 7(a)(1) requires all federal agencies to "utilize their authorities in furtherance of the purposes of [the ESA] by carrying out programs for the conservation of endangered and threatened species[.]" *Id.* § 1536(a)(1). Section 7(a)(2) imposes a further obligation on federal

agencies to consult with the expert fish and wildlife agency to ensure that any action authorized,

funded, or carried out by such agency is not likely to "jeopardize the continued existence" of any

listed species or "result in the destruction or adverse modification" of its "critical habitat." *Id*. §

1536(a)(2). Jeopardy results where an action would reasonably be expected, either directly or

indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed

species in the wild by impacting the reproduction, numbers, or distribution of that species. 50

C.F.R. § 402.02.

26.    Section 9 and its regulations further prohibit, among other things, "any person"

from intentionally "taking" listed species, or "incidentally" taking listed species, without a

permit from the Service. *See id*. §§ 1538-1539. Taking is defined broadly under the ESA to

include harming, harassing, or killing a protected species either directly or by degrading its

habitat sufficiently to significantly impair essential behavioral patterns. 16 U.S.C. § 1532(19); 50

C.F.R. § 17.3.

27.    The Service must also "develop and implement" recovery plans for listed species

"unless [the agency] finds that such a plan will not promote the conservation of the species." *Id*.

§ 1533(f)(1).

28.    In sum, while the ESA imposes numerous provisions to safeguard the survival of

listed species, its overriding goal of conserving such species "is a much broader concept than

mere survival. The ESA's definition of 'conservation' speaks to the recovery of a threatened or

endangered species." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059,

1070 (9th Cir. 2004) (quotations and citation omitted).

29.    Section 10(a)(1)(A) of the ESA, 16 U.S.C. § 1539(a)(1)(A), authorizes

the  Secretary of Interior to permit, "under such terms and conditions as he shall

prescribe," "any act otherwise prohibited by [section 9 (i.e., a taking)] . . . for scientific purposes or to enhance the propagation or survival of the affected species, including, but not limited to, acts necessary for the establishment and maintenance of experimental populations pursuant to subsection (j) of this section . . . ." *See also* 50 C.F.R. § 17.81(b). Section 10 also authorizes the Secretary to release a population of a threatened or endangered species into the wild as an "experimental population." 16 U.S.C. § 1539(j). Pursuant to section 10(j), before authorizing the release of an experimental population, the Service must determine that the release of such a population will further the conservation of that species. *Id*. § 1539(j)(2)(A). The Service must also identify the population and determine, on the basis of the best information available, whether the population "is essential to the continued existence" of the species. *Id*. § 1539(j)(2)(B). An "essential experimental population" is one "whose loss would be likely to appreciably reduce the likelihood of the survival of the species in the wild." 50 C.F.R. § 17.80(b). "All other experimental populations are to be classified as nonessential." *Id*. The regulation must provide the "supporting factual basis" for the finding. *Id*. § 17.81(c)(2).

30.     An experimental population deemed "essential" is generally entitled to the full array of the ESA's substantive protections, but a nonessential experimental population is not. 16 U.S.C. § 1539(j)(2)(C). The Service often relies on its section 10(j) authority to designate a species as "nonessential experimental"—as it did in this case—to avoid the ESA's strict protective provisions in an effort to gain support from those who would otherwise oppose the species' reintroduction. *See e.g.*, 49 Fed. Reg. 33,885, 33,888 (August 27, 1984) (preamble to rulemaking for 50 C.F.R. Part 17) (explaining that section10(j) rules facilitate reintroduction "in those instances where the involved parties are reluctant to accept the reintroduction of an

endangered or threatened species without the opportunity to exercise greater management flexibility on the introduced population.").

31.     Essential experimental populations, as well as nonessential experimental populations within the National Wildlife Refuge System or National Parks System, are treated as a threatened species, regardless of whether the species itself is listed as threatened or endangered. 16 U.S.C. § 1539(j)(2)(C). Nonessential experimental populations outside of the National Wildlife Refuge System or National Parks System, however, are treated "as a species proposed to be listed." *Id.* § 1539(j)(2)(C)(i). Consequently, these nonessential populations are exempt from the ESA's § 7(a)(2) consultation requirements. In addition, the Service cannot designate critical habitat for any nonessential populations. *Id.* § 1539(j)(2)(C)(ii).

32.     Though the provision relaxes protections for reintroduced populations, § 10(j) reintroductions must "further the conservation"—*i.e.*, *recovery*—"of such species." *Id.* § 1539(j)(2)(A). To determine whether a § 10(j) rule will further conservation, the Service must "utilize the best scientific and commercial data available" to consider:

(1)   Any possible adverse effects on extant populations of a species as a result of removal of individuals, eggs, or propagules for introduction elsewhere;
(2)   The likelihood that any such experimental population will become established and survive in the foreseeable future;
(3)   The relative effects that establishment of an experimental population will have on the recovery of the species; and
(4)   The extent to which the introduced population may be affected by existing or anticipated Federal or State actions or private activities within or adjacent to the experimental population area.

50 C.F.R. § 17.81(b).  In sum, the ultimate legal litmus test for any ESA section 10(j) regulation is whether it provides for and facilitates the recovery of the affected species.

//

II. **The National Environmental Policy Act**

35.     The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA has two primary objectives: (1) to foster informed decisionmaking by requiring agencies to consider the environmental impacts of their proposed actions, and (2) to ensure that agencies inform the public that they have considered environmental concerns in their decisionmaking. *See id. §* 1500.1(c).[1]

36.     To accomplish these purposes, NEPA requires that all federal agencies prepare a "detailed statement" regarding all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement, known as an environmental impact statement ("EIS"), must, among other things, rigorously explore and objectively evaluate all reasonable alternatives, analyze all direct, indirect, and cumulative environmental impacts, and include a discussion of the means to mitigate adverse environmental impacts. 40 C.F.R. §§ 1502.14, 1502.16.

37.     An agency may also prepare an environmental assessment ("EA") to determine whether an EIS is necessary. *Id.* §§ 1501.3, 1508.9. An EA must include a discussion of alternatives and the environmental impacts of the action. *Id.* § 1508.9.

38.     An agency may avoid preparing an EIS only if it: (1) prepares an EA identifying and analyzing the action's environmental effects; and (2) makes a finding of no significant impact, which presents the agency's reasons for concluding that the action's environmental effects are not significant. *Id.* §§ 1501.4(b), (e); 1508.9; 1508.13.

---

[1] On September 14, 2020, the Council on Environmental Quality's revised NEPA regulations went into effect. See generally 85 Fed. Reg. 43,304 (July 16, 2020). However, the NEPA process here occurred in 2015 and is subject to the NEPA regulations in effect at that time.

39.     Regardless of whether an agency provides an EA or EIS, NEPA's implementing regulations require each federal agency to disclose and analyze the environmental effects of its proposed actions "before decisions are made and before actions are taken." *Id.* § 1500.1(b). "The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.*

## III. The Administrative Procedure Act

40.     The APA confers a right of judicial review on any person adversely affected by final agency action, and provides for a waiver of the federal government's sovereign immunity. 5 U.S.C. §§ 701–706.

41.      Upon review of agency action, the court shall "hold unlawful and set aside actions . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Id.* § 706(2). An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Further, "the agency must . . . articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (quotations and citations omitted).

## FACTUAL ALLEGATIONS

## I.     The Black-Footed Ferret

42.     The black-footed ferret, a slender-bodied, short-legged mustelid, is an "extreme specialist" that depends almost exclusively on prairie dogs for food and prairie dog burrows for

shelter. Solitary and nocturnal, they spend most of their lives below ground in burrows, generally appearing aboveground only at night.



Credit: J. Michael Lockhart/USFWS

43.     Black-footed ferrets once occupied a vast range throughout North America. Their habitat corresponds to that of the black-tailed prairie dog, Gunnison's prairie dog, and white-tailed prairie dog, whose collective range historically spanned over 562 million acres of intermountain and prairie grasslands from Canada to Mexico. Scientists conservatively estimate that prairie dogs occupied at least 100 million acres of these grasslands in the United States, correlating to a minimum population of 500,000 to 1 million ferrets.

44.     But prairie dog populations have declined drastically due to habitat loss, eradication efforts, and disease. Beginning in the late 1800s, much of the prairie dog's native grassland converted to cropland. By the early 1900s, prairie dogs were (and still are) commonly poisoned to reduce competition with livestock for forage. And epizootic outbreaks of sylvatic plague, a flea-borne illness introduced in the 1930s (and that also infects black-footed ferrets), killed prairie dogs in huge numbers. A 2006 survey found that black-tailed prairie dogs occupied

as little as 1.4% of their historic range in Wyoming, and more recent studies show continuing population declines.

45.     The decline in prairie dogs had dire consequences for the ferret. By 1964, only one known population of ferrets—located in Mellette County, South Dakota—remained. In 1979, after the last captive ferret taken from the Mellette population died, the species was presumed extinct.

46.     That changed in 1981, when a dog killed a black-footed ferret on a ranch near Meeteetse, Wyoming. Biologists surveyed the area and found 130 ferrets nearby, but disease soon killed most of these individuals too. Between 1985 and 1987, the last eighteen surviving Meeteetse ferrets were captured and used to start a captive breeding program. Every known living black-footed ferret descends from these eighteen animals.

## II.     Conservation History of the Black-Footed Ferret

47.     The black-footed ferret was first listed as an endangered species in 1967 under the Endangered Species Preservation Act of 1966. The ferret was listed again in 1970 under the Endangered Species Conservation Act of 1969, then received legacy listing under the Endangered Species Act of 1973.

48.     In 1982, Congress amended the ESA to add § 10(j), which allows the U.S. Fish and Wildlife Service to designate reintroduced populations of listed species as "experimental populations." Reintroductions under § 10(j)—and under § 10(a)(1)(A), which permits reintroductions to "enhance the propagation or survival" of listed species—have since served as the foundation for ferret recovery nationwide.

49.     The Service first drafted a recovery plan for the black-footed ferret in 1978 (when the species was believed to be extinct in the wild), then revised the plan in 1988 after the

Meeteetse rediscovery and start of a captive breeding program. The Service revised the recovery plan again in 2013, and the 2013 plan (hereinafter, the "2013 Recovery Plan") currently guides ferret recovery.

50.     The 2013 Recovery Plan catalogs the threats that continue to hinder black-footed ferret recovery. Principal among them is the lack of sufficiently-sized and properly-managed prairie dog colonies: "most prairie dog populations are no longer large and stable enough (due to plague, poisoning, recreational shooting, and the lack of proactive management) to support recovery of the ferret, and the existing regulatory mechanisms are inadequate to support the large prairie dog populations that ferrets require." In the Plan, the Service lists the inadequacy of prairie dog management as a high magnitude, imminent threat to the ferret, stating that "[w]ithout large, stable prairie dog complexes, ferret recovery in the wild cannot be achieved."

51.     The 2013 Recovery Plan also recognizes the risks posed by the species' extreme genetic bottleneck. The current captive breeding program began with the last eighteen ferrets from Meeteetse, the genetic equivalent of just seven animals. This type of bottleneck can cause both inbreeding depression and genetic drift.[2] Moreover, captive breeding, while necessary, can reduce reproductive fitness and cause physical and behavioral abnormalities, maladaptation to the captive environment, and loss of natural selection. To mitigate these genetic risks, ferrets must be introduced into the wild. The Service recognized in the 2013 Recovery Plan that "[t]imely establishment of wild black-footed ferret populations is critical to minimize deleterious effects resulting from too many generations of captive breeding."

---

[2] The Recovery Plan describes "inbreeding depression" as "caused by increased genetic homozygosity (uniformity) and the subsequent expression of deleterious genes," and "genetic drift" as "the random loss of genetic diversity in small populations."

52.     As the 2013 Recovery Plan makes clear, recovery of the black-footed ferret depends on successful reintroductions. To downlist the species from endangered to threatened, the Service would need to "establish free-ranging black-footed ferrets totaling at least 1,500 breeding adults, in 10 or more populations, in at least 6 of 12 States within the historical range of the species, with no fewer than 30 breeding adults in any population, and at least 3 populations within colonies of Gunnison's and white-tailed prairie dogs." Delisting the species would require the Service to "[e]stablish free-ranging black-footed ferrets totaling at least 3,000 breeding adults, in 30 or more populations, with at least one population in each of at least 9 of 12 States within the historical range of the species, with no fewer than 30 breeding adults in any population, and at least 10 populations with 100 or more breeding adults, and at least 5 populations within colonies of Gunnison's or white-tailed prairie dogs."

53.     Black-footed ferret reintroductions began in 1991, at Shirley Basin, Wyoming, and have since expanded to twenty-nine reintroduction sites in the United States, Canada, and Mexico. But, as of 2018, only 14 reintroduction sites remained active, and the ferret population remains far below the number necessary for down- and delisting. Moreover, despite new reintroduction sites, ferret populations have been in marked decline since the late 2000s. Apart from the approximately 280 ferrets in captivity, less than 400 are estimated to exist in the wild. This divergence between increased reintroduction sites and decreased ferrets is a result of sylvatic plague epizootics, but also because more recent reintroduction sites lack sufficient size to host resilient, persistent ferret populations.



Black-footed ferret population levels and reintroduction site recruitment trends, 1992-2018.
Figure source: *Species Status Assessment Report for the Black-footed Ferret* (Dec. 12, 2019),
U.S. Fish and Wildlife Service.

### III.    Black-Footed Ferret Conservation in Wyoming

54.    In the 2013 Recovery Plan, the Service provides state-specific recovery criteria,

recognizing "[p]articipation by all States within the historical range of the black-footed ferret is

important to maximize the redundancy, representation, and resilience of the ferret and result in

equitable recovery goals for all States." Wyoming carries special importance: "[e]stablishment of

black-footed ferret populations in Wyoming, which ranks third for the amount of potential

habitat of the 12 states in the species' historical range, is especially crucial to recovery." To

contribute its share for downlisting, Wyoming would need to host approximately 171 breeding

adult ferrets and maintain 35,000 acres of prairie dog occupied habitat; for delisting, the state

needs to host 341 breeding adults and maintain 70,000 acres of habitat.

55.    Though the first black-footed reintroduction took place in Wyoming in 1991, the

state has not come close to meeting recovery goals. A main hurdle has been a lack of willingness

17

by private and other non-federal landowners to host reintroductions—unwillingness driven by both liability concerns and negative attitudes toward prairie dogs.

56.     To address these landowner concerns, the Service in 2013 completed a Programmatic Safe Harbor Agreement that exempts landowners willing to host ferret reintroductions, as well as their neighbors, from ESA liability. The Agreement applies to all non-federal lands (*i.e.*, state, private, and tribal lands) in Wyoming, and shields enrolled and adjacent landowners from ESA section 9 liability for take if incidental to lawful activities such as farming and ranching.

57.     Despite the Safe Harbor Agreement, the State of Wyoming demanded that the Service lift *all* ESA protections for the ferret in the state. In November 2013, the Wyoming Game and Fish Department ("WGFD") entered into a memorandum of understanding with the Service (hereinafter, the "2013 MOU") that called on the Service to promulgate a § 10(j) rule designating the state as a nonessential experimental population area.

58.     The 2013 MOU also assigned roles and responsibilities to the parties: the Service would lead development of a § 10(j) rule, but would relinquish the responsibility of ferret recovery to WGFD (*i.e.*, WGFD would "serve as the lead agency for ferret recovery actions in the State of Wyoming"). Further, in the MOU the Service agreed "that future reintroductions of the ferret will be based on mutually affirmed prioritization of prospective reintroduction sites"— a promise to WGFD that it could veto reintroductions even on federal public lands, which comprise 48% of Wyoming and provide much of the State's best-preserved grasslands habitat.

59.     Subsequently, the State of Wyoming, at the instruction of the Governor's Office, refused to support any efforts to recover ferrets until the Service designated the *entire* state— both federal and non-federal lands—as a nonessential, experimental population area under §

18

10(j). For instance, as recounted in an email from Tyler Abbott, the Service's Wyoming Field

Office Supervisor, the State refused to allow the Service to use a black-footed ferret conditioning

pen on Warren Air Force Base in southeast Wyoming—used to acclimate captive-bred ferrets

before release into the wild—until the Service promulgated a statewide § 10(j) rule.



60.     The State also refused to allocate Natural Resources Conservation Service funds

for landowner incentives or other ferret recovery efforts until the Service finalized a § 10(j) rule.

| | |
|---|---|
| From: | Jensen, Brian M. - NRCS, Casper, WY |
| To: | Mccreedy, Clark D |
| Cc: | Sheley, Casey - NRCS, Casper, WY |
| Subject: | RE: BFF Incentives program |
| Date: | Thursday, January 22, 2015 1:51:52 PM |
| Importance: | High |

Clark,

WY NRCS has yet to receive our state allocation for this year, so we are largely unsure of funding for any of our programs at this time, despite us currently taking applications. That being said, there has been no mention of a national BFF initiative for this year (last I heard there were not going to be any new species initiatives nation-wide this year), which would leave any potential program to the states to develop and implement. Our state funding sub-accounts are established with the recommendation of the state technical committee and have been locked for this year and do not include funding for BFF. That committee has been unwilling to consider any sort of BFF funding until the 10j is complete. So, the short answer is, I wouldn't look for any program in WY this year. But who knows what 2016 will bring...

Brian

Brian M. Jensen
State Wildlife Biologist
USDA-NRCS
PO Box 33124
Casper, WY 82602
307-233-6740

**From:** Mccreedy, Clark [mailto:clark_mccreedy@fws.gov]
**Sent:** Thursday, January 22, 2015 6:58 AM
**To:** Jensen, Brian M. - NRCS, Casper, WY
**Subject:** BFF Incentives program

Brian,

Any discussion yet in Wyoming about offering incentives to landowners that participate in ferret reintroduction?

Clark

**************************************************

**Clark McCreedy**
**Partnership Coordinator**
**USFWS - Wyoming Ecological Services**
**5353 Yellowstone Road, 308 A**
**Cheyenne, WY 82009**
**Office: 307-772-2374 ext. 227**
**Cell: 307-631-5920**

61.     Additionally, as conveyed in an email from Zack Walker, the Department's nongame supervisor in charge of black-footed ferret recovery, the State refused to allow any ferret reintroductions until the finalization of a statewide § 10(j) rule, despite the fact that the 2013 Safe Harbor Agreement then in effect provided the same regulatory assurances to private and other non-federal landowners.

> **From:** Zack Walker
> **To:** Randy schein
> **Cc:** Gemio, Lynn; Nichole Cudworth
> **Subject:** Re: Black Footed Ferret
> **Date:** Tuesday, April 14, 2015 4:28:52 PM
>
> Randy,
> Thank you for the email and suggestion of releasing ferrets at Camp Guernsey. Until the
> proposed black-footed ferret 10(j) is finalized we are holding off on moving forward with
> planning any additional ferret releases. We are hoping that this fall after the ruling is complete
> (assuming it is passed) we will start examining areas to determine feasibility of ferret
> introductions. I will make sure to add Camp Guernsey to the list of areas that are considered.
> We do have a number of signs similar to your suggestion that have been made for the Shirley
> Basin ferret population. These might have also been used for the last known native population
> near Meeteetse. We definitely want to ensure that the public know ferrets could be in the area,
> as each one is extremely valuable to the population.
> We may be looking for volunteers to help perform ferret surveys this fall in Shirley Basin. If
> we end up needing an extra hand, I will make sure to let you know.
>
> Zack

62.     As the Service developed the statewide § 10(j) rule, agency staff understood it
would delegate lead responsibility to the WGFD and questioned the consequences. Pete Gober,
the Service's Black-footed Ferret Recovery Coordinator, raised questions internally about "what
is gained via deference to the State versus what could be lost viz a viz foregoing potential
Sec[tion] 7 options in the future . . . for example (with some historical precedent) a future
statewide [prairie dog] eradication program on Federal lands or a new toxicant registrant process
like Rozol."

> **From:** Gober, Pete
> **To:** Michael Thabault
> **Subject:** Fwd: ferret 10j
> **Date:** Monday, January 12, 2015 4:35:02 PM
>
> Mike:
>
> This is what I mentioned this weekend regarding some of the WY 10j traffic between WY ES
> and the RO. I think Bridget is looking for good answers to potential questions from the enviro
> community regarding what is gained for recovery via deference to the State versus what could
> be lost viz a viz foregoing any potential Sec 7 options in the future...for example (with some
> historical precedent) a future statewide pdog eradication program on Federal lands or a new
> toxicant registrant process like Rozol. Tyler has suggested verbiage that highlights WGF
> recovery contributions...credit certainly granted...but on the other hand there has only been one
> reintro there in 24 years...so it could be helpful for WGF to have a BFF management plan or
> indicate via letter what they hope to do once a statewide 10 j might be in place (what we heard
> verbally in general). It would be better if we had this before we receive any related concerns
> in comments as it could help us in responding to them. I have mentioned this idea to only to
> Scott T., John E, and you...it may be worthwhile or not...and maybe its best to be minimalist in
> the 10j approach vs expansive as far as soliciting comments...putting everything on the table
> may serve FWS the best...or not...but it may become more of an issue if other states follow
> this path...as AZ has already inquired. Like you, I'm OK with the effort...but we need good
> answers now to the questions we anticipate later.
>
> Pete

Likewise, in comments on a January 13, 2015 draft Informational Memorandum being prepared

as part of the rulemaking package, staff at the National Black-Footed Ferret Conservation Center

("NBFFCC"), asked: "It is assumed that complete deference to Wyoming will result in additional

reintroductions there. Is it wise to forego our Sec[tion] 7 options statewide given their track

record? Should we request a BFF management plan from [WGFD] prior to finalizing the 10(j)?"



63.    The Service, however, hid these concerns from the public. An internal draft of the

§ 10(j) rule included a request for public comments on the delegation of authority for ferret

recovery to the State, as well as the consequences of promulgating a special statewide rule, and

doing so without consideration of any specific release sites.



The Service's Regional Office and Solicitor's Office deleted these queries from the proposed

rule, evidently "in hopes they would not be major concerns."

> --------- Forwarded message ---------
> From: Gober, Pete <pete_gober@fws.gov>
> Date: Mon, Jan 5, 2015 at 11:13 AM
> Subject: Re: ferret 10j
> To: "Fahey, Bridget" <bridget_fahey@fws.gov>
> Cc: Julie Lyke <julie_lyke@fws.gov>
>
> Bridget
>
> I'll ask Julie and John to review and provide comments.
>
> In the past, Mike has expressed concern about the relatively recent WY ES and WGF MOU
> that gave the State the lead on all ferret issues.  As you know, the State will probably emphasis
> the 10j approach and white tail pdog range because of tradition and less inherent ag conflicts
> vs btpd range.  Thus, btpd range and the SHA approach may be set aside by the State.  We
> provided some suggestions for public input on these issues, but they were deleted by the RO,
> SOL, and/or others.  Our feeling was that since the wildlife ngos were likely to address these
> issues anyway, it would be appropriate to be up front about them in light of the past APA
> petition and our responses to it. However, I suppose it was decided to not bring these issues up
> in hopes they would not be major concerns.  We have been told that DOW and others will
> comment nevertheless.
>
> Pete

64.     The Service also hid the true reason for promulgating the rule: the State's

unbending demand that the Service provide it with a special blanket ESA exemption for the

black-footed ferret statewide and control over reintroductions, rather than ferret conservation.

Agency staff manufactured a different rationale—"checkerboard [land] ownership patterns"—in

the Informational Memorandum submitted to Service leadership as part of the approval process

for the § 10(j) rule.



65.     On April 10, 2015, the Service published its proposed § 10(j) rule for the ferret,

designating a "Wyoming Experimental Population Area." Establishment of a Nonessential

Experimental Population of Black-Footed Ferrets in Wyoming, 80 Fed. Reg. 19,263, 19,274

(April 10, 2015). The rule did not contemplate specific reintroductions. Rather, it classified any

prospective "reestablished population" in the state as "nonessential experimental" to "provide

relaxed management rules to *facilitate* [unspecified, future] reintroductions." *Id.* at 19,263

(emphasis added). And instead of committing to undertake any specific reintroductions, the

Service delegated "primary management responsibilities for ferret reintroductions" to WGFD. *Id.*

at 19,268.

66.     On October 30, 2015, the Service issued the final Wyoming § 10(j) rule, which

designated every to-be-reintroduced ferret population in the state as a nonessential experimental

population and concurrently delegated all authority for conducting reintroductions, and

managing reintroduced populations, to WGFD. Establishment of a Nonessential Experimental

Population of Black-footed Ferrets in Wyoming, 80 Fed. Reg. 66,821, 66,826 (codified in part at

50 C.F.R. § 17.84(g)) (Oct. 30, 2015).

67.     In effect, the final rule delists the species within the State's borders irrespective of reintroductions; by prospectively designating any yet-to-be-reintroduced ferret as nonessential, the rule strips away protections otherwise afforded by the ESA, including section 7(a)(2) consultation requirements, section 9 prohibitions against unlawful take, and possible critical habitat designations. Instead, the rule authorizes incidental take of the species writ-large in the state (even to "baseline" levels, meaning complete removal), eliminating a key protection against direct and indirect mortality.

68.     The final rule amounts to an unequal bargain with the State of Wyoming. Despite ceding recovery authority to the State and effectively delisting the species in the name of "regulatory relief," the final rule contains no assurance that reintroductions will actually occur anywhere in Wyoming.

69.     At the same time the Service published the final statewide § 10(j) rule, it released its final EA and FONSI prepared under NEPA. The EA and FONSI assumed without question that no ferret populations in the state ever could be essential to the recovery of the species. The documents also ignored key aspects of the rule, including the Service's abdication of its recovery duty to the State, the lack of any assurances that reintroductions would in fact occur, and the consequences of the broad nonessential designation going forward—most notably the consequences of removing ESA section 7 consultation requirements statewide.

70.     Since the Service promulgated the Wyoming § 10(j) rule, recovery in Wyoming has in fact stalled. WGFD conducted an initial reintroduction of ferrets near Meeteetse in 2016 and continues to release captive ferrets solely at this one site. But Wyoming is still far short of its downlisting target and no reintroductions have occurred at any new sites in the state.

71.     The final § 10(j) rule has actually impeded reintroductions on federal lands—specifically, the Thunder Basin National Grassland, widely considered the best potential ferret reintroduction site in the State of Wyoming, if not all of North America. In November 2016, the Governor of Wyoming, WGFD, Wyoming Office of State Lands and Investments, and Wyoming Department of Agriculture sent letters informing the U.S. Forest Service that the State did not support ferret reintroduction in Thunder Basin National Grassland. Wyo. Game and Fish Dept., Thunder Basin and Black-Footed Ferrets Talking Points (Aug. 14, 2018).[3]

72.     Just over a year later, in December 2017, the Fish and Wildlife Service and Forest Service announced an agreement with WGFD that "the reintroduction of black-footed ferrets on the Grassland is not appropriate at this time." *Id.* (*citing* U.S. Forest Serv., U.S. Fish and Wildlife Serv., and Wyo. Game and Fish Dept., Interagency Statement (Dec. 4, 2017)).

73.     In 2020, the Forest Service amended Thunder Basin National Grassland's management plan to eliminate the Black-Footed Ferret Reintroduction Habitat Management Area, shrink objectives for prairie dog colony acreage below the minimum threshold necessary for self-sustaining ferret populations, and allow for the lethal management of prairie dogs through use of poisoning and shooting in active colonies. U.S. Forest Serv. 2020. Thunder Basin National Grassland 2020 Plan Amendment Record of Decision.[4]

**FIRST CLAIM FOR RELIEF**
**Violations of the Endangered Species Act and Administrative Procedure Act**

**COUNT ONE**
**Improper Designation of a Statewide Nonessential Experimental Population Area**

---

[3] Available at: https://wyoleg.gov/InterimCommittee/2018/SFR-20180829ThunderBasinFerretTalkingPoints_Aug2018.pdf. (last visited Oct. 27, 2021).
[4] Available at: https://www.fs.usda.gov/nfs/11558/www/nepa/110862_FSPLT3_5538534.pdf. (last visited Oct. 27, 2021).

74.     Plaintiffs incorporate by reference all preceding paragraphs.

75.     Pursuant to § 10(j) of the ESA, 16 U.S.C. § 1539(j), and the Service's implementing regulations, the Service may authorize the release of any population of an endangered or threatened species outside the current range of such species. Before doing so, the Service must determine by regulation: (1) that such release will further the conservation of such species, and (2) whether or not such population is essential to the continued existence of the species in the wild. 16 U.S.C. § 1539(j)(2)(A), 1539(j)(2)(B); 50 C.F.R. § 1781(c)(2).

76.     The Service acted arbitrarily and capriciously by designating the entire State of Wyoming a nonessential experimental population area in multiple respects. For one, section 10(j) does not authorize the Service to prospectively designate "nonessential experimental population areas" separate from any identified population to-be-released. The text of section 10(j) and its implementing regulations contain no authority for such hypothetical designations. And without any particular release to consider, the Service cannot make the requisite findings that "such release" will further the conservation of the species, or is essential or nonessential to the continued existence of the species in the wild. Relatedly, this impermissibly broad application of section 10(j) authority resulted in a final § 10(j) rule that lacks a rational basis for encompassing all federal public lands, when the impetus for the rule was to promote reintroductions on private and other non-federal lands. Further, the Service's statewide designation is the product of political demands for maximum regulatory "flexibility" rather than ferret conservation reflective of the species' biological needs for recovery.

77.     The Service's designation of a blanket statewide § 10(j) rule untethered to any particular release population for the State of Wyoming violates § 10 of the ESA, 16 U.S.C. §

1539, its implementing regulations, 50 C.F.R. § 17.81, and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).

## COUNT TWO
### Failure to Use the Best Available Science and Information in Designating all Prospective Black-footed Ferret Reintroductions in Wyoming as Nonessential

78.     Plaintiffs incorporate by reference all preceding paragraphs.

79.     Pursuant to the Endangered Species Act, the Service's implementing regulations, and Service policy, the Service must utilize the best available science and information in promulgating section 10(j) regulations, determining whether an experimental population is essential to the continued existence of the species in the wild, and in otherwise implementing the requirements of the Act. 16 U.S.C. § 1536(a)(2); 16 U.S.C. § 1539(j)(2)(B); 50 C.F.R. § 17.81(c)(2); 50 C.F.R. § 402.14(d).

80.     By designating all hypothetical future ferret populations to be reintroduced in the State of Wyoming as "nonessential" the Service failed to use the best scientific and commercial data available in several respects, including, but not limited to: failing to identify and evaluate any particular proposed reintroduction in connection with its "nonessential" determination despite acknowledging that expeditious reintroductions are vital to the species' persistence; failing to consider whether any future reintroduced populations in Wyoming could be essential to the survival of the species in the wild; using "regulatory flexibility" rather than the species' biological needs for recovery as a basis for the rulemaking; failing to consider data supporting the importance of wild populations to the species' survival; ignoring the operative recovery plan for black-footed ferrets, including the identified threats to the species and recovery guidelines; and ignoring clearly-expressed antipathy towards prairie dog management and ferret reintroductions by the State of Wyoming.

28

81.     The Service's statewide "nonessential" designation for Wyoming violates § 10 of the ESA, 16 U.S.C. § 1539, its implementing regulations, 50 C.F.R. § 17.81, and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and/or constitutes "agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1).

82.     The Service's associated 2015 BiOp that was intended to evaluate the impact of the Wyoming § 10(j) rule on the ferret's survival and recovery—*i.e.*, the Rule's designation of the entire state as a "nonessential experimental population area" and the Service's abdication of authority over all prospective reintroductions to the state wildlife agency—is also not based on the best available information and science because its "no jeopardy" determination relies on the legally insufficient statewide nonessential population designation. The 2015 BiOp is additionally flawed for: (1) failing to evaluate the effects on the species of the Rule's failure to consider any potential reintroductions sites and timelines for reestablishing additional wild ferret populations in the State; (2) relying on speculative outcomes rooted in unenforceable measures to reduce the incidence of the sylvatic plague and the grave threat it poses to black-footed ferrets and their habitat, *i.e.*, stable prairie dog complexes; and (3) failing to evaluate the effects of prairie dog poisoning on the sufficiency of habitats to support black-footed ferrets. As a result, the 2015 BiOp fails to ensure the final Wyoming § 10(j) rule will not reduce appreciably the likelihood of the survival and recovery of black-footed ferrets, *i.e.*, not jeopardize the species, and thus violates section 7 of the ESA, 16 U.S.C. § 1536(a)(2) and (b)(3)(A), and its implementing regulations, 50 C.F.R. §§ 402.02, 402.14, and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and/or constitutes "agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1).

### COUNT THREE
### Failure to Provide for the Conservation of the Species

83.     Plaintiffs incorporate by reference all preceding paragraphs.

84.     Pursuant to the ESA, regulations related to an experimental population must provide for the conservation of the species. 16 U.S.C. §§ 1539(a)(1)(A), (d), (j)(2)(C); 50 C.F.R. § 17.81. To provide for the conservation of the species means to take measures that lead to the recovery of the species such that ESA protections are no longer required. 16 U.S.C. § 1532(3).

85.     Additionally, the Service must utilize the programs it administers in furtherance of the purposes of the ESA, central among them the conservation of threatened and endangered species. 16 U.S.C. §§ 1536(a)(1), 1531(b).

86.     The Service's final Wyoming § 10(j) rule does not provide for the conservation of the black-footed ferret in several respects, including, but not limited to: designating the State of Wyoming as a nonessential experimental population area without identifying any proposed reintroductions; delineating the entire state as a nonessential experimental population, including federally-managed lands; eliminating protections otherwise afforded to the ferret under the ESA, including under sections 4, 7, and 9; allowing reintroduced ferret populations to be "returned to baseline" (*i.e.*, intentionally taken to the point where ferrets no longer exist in the wild); lacking commitments or timeframes for reintroductions; lacking a process for periodic review and evaluation of the success or failures of releases and their effects on ferret recovery; failing to consider the best available scientific and commercial data and information available; and improperly abdicating and subdelegating the duty to recover ferrets to the State of Wyoming and WGFD.

87.     The Service's failure and/or refusal to provide for the conservation of the black-footed ferret violates § 10 of the ESA,  16 U.S.C. § 1539, § 7 of the ESA, 16 U.S.C. § 1536, the

ESA's implementing regulations, 50 C.F.R. § 17.81, and is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and/or constitutes "agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1).

### SECOND CLAIM FOR RELIEF
**Violations of the Endangered Species Act and Administrative Procedure Act**
**Improper Subdelegation of Statutory Authority**

88.     Plaintiffs incorporate by reference all preceding paragraphs.

89.     When Congress passed and amended the ESA, it delegated authority to the Secretary of the Interior to administer the Act's provisions, including section 10(j), in furtherance of species recovery.

90.     While the Secretary can delegate that duty to the Service, the Service cannot subdelegate the duty to a nonfederal entity unless Congress affirmatively provides authority to do so. *U.S. Telecom Ass'n v. F.C.C.*, 359 F.3d 554, 565–66 (D.C. Cir. 2004). Moreover, the Service cannot subdelegate its authority when doing so would frustrate the purpose of the ESA.

91.     The Service's final statewide Wyoming § 10(j) rule impermissibly subdelegates authority to the State of Wyoming and WGFD to lead ferret recovery and reintroductions in the State. The ESA provides no authority for the Service to make such a subdelegation. The Service's subdelegation of authority also frustrates the purposes of the ESA, including the purpose of recovering the black-footed ferrets in the wild, by granting the State control over ferret reintroductions statewide including on federal lands, and the ability to veto ferret reintroductions. While section 6 the ESA, 16 U.S.C. § 1535, and its implementing regulations, 50 C.F.R. § 81.2, provides the mechanism for state participation through management agreements and/or cooperative agreements, no such valid agreements exist here, nor would such

agreements allow the Service to cede management authority over the recovery of a federally

listed species to a State and its agencies.

92.     By subdelegating authority to the State, the Service acted *ultra vires*, "in excess of

statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), and the final statewide

Wyoming § 10(j) rule violates the ESA, and is "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).

**THIRD CLAIM FOR RELIEF**
**Violations of the National Environmental Policy Act and Administrative Procedure Act**

**COUNT ONE**
**Failure to Prepare an Environmental Impact Statement**

93.     Plaintiffs incorporate by reference all preceding paragraphs.

94.     Under NEPA, federal agencies must prepare an EIS for any federal action that

*may* have a significant environmental impact. 42 U.S.C. § 4332. In determining whether a

proposed action may "significantly" impact the environment, NEPA's implementing regulations

require federal agencies to consider both the "context" (*e.g.*, regional, locality) and the

"intensity" (*i.e.*, severity of the impact) of the action. 40 C.F.R. § 1508.27. NEPA's regulations

further provide a list of ten factors the agency should consider in determining the intensity of a

project, any one of which may be sufficient to require preparation of an EIS. *Id.*; *Standing Rock*

*Sioux Tribe, et. al. v. U.S. Army Corps of Engineers, et. al.*, 985 F.3d 1032, 1039 (D.C. Cir.

2021).

95.     The Service violated NEPA and its implementing regulations by relying on an EA

and FONSI for the final statewide Wyoming § 10(j) rule given the Rule's "context" and several

"significance" factors indicate the need for an EIS. For instance, the statewide Wyoming § 10(j)

rule poses major environmental consequences for both the overall recovery of this federally

32

listed species throughout its entire range and in the State of Wyoming. 40 C.F.R. § 1508.27(a); §

1508.27(b)(9). The EA/FONSI also ignore the context of the rulemaking—namely, the State of

Wyoming's antipathy towards prairie dogs and ferret reintroductions, and the consequences of

handing over recovery authority to a state hostile to the presence of prairie dogs and black-footed

ferrets within its borders. *Id.* § 1508.27(a). Further, the effects of this proposed statewide

Wyoming § 10(j) rule, which effectively delists one of the most endangered mammals in the

world but contains no requirements, timelines, or other assurances that reintroductions will

actually occur, are highly controversial and uncertain. *Id.* § 1508.27(b)(3), (4). And even though

agency staff understood that such an expansive, prospective § 10(j) rule was unprecedented and

could lead other states to ask for similar rules, the EA/FONSI fail to address "[t]he degree to

which the action may establish a precedent for future actions with significant effects or

represents a decision in principle about a future consideration." *Id.* § 1508.27(b)(6). The

EA/FONSI also fail to consider the precedential effect that a nonessential designation would

have on all future federal land management actions in the absence of any section 7 consultation

obligations. *Id.* Likewise, the EA/FONSI fail to address the unprecedented handover of recovery

responsibility to the State of Wyoming, and how that handover could affect the ability of federal

land management agencies to manage federal public lands for ferret reintroductions. *See id.* §

1508.27(b) ("Responsible officials must bear in mind that more than one agency may make

decisions about partial aspects of a major federal action.").

96.     By failing to prepare an EIS, the Service acted arbitrarily, capriciously, and in

violation of NEPA, its implementing regulations, and the APA, 5 U.S.C. § 706(2)(A).

## COUNT TWO
### Failure to Prepare an Adequate Environmental Assessment

97.     Plaintiffs incorporate by reference all preceding paragraphs.

102.    If an agency decides not to prepare an EIS, an EA must "provide sufficient

evidence and analysis" to support a FONSI. 40 C.F.R. § 1508.9(a)(1).

The EA must take a hard look at the direct, indirect, and cumulative impacts of a proposed action

to inform its decision about whether the agency must prepare an EIS because a proposed action

significantly impacts the environment. *Id.* §§ 1502.16(a)-(b), 1508.7, 1508.8.

103.    An EA must also discuss the need for the proposal, and "study, develop, and

describe appropriate alternatives to recommended courses of action" as required by 42 U.S.C. §

4332(2)(E). *See* 40 C.F.R. § 1508.9.

104.    The information used in the EA must be high quality and scientifically accurate.

40 C.F.R. § 1500.1(b).

105.    The final EA/FONSI for the statewide Wyoming § 10(j) rule are deficient in a

number of respects, including, but not limited to: failing to evaluate whether any reestablished

population of black-footed ferrets in Wyoming could be essential to the recovery of the species;

failing to consider an alternative whereby *any* future reintroduced population could be deemed

essential; failing to identify and discuss any potential reintroduction sites and evaluate a timeline

for reestablishing any wild ferret populations within Wyoming, despite acknowledging that

recent studies "identified several sites in Wyoming with potential for ferret reintroduction

including one site with potential for reintroduction within less than 3 years, 24 sites with

potential for reintroduction within 3–10 years, and two sites with long-term potential for

reintroduction"; failing to consider the consequences of relying on captive populations as the

sole "essential" population on ferret genetics and fitness; failing to consider the direct, indirect,

and cumulative effects of the Service's abdication of the duty to recover the ferret to the State of

Wyoming without commitments to conduct reintroductions; failing to adequately consider the

indirect and cumulative effects of the Service's nonessential designation, which eliminated ESA

section 7 consultation duties for federal actions and the Service's ability to designate critical

habitat for the species; failing to use high-quality scientific information to support its analysis;

and by otherwise failing to take a hard look at the effects of the statewide Wyoming § 10(j) rule

on the black-footed ferret's future persistence and recovery.

106.    By failing to prepare an adequate EA and take the requisite hard look at the

environmental consequences of its proposed action and other reasonable alternatives thereto, the

Service acted arbitrarily, capriciously, and in violation of NEPA, its implementing regulations,

and the APA, 5 U.S.C. § 706(2)(A).

## REQUEST FOR RELIEF

Plaintiffs respectfully request that the Court:

A.    Issue a declaratory judgment that the Service's final statewide Wyoming § 10(j)

rule and associated EA/FONSI, and 2015 BiOp violate the law as described in this complaint;

B.    Set aside and remand the Service's final statewide Wyoming § 10(j) rule and

associated EA/FONSI, and 2015 BiOp for further analysis and action consistent with the law and

this Court's memorandum opinion and order;

C.    Issue such injunctive relief as Plaintiffs may subsequently request;

D.    Retain continuing jurisdiction of this matter until the Service fully remedies the

violations of law described in this complaint;

E.    Award Plaintiffs their costs, attorneys' fees, and other expenses pursuant to the

Endangered Species Act, 16 U.S.C. § 1540(g), and/or the Equal Access to Justice Act, 28 U.S.C.

§ 2412;

F.    Grant Plaintiffs such other relief as the Court deems just and equitable.

Respectfully submitted this 28th day of October, 2021.

/s/ Jennifer Schwartz
Bar No. OR072978
Wildearth Guardians
P.O. Box 12086
Portland, OR 97213
Ph: (503) 780-8281
jschwartz@wildearthguardians.org

Attorney for Plaintiff WildEarth Guardians

/s/ Matthew Sandler
Matthew Sandler
Bar No. CO0105
Rocky Mountain Wild
1536 Wynkoop St. Suite 900
Denver, CO 80202
(303) 579-5162
Matt@rockymountainwild.org

Attorney for Plaintiff Rocky Mountain Wild

John Persell
Bar No. ID0002
Western Watersheds Project
P.O. Box 1770
Hailey, ID 83333
(503) 896-6472
jpersell@westernwatersheds.org

Attorney for Plaintiff Western Watersheds Project