**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WILDEARTH GUARDIANS, *et. al.*, | Case No: 1:21-cv-02864-RDM |
| Plaintiffs, | |
| vs. | <u>Next Scheduled Deadline</u>: |
| U.S. FISH AND WILDLIFE SERVICE, *et. al.*, | Federal-Defendants shall file their Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment on or before March 31, 2023 |
| Defendants, | |
| and | |
| STATE OF WYOMING, | |
| Intervenor-Defendant. | |

## <u>PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Fed. R. Civ. P. 56 and LCvR 7, Plaintiffs WildEarth Guardians, Western Watersheds Project, and Rocky Mountain Wild respectfully request that this Court grant summary judgment and relief in Plaintiffs' favor in the above-captioned action. Plaintiffs seek declaratory relief finding that the United States Fish and Wildlife Service's (the "Service") 2015 Rule establishing a statewide "Nonessential Experimental Population" of black-footed ferrets in Wyoming ("Wyoming 10(j) Rule") and associated Biological Opinion violate the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq*. and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*. Plaintiffs additionally seek declaratory relief finding that the Service's underlying Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") violate the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq*. and the APA, 5 U.S.C. § 701 *et seq*. Plaintiffs further request that the Court vacate and set aside the Service's Wyoming 10(j) Rule and associated EA/FONSI and Biological Opinion and remand

the matter to the agency for further analysis and action consistent with the law and this Court's Opinion and Order.

This motion is supported by the attached Memorandum of Points and Authorities, the Administrative Records certified by Federal-Defendants, Plaintiffs' Complaint (ECF No. 1) and such other and further matters as may be presented to the Court before the decision hereon. Plaintiffs' standing to pursue this action is set forth in Plaintiffs' Compl. ¶¶ 10-17 as well as in the attached declarations of Erik Molvar, Megan Mueller and Jeremy Nichols.

Dated: February 17, 2023          Respectfully submitted,

*/s/ Jennifer Schwartz*
Wildearth Guardians
P.O. Box 12086
Portland, OR 97213
Ph: (503) 780-8281
jschwartz@wildearthguardians.org

*/s/ Megan Backsen*
Western Watersheds Project
P.O. Box 6774
Reno NV 89513
Ph: (719) 207-2493
megan@westernwatersheds.org

*/s/ Matthew Sandler*
Rocky Mountain Wild
1536 Wynkoop St. Suite 900
Denver, CO 80202
Ph: (303) 579-5162
matt@rockymountainwild.org

*Attorneys for Plaintiffs*

**LIST OF ACRONYMS**

| | |
|---|---|
| Administrative Procedure Act | APA |
| Bureau of Land Management | BLM |
| Council on Environmental Quality | CEQ |
| Environmental Assessment | EA |
| Environmental Impact Statement | EIS |
| Endangered Species Act | ESA |
| Finding of No Significant Impact | FONSI |
| National Environmental Policy Act | NEPA |
| National Park Service | NPS |
| Nonessential Experimental Population | NEP |
| Safe Harbor Agreement | SHA |
| Wyoming Game and Fish Department | WGFD |

**Table of Contents**

Introduction……………………………………………………………………...…1

Background……………………………………………………………………..…1

I.      THE ENDANGERED BLACK-FOOTED FERRET………………………………..1

II.     CONSERVATION HISTORY OF THE BLACK-FOOTED FERRET………………..3

III.    ONGOING THREATS TO BLACK-FOOTED FERRET RECOVERY………………5

A.      Prairie Dog Management and Insufficient Habitat………………………………...5

B.      Disease Outbreaks……………………………………………………………7

C.      Genetic Imperilment…………………………………………………………7

IV.     BLACK-FOOTED FERRET CONSERVATION IN WYOMING………………………8

V.      THE CHALLENGED RULEMAKING……………………………………………9

STANDARD OF REVIEW……………………………………………………………14

ARGUMENT………………………………………………………………………15

I.      THE SERVICE VIOLATED THE ESA………………………………………………15

A.      The Service's Blanket "Nonessential" Determination for all of Wyoming, in the Absence of Any Actual, Proposed Ferret Releases is Arbitrary and Capricious……………………………16

1.      A 10(j) rule must apply to an actual, to-be-released experimental population and the "essentiality" determination requires consideration of site-specific and population-specific factors……………………………………………………………………………19

2.      The Service's essentiality determination was based on political expediency, not the best available science……………………………………………………………………21

3.      The Service arbitrarily relied on the captive black-footed ferret population as its basis for concluding that all experimental, wild populations are "nonessential"…………………………24

B. The Service Unlawfully Subdelegated its Statutory Authority to WGFD……………………28

C. The Wyoming 10(j) Rule Fails to Provide for the Conservation of Black-Footed Ferrets……31

D. The Service's No Jeopardy Finding is Arbitrary and Capricious…………………………….34

II.      THE SERVICE VIOLATED NEPA……………………………………………………..36

A.  The Service Failed to Prepare an Environmental Impact Statement…………………………36

B.  The Service's EA Failed to Take the Requisite "Hard Look" at the Rule's Likely Impacts on the Black-Footed Ferret and the Ferret's Recovery……………………………………………42

CONCLUSION…………………………………………………………………………………..45

# Table of Authorities

**Cases**

*Alaska v. Lubchenco*, 723 F.3d 1043 (9th Cir. 2013) …………………………………………36

*American Rivers v. FERC*, 895 F.3d 32 (D.C. Cir. 2018) …………………………………......38

*Anderson v. Evans*, 371 F.3d 475 (9th Cir. 2004) …………………………………………...41

*Assiniboine & Sioux Tribes v. Bd. of Oil and Gas*, 792 F. 2d 782 (9th Cir. 1986) ……………29

*Baltimore Gas & Elec. Co. v. Nat. Resources Def. Council*, 462 U.S 89 (1983) ……………......37

*Ctr. for Biological Diversity v. BLM*, 689 F.3d 1101 (9th Cir. 2012) ……………………………36

*\*Ctr. for Biological Diversity v. Jewell*, 2018 WL 1586651 (D. Ariz. Mar. 31, 2018) ……………………………………………………………………………………………passim

*Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988) …………………………………………36

*Defs. of Wildlife v. Gutierrez,* 532 F. 3d 913 (D.C. Cir. 2008) ……………………………30, 31

*Forest Guardians v. U.S. Fish and Wildlife Serv.*, 611 F.3d 692 (2010) …………………………19

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059 (9th Cir. 2004) ……………………………………………………………………………..........15, 33, 35

*Humane Soc'y of the U.S. v. Dep't of Comm.*, 432 F. Supp. 2d 4 (D.D.C. 2006) ……………38, 39

*Kleppe v. Sierra Club*, 427 U.S. 390 (1976) ……………………………………………………43

*Marsh v. Or. Natural Res. Council*, 490 U.S. 360 (1989) ……………………………………15, 28

*Midwater Trawlers Co-op. v. Dep't of Commerce,* 282 F.3d 710 (9th Cir. 2002) …………22, 24

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ……15, 24, 39

*Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7 (2nd Cir. 1997) ……………………………………38

*Nat'l Park and Conservation Ass'n v. Stanton,* 54 F. Supp. 2d 7 (D.D.C. 1999) ………..30, 31, 32

*Nat'l Parks Conserv. Assoc. v. Semonite*, 916 F.3d 1075 (D.C. Cir. 2019) …………………39, 43

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917 (9th Cir. 2008) …………….....36

*Or. Nat. Desert Ass'n v. BLM*, 625 F.3d 1092 (9th Cir. 2008) …………………………………43

*Pistachio Grp. of the Ass'n of Food Indus., Inc. v. United States*, 671 F. Supp. 31 (Ct. Int'l Trade 1987) ……………………………………………………………………………………31-32

*Pub. Citizen v. Dep't of Transp.,* 316 F.3d 1002 (9th Cir.2003) …………………………………39

*Red Wolf Coal. v. U.S. Fish and Wildlife Serv.*, 346 F. Supp. 3d 802 (E.D. N. Carolina, 2018) …………………………………………………………………………………............32, 33, 35

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) ……………………………37

*Sierra Club v. Clark*, 755 F.2d 608 (8th Cir. 1985) …………………………………………33, 35

*Sierra Club v. Peterson*, 717 F.2d 1409 (D.C. Cir. 1983) …………………………………………...38

*S. Yuba River Citizens League v. NMFS*, 723 F. Supp.2d 1247 (E.D. Cal. 2010) ………………36

*Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978) ……………………………………………………15

*Trout Unlimited v. Lohn*, 559 F.3d 946 (9th Cir. 2009) ……………………………………………25

*Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564 (D.C. Cir. 2016) ……………………42, 43

*United States v. McKittrick*, 142 F.3d 1170 (9th Cir. 1998) …………………………………………17

*\*U.S. Telecom Ass'n v. F.C.C.*, 359 F. 3d 554 (D.C. Cir. 2004) ……………………29, 30, 31, 32

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519 (1978) ………………43

*W. Watersheds Project v. Abbey*, 719 F.3d 1035 (9th Cir. 2013) ……………………………44, 45

*Wildearth Guardians v. Bernhardt*, 502 F. Supp. 3d 237, 243 (D.D.C. 2020) ……………………43

*Wyoming Farm Bureau v. Babbitt*, 199 F.3d 1224, 1234 (10th Cir. 2000) …………………19, 22

**Statutes**

5 U.S.C. § 706(2)(A) ……………………………………………………………………15, 29, 32

5 U.S.C. § 706(2)(C) …………………………………………………………………………………32

16 U.S.C. § 1531(b) ……………………………………………………………………………15, 25

16 U.S.C. § 1531(c)(1) …………………………………………………………………...16, 27, 32

16 U.S.C. § 1532(3) ……………………………………………………………………………16, 25

16 U.S.C. § 1533(a)(3)(A) …………………………………………………………………...18, 23

16 U.S.C. § 1533(b)(2) ………………………………………………………………23

16 U.S.C. § 1533(d) …………………………………………………………16, 18, 33

16 U.S.C. § 1536 …………………………………………………………………18, 23

16 U.S.C. § 1536(a)(1) ……………………………………………………………27, 32

16 U.S.C. §1536(a)(2) ………………………………………………………………35

16 U.S.C. § 1539(j) …………………………………………………………………17

16 U.S.C. § 1539(j)(1) ……………………………………………………………16, 46

16 U.S.C. § 1539(j)(2)(A) …………………………………………………………16, 17

16 U.S.C. § 1539(j)(2)(B) …………………………………………...17, 18, 20, 22, 24

16 U.S.C. § 1539(j)(2)(C) …………………………………………16, 18, 22, 23

42 U.S.C. § 4332(1) …………………………………………………………………37

42 U.S.C. §§ 4332(2)(C) …………………………………………………………43

**Regulations**

40 C.F.R. § 1500.1(a) ………………………………………………………………37

40 C.F.R. § 1500.1(b) ………………………………………………………………38, 43

40 C.F.R. § 1500.1(c) ………………………………………………………………37, 43

40 C.F.R. § 1501.4 …………………………………………………………………38

40 C.F.R. § 1502.14 …………………………………………………………………44

40 C.F.R. § 1502.14(a) ………………………………………………………………43, 44

40 C.F.R. §1502.16 …………………………………………………………………43

40 C.F.R. § 1502.24 …………………………………………………………………38

40 C.F.R. § 1508.27 …………………………………………………………………38, 39

40 C.F.R. § 1508.27(a) ………………………………………………………………40

40 C.F.R. § 1508.27(b) ……………………………………………………………39, 40

40 C.F.R. § 1508.27(b)(1) ………………………………………………………………42

40 C.F.R. § 1508.27(b)(3) ………………………………………………………………42

40 C.F.R. § 1508.27(b)(5) ………………………………………………………………40

40 C.F.R. § 1508.27(b)(6) …………………………………………………………40, 41

40 C.F.R. § 1508.27(b)(7) ………………………………………………………………41

40 C.F.R. § 1508.27(b)(9) ………………………………………………………………42

40 C.F.R. § 1508.27(b)(10) …………………………………………………………42-43

40 C.F.R. § 1508.28 ……………………………………………………………………40

40 C.F.R. § 1508.7 ……………………………………………………………………41, 43

40 C.F.R. § 1508.8 ………………………………………………………………………43

40 C.F.R. § 1508.14 …………………………………………………………………43

50 C.F.R. § 17.3 …………………………………………………………………………19

50 C.F.R. § 17.80(b) ……………………………………………………………………26

50 C.F.R. § 17.81(b) …………………………………………………………………17, 20

50 C.F.R. § 17.81(c)(1) ………………………………………………………………18, 21

50 C.F.R. § 17.81 (c)(2) ……………………………………………17, 18, 21, 22, 24, 26

50 C.F.R. § 17.81(c)(3) ………………………………………………………………18, 22

50 C.F.R. § 402.01(b) …………………………………………………………………29-30

50 C.F.R. § 402.02 ……………………………………………………………………26, 35

50 C.F.R. § 402.14 ………………………………………………………………………35

**Other Authorities**

49 Fed. Reg. 33885 (August 27, 1984) ……………………………................................passim

85 Fed. Reg. 43304 (July 16, 2020) ……………………………………………………...37

86 Fed. Reg. 33613 (June 25, 2021) …………………………………………………...41

H.R. Conf. Rep. No. 835 ……………………………………………………………17, 26

H.R. Rep. No. 95-1625 ………………………………………………………………….25

## INTRODUCTION

The Endangered Species Act ("ESA") fundamentally requires the U.S. Fish and Wildlife Service ("Service") to provide for the recovery of listed endangered species like the black-footed ferret. However, in this case, the Service abdicated its responsibility to recover the ferret and, in deference to political pressure from the State of Wyoming (the "State"), adopted a rule that instead impedes this species' survival and recovery in the wild. Plaintiffs WildEarth Guardians, Western Watersheds Project, and Rocky Mountain Wild – a coalition of organizations dedicated to wildlife conservation – bring this case challenging the Service's 2015 Rule establishing a statewide "Nonessential Experimental Population" of black-footed ferrets in Wyoming ("Wyoming 10(j) Rule") pursuant to section 10(j) of the ESA. 16 U.S.C. § 1539(j). This case also challenges the Service's Biological Opinion, produced pursuant to section 7 of the ESA, *Id*. § 1536, and environmental analysis conducted pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332 *et seq*. For the reasons argued herein, Plaintiffs respectfully request that the Court set aside the challenged Service's actions and remand them to the agency for a new decision that fully complies with the ESA and NEPA.

## BACKGROUND

## I.   THE ENDANGERED BLACK-FOOTED FERRET

The black-footed ferret (*Mustela nigripes*) is widely considered North America's rarest, most imperiled mammal. The current wild population of black-footed ferrets is only around 200 breeding adults, and the species still faces significant threats to its conservation. 000979; 000819; 005961-84; 000591; 000717. After the first attempt at captive breeding failed in 1979, the species was presumed extinct until a ranch dog discovered the last remnant population near Meeteetse, Wyoming in 1981. 000963. But disease and plague outbreaks soon killed most of the

1

Meeteetse population, and all the surviving wild ferrets were subsequently removed and used to initiate a captive breeding program. *Id*. Of the 18 remaining ferrets captured from Meeteetse, 15 individuals, representing the genetic equivalent of seven distinct founders, produced a captive population lineage that is the foundation of present recovery efforts. 005968. Thus, all living black-footed ferrets, both captive and wild, descend from just these 15 individuals. *Id*.

The only ferret native to the Americas, black-footed ferrets once occupied a vast range spanning over 562 million acres of Great Plains, mountain basins and semi-arid grasslands from Canada to Mexico. The ferret's historic habitat directly corresponds to the habitats of their obligate species—the black-tailed, Gunnison's, and white-tailed prairie dogs. Scientists conservatively estimate that prairie dogs historically occupied at least 100 million acres in the western United States alone, correlating to a minimum historic population of 500,000 to 1 million ferrets. 000829-830.

Weighing up to 2.5 pounds and measuring 18 to 24 inches in length, this distinctively black-masked, slender-bodied, short-legged member of the weasel family (*Mustelidae*) is considered an "extreme specialist" because it depends almost exclusively on prairie dogs for food and prairie dog burrows for shelter. Solitary and nocturnal, black-footed ferrets spend most of their lives below ground, generally appearing above ground only at night. 005963-64; 000831.

In the wild, ferrets breed at around one year of age during early spring and whelping, the rearing of young, takes place below ground with an average litter size of 3.5 "kits." The kits are born helpless, but are mobile enough to appear above ground at roughly 60 days old and are generally ready to disperse from their mother by the fall months. Newly-released captive-born ferrets have been recorded as dispersing up to 30 miles, with wild-born ferrets dispersing around 12 miles from their natal areas. Males tend to move greater distances than females. 000831.

Though ferrets can reach four to five years of age in the wild, mustelids typically have short life expectancies and high juvenile mortality rates (50% or greater). For example, the mean life expectancy of ferrets in the wild Meeteetse population was only 0.9 years. Captive-raised ferrets also have relatively low survival rates in the wild (less than 45%), even with improved pre-conditioning release techniques being used in recent years. 000670; 005964.

As obligate predators of prairie dogs, black-footed ferrets typically need large, contiguous prairie dog colonies with high burrow densities to meet their individual ferret needs. Based on average historic prairie dog density estimates and the ferret's territory sizes, the Service estimated that, in order to survive in the wild, a population of 30 breeding adult black-footed ferrets would require 1,800 ha (**~4,450 acres**) of occupied black-tailed prairie dog habitat, and 3,000 ha (**~7,400 acres**) of Gunnison's or white-tailed prairie dog habitat. 000832-834.

## II.     CONSERVATION HISTORY OF THE BLACK-FOOTED FERRET

As the Service has emphasized, the black-footed ferret is a "conservation-reliant species," meaning its continued existence is now entirely dependent on human intervention. 000889-890; 006125-138; 000415. Among the first species to be listed as endangered in 1967 and again in 1970 under early endangered species legislation, the black-footed ferret received legacy "endangered" listing status under the ESA in 1973. 000825; 006125. The Service first drafted a Recovery Plan for the species in 1978 when it was presumed extinct in the wild, and then revised the Plan in 1988 after the start of a captive breeding program with the remnant survivors of the Meeteetse population. In 2013, the Service revised the ferret's Recovery Plan again, and this revision continues to guide current recovery efforts with the goal of "delisting" the species—recovering the ferret to the point where it no longer needs ESA protection. 005953.

The extirpation of the black-footed ferret from the wild is due in large part to the species' dependence on prairie dogs, which were dramatically reduced in numbers and extent beginning in the late 1800s. The conversion of native grasslands to cropland, large-scale prairie dog poisoning campaigns at the behest of the agriculture industry, and sylvatic plague (a non-native flea-borne illness introduced in the 1930s that also infects black-footed ferrets) and other disease outbreaks all contributed to a steep decline in prairie dog populations. Additionally, recreational prairie dog shooting, which began in the 1940s and persists largely unregulated today, was another factor that contributed to the ferret's listing. 005971-984; 000962-963; 006125-126.

Black-footed ferret recovery depends on multiple successful reintroductions in the wild. 000834-835. Pursuant to the recovery plan, in order to remove the ferret from the ESA's list of protected species, the Service must meet the following criteria:

> • Establish free-ranging black-footed ferrets totaling **at least 3,000 breeding adults**, **in 30 or more populations**, with at least one population **in each of at least 9 of 12 States** within the historical range of the species, **with no fewer than 30 breeding adults in any population**, and at least 10 populations with 100 or more breeding adults, and at least 5 populations within colonies of Gunnison's and white-tailed prairie dogs;
>
> • **Maintain a total of approximately 494,000 ac (200,000 ha) of prairie dog occupied habitat** at reintroduction sites by planning and implementing actions to manage plague and conserve prairie dogs. 005954.

Despite being protected under the ESA for over *fifty years*, these recovery goals remain far from reach. 000979.

When the Service revised the ferret's Recovery Plan in 2013, it optimistically projected that it could achieve its downlisting goals by 2023. 006021. But according to the Service's recent data from 2021, only one remaining active site meets the minimum criterion of at least 30 breeding adult ferrets. 000979. And though the Service has released ferrets at 29 discrete locations throughout the species' historical range since reintroduction efforts first began in 1991,

only 14 of those sites remain active.[1] Worse, the Service considers only two of the 14 active sites to be in high quality condition. 000819-820.

The degraded condition of the recent release sites is largely due to the effects of sylvatic plague, particularly in reintroduction sites that are too small to effectively withstand plague events and sustain resilient ferret populations. *Id*.; 000979. Consequently, the wild population has been in serious decline since the late 2000s. 000873-874; 000973. Further, the whelping success rates of the captive population have also precipitously declined in recent years. 000870. All told, only about 200 breeding adult ferrets in 14 populations, most in unstable condition, are estimated to presently exist in the wild—a small fraction of what is needed to meet the recovery objective of at least 3,000 breeding adults in 30 or more stable populations. 000979.

## III.   ONGOING THREATS TO BLACK-FOOTED FERRET RECOVERY

### A.  Prairie Dog Management and Insufficient Habitat

Principal among the factors impeding the ferret's recovery is the lack of sufficiently-sized and properly-protected prairie dog colonies. According to the Service, "most prairie dog populations are no longer large and stable enough (due to plague, poisoning, recreational shooting, and the lack of proactive management) to support recovery of the ferret, and the existing regulatory mechanisms are inadequate to support the large prairie dog populations that ferrets require." 005994; *see also* 000673-675. The Service's Recovery Plan specifically lists the inadequacy of prairie dog management as a high magnitude, imminent threat, stating that "[w]ithout large, stable prairie dog complexes, ferret recovery in the wild cannot be achieved." 005995. An expert report to the Service further explained:

---

[1] The Service's 2021 PowerPoint presentation lists 16 (instead of 14) active sites, 000979, but this discrepancy from the 2019 assessment appears to be based on the Service erroneously listing three sites as active when no ferrets have been observed there in recent years. *See* 000869.

> Given experiences with…large prairie dog die-offs due to plague…it is evident that a large number of reintroduction sites must be concurrently active, and several more fully ready to receive black-footed ferrets if unexpected, rapid loss of habitat at a given site requires sudden translocation of black-footed ferrets. In addition to sites maintained at ready, many additional widely separated sites must be in various stages of development in the 3-10 year timeframe.

004227 ("Luce (2008)") (internal citations removed).

Prairie dog conservation and management on federally-managed public lands[2] is paramount, given the need for expansive prairie dog occupied habitat with high densities of prairie dogs "to ensure long-term [ferret] persistence of wild populations." 000982; 005994. As ferret recovery experts have noted, the ESA requires all federal agencies "to fully promote and support endangered species recovery," which in this case means funding and refocusing management priorities to establish and conserve large prairie dog complexes wherever possible on federal public lands. 006137.

Yet over the last decade, the Service has largely failed to actively pursue ferret reintroductions on federal public lands. Luce (2008) identified over 180 potential release sites throughout the ferret's historical range, including many on public lands like the Thunder Basin National Grassland in Wyoming. 004270-75, 004234-35, 004244-48, 004252-56 (listing numerous suitable reintroduction sites on federal public lands). Notably, of all 12 states, Wyoming contains the most potential reintroduction sites, with 27 identified by Luce (2008). 004226, 004253-256. But rather than pursue these viable reintroduction sites, the Service has knowingly set several recently reintroduced populations up for failure by releasing ferrets at sites that lack sufficient active prairie dog habitat to withstand the effects of plague and sustain a viable population of at least 30 breeding adult ferrets. *See* 000972. Indeed, six of ten recent

---

[2] *E.g.*, grasslands and prairies managed by the U.S. Forest Service, Bureau of Land Management (BLM), and National Park Service (NPS).

release sites had less than 1,000 acres of active prairie dog habitat and those ferret populations are now extirpated. *Id*.

### B.  Disease Outbreaks

Recovery efforts for the black-footed ferret are further hampered by periodic sylvatic plague outbreaks, an exotic disease to which both ferrets and prairie dogs are extremely susceptible. Plague can impact ferrets directly via infection and subsequent mortality. It can also indirectly impact ferrets by causing dramatic declines in their primary prey base—prairie dogs. The high densities and high rates of social contact between prairie dogs makes sylvatic plague particularly deadly to the species. 005978-982; 000840-846. As the Recovery Plan recognizes, the significant impact sylvatic plague has on ferret recovery "underscores the value of establishing spatially separated reintroduction sites across the widest possible distribution of the species' historical range." 005978-982; 000841 ("In general, larger populations exhibit higher resiliency and are better able to withstand stochastic events."). Despite ongoing mitigation efforts at several black-footed ferret reintroduction sites, plague remains the most significant challenge to ferret population resiliency. 000845; *see also* 000839 (describing other diseases that also impact ferrets in the wild and captivity).

### C.  Genetic Imperilment

The Recovery Plan also recognizes the risks posed by the ferret's extreme genetic bottleneck. 006003-005. As noted above, the current captive breeding program began with the genetic equivalent of just seven distinct founding members. This type of genetic bottleneck can impact a species survival in two ways: (1) inbreeding depression, caused by increased genetic homozygosity (uniformity) and the subsequent expression of deleterious genes; and (2) genetic drift, the random loss of genetic diversity in small populations. *Id*.; *see also* 003483 (Species

Survival Plan further describing the ferret's imperilment due to lack of genetic diversity). Recently, researchers have observed abnormalities in captive ferrets that appear to be associated with inbreeding, and may be partially responsible for declining reproductive success in the captive population. 000846-848. Captive breeding, while necessary, can reduce a species' reproductive fitness and cause physical and behavioral abnormalities, resulting in captive-bred ferrets that are ill-equipped to survive in the wild. *Id.*; *see also*, 000670 (discussing relatively low survival rate for captive-raised reintroduced ferrets). As the Service recognized, "[t]imely establishment of wild black-footed ferret populations is critical to minimize deleterious effects resulting from too many generations of captive breeding." 005987.

## IV.     BLACK-FOOTED FERRET CONSERVATION IN WYOMING

The Service's Recovery Plan additionally provides state-specific recovery criteria, recognizing "[p]articipation by all States within the historical range of the black-footed ferret is important to maximize the redundancy, representation, and resilience of the ferret and result in equitable recovery goals for all States." 006024. Wyoming is especially crucial to the ferret's recovery because it has the most potential release sites of all states in the species' historical range and ranks third for its expected contribution to the ferret's recovery goals. 004226; 006025. To contribute its share for delisting, Wyoming must support **341 breeding adult ferrets** and maintain **70,000 acres** of prairie dog occupied habitat. 006025.

Although Wyoming became home to the first ever reintroduced black-footed ferret population at Shirley Basin in 1991, that population has nevertheless suffered substantial declines from plague outbreaks. 008118; 000125-141 (Shirley Basin 10(j) rule). Population monitoring efforts since 2013 show that fewer than 40 adult ferrets occupy this reintroduction area. 000729; 008115-116; 000972. Further, the majority of the Shirley Basin area is now slated

for development of large-scale wind energy infrastructure. 008118. Extensive recreational shooting of prairie dogs on both private lands and leased public lands also remains an ongoing threat to the viability of the already struggling Shirley Basin ferret population. *Id*. All told, these circumstances reinforce the need for the Service to establish additional reintroduction sites in Wyoming in order to meet its recovery goals for the state.

## V.   THE CHALLENGED RULEMAKING

Political opposition to black-footed ferret reintroductions – rooted in perceptions of "regulatory burdens" associated with protecting federally-listed species as well as disdain for prairie dogs from agricultural interests and some private landowners – has driven what the ESA requires to be a science-based decision. *See e.g.*, 006125-138. Specifically, the State of Wyoming refused to support ferret reintroductions outside the existing Shirley Basin area unless the Service first issued a blanket 10(j) rule covering the entire state. *See infra Sec. I.A.2*, (citing *e.g.*, 000375 (acknowledging State viewed statewide 10(j) rule as a "prerequisite to participation in any ferret recovery actions in the State of Wyoming."); 008399 (noting State's "unwillingness to accept other forms of regulatory assurances")). Importantly, the State demanded the unprecedented statewide 10(j) rule despite the fact that the Service had already adopted two key legal instruments that provide exemptions from the ESA's main regulatory provisions: a Programmatic Safe Harbor Agreement ("SHA") and a statewide "block clearance" for the ferret in Wyoming.

In 2013, the Service adopted the SHA under section 10(a)(1)(A)[3] of the ESA, which exempts landowners willing to host ferret reintroductions, as well as their non-participating

---

[3] The Safe Harbor policy, 64 Fed. Reg. 32717 (June 17, 1999), extended the Service's authority under section10(a)(1)(A) to non-federal landowners who volunteer to enroll in a SHA. Section 10(a)(1)(A) allows the Service "to issue permits to authorize incidental take of threatened and

neighbors, from liability for "incidental take" on all non-federal lands throughout the 12 states in the ferret's historical range (*i.e.*, state, private, and tribal lands). 000495-548 (2013 SHA); 000010 (email regarding take coverage). To date, more than half of all ferret reintroductions have been authorized under section 10(a)(1)(A) permits and SHAs. 000354; 005987; 000668.

Also in 2013, the Service issued a statewide "block clearance" for the ferret in Wyoming. That "block clearance" eliminated both the requirement for any project proponent/landowner to survey for ferrets and the requirement for any federal agency to engage in ESA section 7 consultation regarding impacts to ferrets prior to initiating or approving projects or other potentially harmful activities. 007730-757 (State's 2012 request for statewide block clearance); 006106-108 (Service's response in support of State's request); 00718 (describing 2013 block clearance). Nevertheless, the State continued to insist on a statewide 10(j) rule; a demand echoed by representatives of Wyoming's agriculture and fossil fuel industries. 000025-026; *see also* Compl. (ECF No. 1), ¶¶59-61; 001033-045; 001046-069; 001074-096; 001099-1115 (public comments).

Caving to the State's political demands, in November 2013, the Service entered into a memorandum of understanding ("MOU") with the Wyoming Game and Fish Department ("WGFD" or "Department"), which essentially rendered a blanket, statewide 10(j) rule designating all ferrets in the State of Wyoming as "nonessential and experimental" a preordained decision. 000549-558; *see also* 000025-026 (2014 FAQ for Wyoming 10(j) rule). The MOU assigned roles and responsibilities to the parties: the Service would lead development of the 10(j) rule and its associated analysis under NEPA, but would relinquish the responsibility to actually

---

endangered species for scientific research or to enhance the propagation or survival of such species." 000499.

implement the rule, including deciding if and where any future ferret reintroductions in Wyoming would occur, to WGFD. *See* 000553 ("the Department will serve to lead implementation of the rule"); 000554 ("future reintroductions of the ferret will be based on mutually affirmed prioritization of prospective reintroduction sites"); 000555 ("Department will continue to serve as the lead agency for ferret recovery actions in the State of Wyoming"). In effect, the Service gave WGFD veto power over any proposed ferret reintroductions—even on federal public lands, which comprise 48% of Wyoming and offer the best potential habitat. 000738; 000554; 008440. To further placate the State, the Service also agreed that recovery efforts were unlikely to interfere with federal lands grazing leases and activities the State deems "supportive" of livestock grazing (*e.g.*, prairie dog "control")—signaling the Service was unlikely to urge federal land managers like the Forest Service or BLM to focus (or refocus) management priorities on preserving and restoring large blocks of prairie dog habitat to support ferret reintroductions on public lands. 000554.

Fulfilling its promise to develop a statewide 10(j) rule, the Service published a proposed rule in the Federal Register for public notice and comment on April 10, 2015. 000352-364. Pursuant to NEPA, the Service also issued a draft Environmental Assessment (EA) to evaluate the environmental effects of the proposed Wyoming 10(j) Rule. 000581-648. The proposed rule set forth the Service's intent to use its section 10(j) authority to classify all prospective ferret reintroductions in Wyoming as comprising one nonessential, experimental population ("NEP"), but without any commitment to actual reintroductions or identification of any future release site(s). 000352-364. The proposed rule also noted that if it were to be finalized, "the WGFD, in cooperation with the Service, would have primary management responsibilities for ferret reintroductions in Wyoming." 000357.

The draft EA evaluated a "No Action" alternative (*i.e.*, the Service would not issue any new 10(j) rule in Wyoming) and just two action alternatives: (1) issue a 10(j) rule that would establish statewide NEP status for the black-footed ferret in all of Wyoming, or (2) consider developing individual site-specific 10(j) rules, like the Shirley Basin 10(j) rule, at some undetermined point in the future. 000599-601. In the EA, the Service admits it chose not to analyze other alternatives for pursuing ferret recovery, such as reintroductions under section 10 permits and SHAs, because "[s]takeholders viewed the implementation of a statewide 10(j) rule as a pre-requisite to participation in any ferret recovery actions in the State of Wyoming." 000601. The EA also notes patterns of land ownership in Wyoming, which, like most western states, are "characterized by marked interspersion of private, state, and Federal lands," as another reason for apparently disregarding alternative ferret recovery actions. *Id*.

In addition to soliciting public comment for the proposed rule, the Service initiated a peer review process. 000353; 000649-651. Public comments from conservationists, as well as feedback from two of the three peer review experts, expressed general support for a 10(j) rule that would actually result in additional ferret reintroductions, but raised significant concerns about: the Service's blanket approach to designating the entire State of Wyoming a "nonessential" population; the agency's stated rationale for its "nonessential" determination being a product of political expediency rather than a science-based inquiry; the rule's lack of commitment to any specific ferret releases or timeline for future reintroductions; and the delegation of lead decision-making authority over prospective ferret reintroductions to the State, vis-à-vis WGFD. *See* 001097-098; 001070-073; 001046-057; 000995-997.

After issuing its final EA (unchanged from the draft version), a "Finding of No Significant Impact" ("FONSI"), and an "intra-agency" Biological Opinion prepared pursuant to

the ESA, the Service published its final Wyoming 10(j) Rule in the Federal Register on October 30, 2015. 000365-382 (Final Rule); 000655-776 (FONSI, final EA, and response to comments); 000655-691 (Biological Opinion). The Rule implemented the Service's deal with WGFD, as promised in the 2013 MOU, by designating the entire state a NEP of black-footed ferrets without identifying any particular release site(s) or committing to any actual ferret reintroductions. 000365-382. Further in line with the 2013 MOU, the Final Rule solidified WGFD's role as "lead agency" in deciding whether and where to reintroduce black-footed ferrets in Wyoming, and in the subsequent management of any such reintroduced populations. 000366.

Since the Service promulgated the Wyoming 10(j) Rule in late 2015, ferret recovery in Wyoming has in fact stalled. With plague and other threats diminishing the Shirley Basin population and WGFD releasing ferrets only at one additional site (mainly comprising two private ranches and a smaller mix of State and BLM lands near Meeteetse) where they have failed to flourish, there are fewer black-footed ferrets on the ground in Wyoming today than prior to the challenged Rule's adoption. 000972; 008307-321 (showing 35 ferrets were initially released at the Meeteetse site in 2016, but despite additional releases in 2017 and 2018, plague took its toll on the population and only five ferrets were confirmed in the 2019 annual monitoring count); 008152-153 (describing declines in the Shirley Basin population).

Predictably, the State flexed its veto power under the Wyoming 10(j) Rule to thwart recovery efforts on federal public lands—specifically, the Thunder Basin National Grassland, which is widely considered the best potential ferret reintroduction site in the State of Wyoming, if not all of North America. 008435. In November 2016, the Governor of Wyoming, WGFD, the Wyoming Office of State Lands and Investments, and the Wyoming Department of Agriculture all sent letters to the Forest Service informing it that the State did not support ferret

reintroduction in Thunder Basin. *Id*. Just over a year later, both the Service and Forest Service announced an agreement with WGFD that "the reintroduction of black-footed ferrets on the Grassland is not appropriate at this time." *Id*.; 008444-445. Then in 2020, ensuring no ferrets could reclaim their historic habitat on this publicly-owned federal National Grassland, the Forest Service amended Thunder Basin's management plan to eliminate the previously established "Black-Footed Ferret Reintroduction Habitat Management Area," shrink objectives for prairie dog colony acreage below the minimum threshold necessary for self-sustaining ferret populations, and radically expand the lethal management of prairie dogs through use of poisoning and shooting in active colonies. 008435. Thus, having witnessed their greatest concerns with the Wyoming 10(j) Rule and all its flawed assumptions become an on-the-ground reality, Plaintiffs now turn to this Court for relief.

## STANDARD OF REVIEW

This action is governed by the Administrative Procedure Act, which directs that a reviewing Court "shall" set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 377 (1989). While review under the "arbitrary and capricious" standard is narrow, a court's inquiry must be "searching and careful," and an agency must articulate a rational connection between the facts found and the conclusions made. *Id*. at 378. A decision is arbitrary and capricious if the agency:

> "has relied on factors which Congress has not intended it to consider, entirely
> failed to consider an important aspect of the problem, offered an explanation for
> its decision that runs counter to the evidence before the agency, or is so
> implausible that is could not be ascribed to a difference in view or the product of
> agency expertise."

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

## ARGUMENT

## I.   THE SERVICE VIOLATED THE ESA

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). While the ESA affords critical protections for endangered species like the black-footed ferret, against actions that might otherwise doom them to extinction, "the ESA was enacted not merely to forestall the extinction of species (*i.e.*, promote a species survival), but to allow a species to recover to the point where it may be delisted." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004), *amended on other grounds by* 387 F.3d 968 (9th. Cir. 2004). Indeed, Congress enacted the ESA to provide both "a program for the conservation of … endangered species" and "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b). The ESA further establishes a policy that "all Federal departments and agencies shall seek to conserve endangered species … and shall utilize their authorities in furtherance of the purposes of" the ESA. *Id.* § 1531(c)(1). "Conservation" and "conserve" under the ESA mean "to use and the use of all methods and procedures which are necessary to bring any endangered species … to the point at which the measures provided pursuant to [the ESA] are no longer necessary"—*i.e.*, to recover the species from its imperiled status. *See id.* § 1532(3).

This overriding "conservation"—*i.e.*, recovery—mandate permeates each of the ESA statutory provisions that govern the Service's actions in this case. *See e.g.*, *Ctr. for Biological Diversity v. Jewell*, 2018 WL 1586651, at *3-5, 13-21 (D. Ariz. Mar. 31, 2018) (holding the Service's 10(j) rule for the Mexican gray wolf failed to fulfill the ESA's recovery mandate). First, at the most foundational level, recovery is at the heart of the ESA's section 10(j) provisions

for species reintroductions. Section 10(j) authorizes the Service to designate populations of reintroduced endangered species as "experimental,"[4] provided such reintroductions "will further the *conservation* of [the] species." 16 U.S.C. § 1539(j)(2)(A) (emphasis added). Further, under the ESA, each member of an experimental population generally "shall be treated as a threatened species," *id.* § 1539(j)(2)(C), which makes them subject to "such regulations as [the Service] deems necessary and advisable to provide for the *conservation* of such species." *Id.* § 1533(d) (emphasis added). Thus, per the "conservation" definition provided by the ESA, *id.* § 1532(3), any regulations issued to manage experimental populations under section 10(j) must provide for the recovery of the species—including the 10(j) Rule at issue here.

Despite this pervasive ESA recovery mandate, the Service's Wyoming 10(j) Rule not only fails to further black-footed ferret recovery, but it establishes a precedent-setting framework that is affirmatively impeding the ferret's recovery, in turn threatening the very survival of this critically endangered species in the wild.

### A. The Service's Blanket "Nonessential" Determination for all of Wyoming, in the Absence of Any Actual, Proposed Ferret Releases is Arbitrary and Capricious.

Pursuant to section 10(j), the Service is authorized to release an "experimental population" of a listed species into the wild subject to certain requirements. 16 U.S.C. § 1539(j). Before authorizing the release of an experimental population, the Secretary must promulgate a 10(j) rule that includes two specific findings. *Jewell*, 2018 WL 1586651, at *4-5 (citing *United States v. McKittrick*, 142 F.3d 1170, 1176 (9th Cir. 1998)). First, the Service must find that "such release will further the conservation of such species." *Id.* (citing 16 U.S.C. § 1539(j)(2)(A); 50

---

[4] An "experimental population" is any population of an endangered or threatened species authorized for release that is "wholly separate geographically from nonexperimental populations of the same species" and outside the current range of that species. 16 U.S.C. § 1539(j)(1),(2)(A).

C.F.R. § 17.81(b)). Second, the regulations must also include a determination, based solely on the best available science, as to whether or not the experimental population is "essential to the continued existence of an endangered species or a threatened species." *Id*. (citing 16 U.S.C. § 1539(j)(2)(B); 50 C.F.R. § 17.81 (c)(2)).

"Essential" means the experimental population's loss "would be likely to appreciably reduce the likelihood of the survival of the species in the wild." 50 C.F.R. § 17.80(b). All other experimental populations that do not satisfy this definition are deemed nonessential. *Id*. Congress recognized that in most circumstances, experimental populations will likely be deemed nonessential. 49 Fed. Reg. 33885, 33888 (August 27, 1984) (citing H.R. Conf. Rep. No. 835 at 34). This is because the loss of a single experimental population will rarely appreciably reduce the likelihood of survival in the wild for the entire species as a whole. *Id*.; *see also* 49 Fed. Reg. at 33890 (same). Under "some circumstances," however, essential status may be justified "[w]here the biological facts support an essential designation." *Id*. at 33888. In those cases, the Service must make an essentiality finding. *Id*.[5]

Each section 10(j) rule is meant to be developed on a "case-by-case basis" through the APA rulemaking process "to address the needs for each particular population proposed for experimental designation." 49 Fed. Reg. at 33886; *Jewell*, 2018 WL 1586651, at *4 (citing same). The special rule must identify the experimental population, 16 U.S.C. § 1539(j)(2)(B), the

---

[5] "Essential" and "nonessential" populations are managed differently. Essential experimental populations are treated as "threatened" species and, as such, are subject to special section 4(d) or 10(j) regulations providing more flexibility for their management.16 U.S.C. § 1539(j)(2)(C); 16 U.S.C. § 1533(d). As "threatened" species, essential populations are also subject to the consultation requirement of section 7 of the ESA, 16 U.S.C. § 1536, and qualify for the designation of critical habitat, *see* 16 U.S.C. § 1533(a)(3)(A). NEPs are also subject to special section 4(d) or 10(j) regulations, except: (1) NEPs are exempt from the section 7 consultation requirement because they are treated as a species "proposed to be listed;" and (2) no critical habitat is to be designated for NEPs. 16 U.S.C. § 1539(j)(2)(C)(i), (ii).

geographic area where the rule applies, 50 C.F.R. § 17.81(c)(1), and the specific management restrictions that apply (or not) to that particular experimental population, 50 C.F.R. § 17.81(c)(3).

Here, the Service's nonessential determination is legally deficient in three key respects. For one, the Wyoming 10(j) Rule was not promulgated for the reintroduction of a specific black-footed ferret population, but rather to purportedly facilitate future reintroductions. As such, the Rule only contemplated purely hypothetical populations in the abstract—untethered to any actual proposed release(s). 000365-382. This makes the Rule's blanket nonessential determination contrary to the plain language of section 10(j)(2)(B) and the Act's implementing regulations. Second, the Service failed to base its "essentiality" determination "*solely* on the best scientific and commercial data available[.]" 50 C.F.R. § 17.81(c)(2)(emphasis added); *see also* 16 U.S.C. § 1539(j)(2)(B). Instead, the determination was illegally premised on a finding that a statewide NEP designation was necessary to obtain the State's approval and assuage private party concerns about the perceived regulatory burdens associated with the ESA. *See supra Background Sec. IV.* The Service also erroneously determined not only that all of Wyoming could be lost as habitat for the ferret—*i.e.*, that the species could go extinct throughout the state—but that *all* wild black-footed ferret populations established to date could be lost without appreciably reducing the species' prospects of survival in the wild. 000367, 000370. Each of these findings conflict with section 10(j) of the ESA and are without merit.

**1. A 10(j) rule must apply to an actual, to-be-released experimental population and the "essentiality" determination requires consideration of population-specific and site-specific factors.**

As noted *supra*, 10(j) rules are meant to be developed on a "case-by-case" basis for each "individual" experimental population. 49 Fed. Reg. at 33886. A "population" for purposes of the ESA is defined as "a group of fish or wildlife in the same taxon[,] *in common spatial*

*arrangement* that interbreed when mature." 50 C.F.R. § 17.3 (emphasis added). As a threshold matter, designating an entire state — delineated by political, not scientific, boundaries — as a single "nonessential, experimental population" for a non-migratory species with a relatively limited home range, as the Service did here, appears at odds with section 10(j)'s intent and the regulatory definition of "population." *Id*.[6] Further, the plain language of section 10(j) and its implementing regulations shows that the "essentiality" determination requires the Service to consider factors specific to an actual, to-be-released experimental population and the discrete location where such population will be found. *See* 16 U.S.C. § 1539(j)(2)(B); 50 C.F.R. § 17.81(b), (c); 49 Fed. Reg. at 33886-891. Yet the Wyoming 10(j) Rule merely contemplates potential reintroductions in the abstract without identifying any proposed release site(s).

For instance, in order to determine whether the release of an individual experimental population "will further the conservation of the species," the Service must consider the following population-specific or site-specific factors:

- The likelihood that any such experimental population will become established and survive in the foreseeable future;
- The relative effects that establishment of an experimental population will have on the recovery of the species; and
- The extent to which the introduced population may be affected by existing or anticipated Federal or State actions or private activities within or adjacent to the experimental population area.

---

[6] The entire State of Wyoming, which is over 62.6 million acres, 000738, cannot conceivably meet the "common spatial arrangement" component of the ESA's "population" definition. For instance, there is no common spatial relationship between the ferrets released at Shirley Basin and those released at Meeteetse—these are separate populations as defined by 50 C.F.R. § 17.3. *See e.g.*, *Forest Guardians v. U.S. Fish and Wildlife Serv.*, 611 F.3d 692, 706 (2010) (holding Service reasonably determined that pair of falcons in New Mexico were not considered part of Mexican falcon "population" found 100 miles south because they did not share "common spatial arrangement" to interbreed); *Wyoming Farm Bureau v. Babbitt*, 199 F.3d 1224, 1234 (10th Cir. 2000) (individual animals must share "common spatial arrangement sufficient to interbreed with other members of a population" to be considered part of that *particular population*).

50 C.F.R. § 17.81(b). Similarly, 10(j) rules must also include the following site-specific or population-specific identifying information and analysis:

- *Appropriate means to identify the experimental population, including*, but not limited to, *its actual or proposed location, actual or anticipated migration, number of specimens released or to be released*, and other criteria appropriate to identify the experimental population(s);
- A finding, based solely on the best scientific and commercial data available, and the supporting factual basis, on whether the experimental population is, or is not, essential to the continued existence of the species in the wild;
- Management restrictions, protective measures, or other special management concerns of *that population*, which may include but are not limited to, measures to isolate and/or contain the experimental population designated in the regulation from natural populations; and
- A process for periodic review and evaluation of the success or failure of *the release* and the effect of *the release* on the conservation and recovery of the species.

50 C.F.R. § 17.81(c)(emphasis added); *see also* 49 Fed. Reg. at 33889 ("An 'experimental' designation, in conjunction with § 17.81(c)(1), requires that that there be included within the [10(j) rule] a description of the area in which the species will be found…"); 49 Fed. Reg. at 33891 (further describing the site-specific or population-specific risk analysis that takes place as part of the 10(j) rulemaking process to determine the likelihood that a particular experimental population will successfully establish itself in the wild). By arbitrarily designating the entire State of Wyoming a "nonessential, experimental population" of black-footed ferrets, the Wyoming 10(j) Rule fails the initial task of identifying a specific to-be-reintroduced population and describing the discrete location(s) where such population will be found.

This blanket, statewide NEP designation was especially arbitrary in this case given the Service's recovery goals only call upon Wyoming to maintain 70,000 acres of prairie dog occupied habitat for ferret reintroductions (less than .01% of the state's land mass) and, again, the ferret is not a wide-ranging, migratory species. *See supra Background Sec. I.* The record shows that the Service's own officials questioned the "appropriateness of designating an entire

State as a 10(j) area without identifying specific reintroduction sites, and of including additional entire States as 10(j) areas." 008399 (comments in internal memo). In short, the Wyoming 10(j) Rule goes beyond the parameters that both Congress and the Service itself set for "case-by-case" 10(j) rules, making the task of determining whether "such population" is essential (and providing the requisite factual finding pursuant to 50 C.F.R. § 17.81(c)(2)), all but impossible.

### 2. The Service's essentiality determination was based on political expediency, not the best available science.

Determinations on essentiality must be based on the best available science and biological factors, not political considerations or a desire for management flexibility. 16 U.S.C. § 1539(j)(2)(B); 50 C.F.R. § 17.81(c)(2). As the Ninth Circuit cogently explained under similar circumstances: "the best available politics does not equate to the best available science as required by the Act." *Midwater Trawlers Co-op. v. Dep't of Commerce*, 282 F.3d 710, 720 (9th Cir. 2002) (invalidating rule that "was a product of pure political compromise, not reasoned scientific endeavor" where Congress similarly mandated that the agency employ the "best available scientific information" as its methodology in making its decisions). The "essentiality" determination "is a fundamentally biological inquiry," requiring the Service to base its finding only on the best available information regarding that species' biological needs and its existing circumstances. *Jewell*, 2018 WL 1586651, at *20-21 (Service failed to follow the ESA's "best available science" mandate in designating the sole population of Mexican gray wolves "nonessential"). The record here shows that the Service again failed to heed this clear directive.

It is worth noting that, to the extent the State and private parties demand "management flexibility," this can also be obtained by designating an "essential" experimental population of black-footed ferrets in accordance with section 10(j) of the ESA. *See* 16 U.S.C. § 1539(j)(2)(C). Special regulations for essential populations provide significant flexibility, just as they do for

nonessential populations. 50 C.F.R.§ 17.81(c)(3). Such regulations may include measures to isolate the experimental population to certain areas and flexible provisions allowing for various kinds of "take." *Id.*; *see also* 49 Fed. Reg. at 33885 (discussing the benefits of regulations for all experimental populations); *Wyoming Farm Bureau*, 199 F.3d at 1231-1232 (same).

Unfortunately, by repeatedly suggesting in its public-facing documents that an experimental population must be nonessential to obtain "management flexibility," the Service misconstrues section 10(j) of the ESA and conflates the management flexibility afforded to all experimental populations, as envisioned by Congress, with that provided solely to nonessential populations. *See e.g.*, 000720-21 (stating NEP designation is necessary for "facilitating voluntary participation in recovery actions while ensuring that the concerns of private landowners, related to Act regulatory burden, are addressed effectively."); 000726 ("Regulatory restrictions under the Act are considerably reduced under a [NEP] designation.").[7] In actuality, the only difference between essential and nonessential experimental populations established under section 10(j) is the: (1) obligation to consider designating critical habitat (as the Service does for all listed species); and (2) duty to consult pursuant to section 7 of the ESA, which only pertains to federal agency actions. 16 U.S.C. § 1539(j)(2)(C)(i). Neither of these two statutory obligations, however, render management of essential experimental populations inflexible or unworkable.[8]

---

[7] This misconception that a "nonessential" designation is the only means for reducing the Act's "regulatory restrictions" also frustrates other reintroduction options like Section 10(a)(1) permits and SHAs that also provide exemptions for "incidental take" and have been widely used for black-footed ferret reintroductions in other states. *See supra Background and infra Sec. I.C, II.B.*
[8] The designation of critical habitat, for example, is not automatic or rigid. The Service is only required to designate critical habitat "to the maximum extent prudent and determinable," 16 U.S.C. § 1533(a)(3)(A), and must take into account the "economic impact" of such designations, 16 U.S.C. § 1533(b)(2). The Service can also exclude an area if it determines the benefits of exclusion "outweigh the benefits" of inclusion. 16 U.S.C. § 1533(b)(2). Likewise, the consultation requirements under section 7 of the ESA pertain only to "federal actions" that "may

In any event, "the management flexibility afforded to the agency under Section 10(j),
does not override the duty to use the best available science." *Jewell*, 1018 WL 1586651, at \*16
(cleaned up). The Service cannot base its "nonessential" designation on placating the demands of
the State and private economic interests or a desire to avoid a critical habitat designation and
section 7 consultations when Congress mandated that such determinations be based *solely* on the
best available science. 16 U.S.C. § 1539(j)(2)(B); 50 C.F.R. § 17.81(c)(2); *Midwater Trawlers
Co-op.*, 282 F.3d at 720. Yet the record here shows that the Service blatantly did just that: the
Wyoming 10(j) Rule was unlawfully premised on political compromise rather than the best
available information on the ferret's existing circumstances and biological imperatives. *See
supra Facts Section*; 000370 ("any release of ferrets in Wyoming will be part of an NEP because
of the need for increased management flexibility, which will encourage landowner participation
and alleviate concerns regarding possible land use restrictions."); 000375 ("Stakeholders in
Wyoming essentially viewed the implementation of a Statewide 10(j) rule as a prerequisite to
participation in any ferret recovery actions in the State of Wyoming."); 008397 (internal memo
stating: "[NEP] approach is necessary in order to have local support for additional black-footed
ferrets reintroduction sites in Wyoming."); 008400 ("The State believes [a statewide, NEP
designation] to be in the interest of private land managers, agencies, and industries using both
public and private lands."); 008399 (Service's comments stating "real" reason for Rule was "the
state's unwillingness to accept other forms of regulatory assurances"). This renders the
Wyoming 10(j) Rule arbitrary and capricious. *State Farm*, 463 U.S. at 43 (agency decision must
be based on relevant factors that are tied to the purpose of the underlying statute).

---

affect" listed species. 16 U.S.C. § 1536. Section 7 imposes no consultation obligations on State,
Tribal, or private entities. *Id.*

**3.  The Service arbitrarily relied on the captive black-footed ferret population as its basis for concluding that all experimental, wild populations are "nonessential."**

The Service's additional rationale for its blanket, statewide "nonessential" determination is equally invalid. The Service maintains that even if no wild ferrets existed in Wyoming, or indeed, the entire United States, the prospects of survival of the species in the wild would not be "appreciably reduced" because the agency only considers the captive-breeding program population to be "essential." 000714 (EA's definition of NEP). The Final Rule states: "Only ferrets that are surplus to the needs of the captive-breeding program are used for reintroduction into the wild. Therefore, any loss of an experimental population in the wild will not threaten the survival of the species as a whole." 000370. Under this reasoning, the loss of *all* experimental black-footed ferret populations in the wild would not "appreciably reduce" the prospects of the species' survival in the wild so long as additional "surplus" animals in zoos, holding pens, or captive-breeding facilities remain available for release. *Id.* In other words, according to the 10(j) rule, it is permissible for black-footed ferrets to go fully extinct in the wild, so long as captive breeding programs continue to produce more "surplus" ferrets and are maintained in perpetuity. This interpretation is antithetical to the ESA's conservation/recovery mandate, conflicts with section 10(j), is at odds with the best available science, and is entirely unreasonable.

First, the ESA's primary goal is recovery: to get listed species off the life support system of human intervention and preserve their ability to survive and recover in the wild, on their own. *See Trout Unlimited v. Lohn*, 559 F.3d 946, 957 (9th Cir. 2009) ("the ESA's primary goal is to preserve the ability of natural populations to survive in the wild."); 16 U.S.C. § 1532(3) (defining "conservation" as using all methods necessary to bring listed species to point at which the measures provided by the ESA are no longer necessary); 16 U.S.C. § 1531(b) (purpose of ESA is to conserve "ecosystems" upon which species depend); H.R. Rep. No. 95-1625, at 5,

reprinted in 1978 U.S.C.C.A.N. at 9455 (discussing ESA's focus on natural populations). While the Service can rely on captive populations to reestablish a species, recovery under the ESA only takes place in the wild. *Jewell*, 2018 WL 1586651, at *4. As such, the Service must "determine recovery based on the viability of species, *not in captivity but in the wild*." *Id.* (emphasis added). An interpretation that permits the Service to rely on a captive breeding program as the sole "essential" population for a listed species' survival in the wild is not only antithetical to recovery efforts, but turns the ESA's goal for endangered and threatened species recovery *in the wild* on its head and mistakenly reads "in the wild" out of section 10(j). *Id.*

Second, the Service's reliance on the captive breeding population conflicts with the plain language of section 10(j). Consistent with the ESA's recovery goals, a 10(j) "essentiality" determination must be based on the impact the loss of the population would have on the species ability to survive in the wild, not on the number of available-for-release ferrets in captivity or zoos. *See* 50 C.F.R. §§ 17.80(b), 17.81(c)(2). Indeed, section 10(j) directs the Service to determine whether the experimental population is "essential" to the continued existence of the species "*in the wild*." 50 C.F.R. § 17.80(b) (emphasis added); *see also* Fed. Reg. at 33888 (citing H.R. Conf. Rep. No. 835 at 34); *see also, e.g.*, 50 C.F.R. § 402.02 (defining "jeopardize the continued existence of a species" as actions that appreciably reduce the likelihood of that species' survival and recovery "in the wild"). Thus, the Service's stated rational here directly conflicts with the plain language of section 10(j).

Third, the Service's explanation for its "essentiality" determination here – that only the captive breeding program population of black-footed ferrets is "essential" for the species survival in the wild – is also at odds with the best available science. The Service plainly recognizes that "[t]he black-footed ferret needs multiple, resilient populations distributed across its range in a

variety of ecological settings to persist into the future and to avoid extinction." 000819. The ferret's extreme genetic bottleneck further shows that maintaining multiple self-sustaining ferret populations in the wild is "critical" for reducing the negative effects that result from too many generations of captive breeding. 005968; 005987; 000846-848. For this reason, the Rule's peer review expert stated "[t]he assumption that replacement of wild animals with captive animals is equivalent to maintaining wild populations is therefore biologically as well as legally flawed." 001008-009. And as a practical matter, if all NEPs of ferrets were suddenly lost, the captive breeding program would not have enough "surplus" ferrets available for release to replace them. *See* 000370 (stating captive-bred population produces approximately 120 to 240 juvenile ferrets annually and retains roughly 80 of those juveniles every year to sustain the captive breeding program). These factors alone cast serious doubt on the reasonableness of the Service's "essentiality" determination.

Moreover, the best available information also shows that Wyoming, specifically, is crucial for the black-footed ferret's ability to achieve self-sustaining populations in the wild and not perpetually depend upon annual releases from a captive-breeding program. *See supra Background Sec. IV*. As the Final Rule acknowledges, Wyoming has the most potential reintroduction sites of the 12 states in the ferret's historic range—with over 3.1 million acres of prairie dog occupied habitat. 000368-369 (also noting that Wyoming has lost far less grasslands habitat to cropland conversion than most states in the ferret's historical range); 008401, 008406 (Service's internal memo noting, "one could argue that Wyoming has some of the best remaining habitat for recovery."). Additionally, many of these potential sites in Wyoming are on federal lands, which eliminates the major hurdle of finding a private landowner willing to voluntarily host ferret reintroductions and manage their lands to preserve prairie dog occupied habitat. *See*

004253-256.[9] And the Service's recovery goals, which are notably apportioned based on the amount of prairie dog habitat *historically* present in each state, rather than the estimated habitat currently available, still ranks Wyoming third in terms of each state's necessary contribution to reaching the plan's goals for downlisting and delisting. 006025. Thus, the Service's position that all of Wyoming could be lost in terms of ferret recovery without appreciably reducing the species' likelihood of survival in the wild is not based on the best available science, lacks a rational basis in fact, and is therefore arbitrary and capricious. *Marsh*, 490 U.S. at 378.

Last, it was additionally arbitrary for the agency to point to reintroduction sites in other states (and countries) to downplay the impact of the hypothetical loss of Wyoming when the loss of those populations, according to this Rule's rationale, also poses no risk to the ferrets' ability to survive in the wild. 000367 (Final Rule stating: "loss of an experimental population in Wyoming will not affect the captive population or the 24 existing reintroduction sites in Arizona, Colorado, Kansas, Montana, New Mexico, South Dakota, Utah, and Wyoming; in Chihuahua, Mexico; and in Saskatchewan, Canada.").[10] And indeed, all section 10(j) ferret reintroductions thus far have been designated as "nonessential." 000567; *see also* 000996 (peer review expert questioning, in light of NEP designation for all of Wyoming and most other reintroduction sites, "where will the essential populations of wild, free-ranging ferrets be?"). Tellingly, the Service's Chief of Endangered Species candidly stated in an email to other agency staff: "I am esp[ecially]

---

[9] Federal land managers, like the Forest Service and BLM, are obligated under the ESA "to fully promote and support endangered species recovery." 16 U.S.C. § 1531(c)(1); § 1536(a)(1).

[10] It is also worth noting that: (1) the Service has no regulatory authority over reintroduction sites in Canada or Mexico and cannot rely on such sites or reintroduced populations to meet its recovery obligations under the ESA; and (2) only three of the 24 sites that existed at the time the Wyoming 10(j) Rule was promulgated in 2015 actually supported a "self-sustaining" ferret population (*i.e.*, at least 30 breeding adults); in fact, 14 of those release sites were already inactive by 2015. 000972; 000869.

concerned about how we are going to portray that this is OK for WY but not necessarily other states. Would be good to have at least one essential site per state to match with the recovery plan." 008411. In sum, the Service acted arbitrarily and capriciously in determining that all experimental populations of ferrets in the wild could be lost without appreciably reducing the species' likelihood of survival in the wild because the agency can purportedly just replace them with so-called "surplus" ferrets from captivity. 5 U.S.C. § 706(2)(A).

**B. The Service Unlawfully Subdelegated its Statutory Authority to WGFD.**

It is well settled that "while federal agency officials may subdelegate their decision-making authority to subordinates absent evidence of contrary congressional intent, they may not subdelegate to outside entities—private or sovereign—absent affirmative evidence of authority to do so." *U.S. Telecom Ass'n v. F.C.C.*, 359 F. 3d 554, 566 (D.C. Cir. 2004) (vacating portions of an F.C.C. order that impermissibly subdelegated mass market switching determinations to state agencies); *see also Assiniboine & Sioux Tribes v. Bd. of Oil and Gas*, 792 F. 2d 782, 796 (9th Cir. 1986) ("We are reluctant to read broad authority to subdelegate into [the] statute[], absent clear proof of legislative intent to relieve the Secretary of a portion of his duties and proof that such a delegation would be [consistent with the statute's purpose]."). Congress gave the Service, as delegate of the Secretary of Interior, sole responsibility to "administer" the ESA with respect to terrestrial wildlife, including the duty to affirmatively recover threatened and endangered species and the authority to promulgate special rules in furtherance thereof. *See* 50 C.F.R. § 402.01(b); Compl. ¶¶21-32 (Statutory and Regulatory Framework). While the ESA's legal framework affords the Service broad discretion to collaborate with states, tribes, private landowners, non-governmental organizations, and federal agency partners to achieve on-the-ground conservation for species and their habitats, there is no indication in the statute or its

legislative history that Congress intended to grant the Service authority to abdicate its ESA duties. Thus, the Service cannot subdelegate its responsibility under the Act to affirmatively recover a federally listed species to an "outside entity" like WGFD, which is not bound by the statutory obligations of the ESA and represents interests of the State that are hostile to the Act's overarching conservation purpose. *Telecom*, 359 F. 3d at 565-568; *see also Defs. of Wildlife v. Gutierrez,* 532 F. 3d 913, 926-927 (D.C. Cir. 2008); *Nat'l Park and Conservation Ass'n v. Stanton,* 54 F. Supp. 2d 7, 18-21 (D.D.C. 1999).

In *Defs. of Wildlife*, the Court emphasized that by giving the Coast Guard statutory authority to promulgate traffic schemes in ports, Congress "intended to make the Coast Guard accountable" for waterway safety, and provided parties harmed by a failure to promulgate these traffic schemes a recourse under the ESA or APA. *Id.* Thus, the Coast Guard could not delegate these duties to an international organization that was not subject to the APA or ESA. *Id.* at 927. Even more on point, in *Stanton*, which the D.C. Circuit relied upon in *Telecom*, the court held that the NPS violated the unlawful delegation doctrine by entering into a cooperative agreement with a private actor, there a "local council," under terms that shifted too much decision-making authority over the management of a national scenic river area to the council. 54 F. Supp. 2d at 18-21. Notably, NPS's ability to terminate the agreement with the council did not show that the federal agency retained sufficient final decision-making authority to overcome its improper subdelegation. *Id.* at 21. The Service similarly violated the subdelegation doctrine here because the Wyoming 10(j) Rule adopts the improper grant of decision-making authority over ferret reintroductions to WGFD that was set forth in the 2013 MOU. *Supra Background Sec. V.*

The Service was very much aware that the 2013 MOU puts the State of Wyoming "in the driver's seat" for deciding on future ferret reintroductions in the state, such that its own statutory

29

duty to affirmatively recover the species could be impeded. 008399-412. As noted *supra*, the 2013 MOU designated WGFD "lead" on the actual implementation of the anticipated statewide 10(j) rule, specifically delegating the authority to decide whether, where, and when any future ferret reintroductions in Wyoming might occur. *Supra Background Sec. V* (citing MOU at 000553-555). And by agreeing that any future reintroductions would *only* occur if the State approved of the prospective reintroduction site, 000554 (*i.e.*, sites must be "mutually affirmed"), the Service in effect gave the State veto authority over all potential ferret reintroductions in Wyoming irrespective of land class, *i.e.*, including on all federally-managed public lands. *Id.* Because the Wyoming 10(j) Rule adopts the framework of the 2013 MOU, the Service has unlawfully delegated decision-making authority to WGFD.[11]

Not only does such improper subdelegation defy congressional intent, but as both the D.C. Circuit and District Court have recognized, it can result in a federal agency handing over decision-making authority to an entity with political or economic interests that conflict with the agency's statutory obligations like the "national environmental interests" that the Service, like the NPS in *Stanton*, are "statutorily mandated to represent." *Stanton*, 54 F. Supp. 2d at 20-21; *Telecom*, 359 F.3d at 565-66; *Defs. of Wildlife*, 532 F. 3d at 926-927; *see also Pistachio Grp. of the Ass'n of Food Indus., Inc. v. United States*, 671 F. Supp. 31, 33-36 (Ct. Int'l Trade 1987) (holding the International Trade Administration impermissibly delegated the duty to calculate an exchange rate to the Federal Reserve Bank of New York because the N.Y. Fed was also a private corporation with stock interests that would be affected by the exchange rate decision-making).

---

[11] Though the Service still decides whether to ultimately allocate captive-bred ferrets for release to any particular site, if the State chooses not to propose any reintroductions in the first instance, or exercises its veto authority to quash any reintroductions proposed by the Service or other stakeholders, then the Service's authority to allocate ferrets for release is a moot point.

Such are the very circumstances at play in this case. *See supra Background Sec. V.*

The Service's delegation of decision-making authority over future ferret reintroduction in Wyoming to WGFD frustrates the ESA's conservation purpose; the State of Wyoming neither shares the Service's national conservation interests nor is bound by the ESA. For example, by allowing the State to stall and quash ferret reintroductions, including on federally-managed public lands like Thunder Basin National Grassland, this subdelegation undermines the statutory obligation of all federal agencies to "utilize their authorities in furtherance of the purposes of [the Act] by carrying out programs for the conservation of" the black-footed ferret. 16 U.S.C. § 1531(c)(1); § 1536(a)(1). A 10(j) rule that impedes the ability of federal agencies to fulfill this conservation mandate violates the ESA and is arbitrary and capricious. *See Red Wolf Coal. v. U.S. Fish and Wildlife Serv.*, 346 F. Supp. 3d 802, 813-815 (E.D. N. Carolina, 2018).

In short, putting WGFD in "the driver's seat" on actually implementing the Rule allows the State to indefinitely delay or deny additional reintroductions in Wyoming, impeding ferret recovery and incentivizing a "race to the bottom" approach among the 12 states for contributing to the Recovery Plan's downlisting and delisting goals. As such, the Service violated the unlawful delegation doctrine, abused its discretion, and acted in excess of its statutory authority, further rendering the Wyoming 10(j) Rule arbitrary, capricious and not in accordance with the law. 5 U.S.C. § 706(2)(A), (C); *Telecom*, 359 F. 3d at 565-568; *Stanton*, 54 F. Supp. 2d at 18-21.

### C. The Wyoming 10(j) Rule Fails to Provide for the Conservation of Black-Footed Ferrets.

As explained above, the ESA requires that any special regulations promulgated for "experimental" populations of listed species such as 10(j) rules actually further the conservation of such species. *Jewell*, 2018 WL 1586651, at *3-5, 13-17; *Red Wolf Coal.*, 346 F. Supp. 3d at 812-814. The term "conservation" encompasses more than mere survival. *Gifford Pinchot*, 378

F.3d at 1070. Rather, "conservation" means the species *recovers* to the point where it may be delisted. *Id*. Pursuant to this conservation mandate, the Service's 10(j) Rule here must work toward the recovery of the black-footed ferret; hindering the ferret's recovery rather than advancing it renders the Wyoming 10(j) Rule arbitrary and capricious. *See e.g.*, *Jewell*, 2018 WL 1586651, at *3-5, 13-17; *Red Wolf Coal*., 346 F. Supp. 3d at 812-814.

Unfortunately, many aspects of the Wyoming 10(j) Rule undermine the ferret's path towards recovery that is charted by the best available science—*e.g.*, the Service's own Recovery Plan. These include: (1) a blanket, statewide "nonessential" designation; (2) lack of commitment to any actual proposed reintroduction(s) and failure to identify and analyze any potential release site(s); and (3) subdelegating ultimate reintroduction decision-making authority to WGFD. If the Service fails to further the conservation – *i.e.*, recovery – of the affected species, then its action "would not constitute an act of conservation under the Act and would fall without the scope of authority granted to" the agency. *Sierra Club v. Clark*, 755 F.2d 608, 612-13 (8th Cir. 1985) (construing 16 U.S.C. § 1533(d), which again also applies to "experimental" populations since they are treated as though separately listed as threatened).

First, the Service's blanket NEP designation for the entire State of Wyoming undermines the ferret's recovery in several key ways. For one, it allows the Service to forego any critical habitat designation in Wyoming and section 7 consultation in most situations while also providing a wholesale, statewide exemption from section 9 for unintentional "take" (*e.g.*, "take" from otherwise lawful activities like farming and ranching, including associated prairie dog poisoning and shooting). 000665 (Biological Opinion). It also forecloses the possibility of designating at least one experimental population in the state "essential," which given the importance of Wyoming to the ferret's recovery suggests the Service will never deem any

experimental ferret population "essential" to the species recovery and accordingly afford such population more robust protections under the Act. The statewide NEP designation also substantially undermines, if not entirely precludes, other options for expeditiously reintroducing ferrets to Wyoming, such as through section 10(a)(1) permits to federal land managers like the Forest Service and BLM and SHAs with private landowners. *See infra Sections I.C, II;* 008399 (comment noting "chilling effect" on developing SHAs), 008401-412 (similar admissions). Because the statewide NEP designation reduces federal protections for ferrets throughout all of Wyoming and admittedly leaves "fewer tools in the Service's ferret recovery tool box," 008401, the Wyoming 10(j) Rule fails to advance the conservation of the species.

Second, despite recognizing that Wyoming is especially crucial to the ferret's recovery and that the best available science shows the timely establishment of multiple reintroductions is necessary for the ferret to overcome the effects of plague and its severe genetic peril, the Service's 10(j) Rule nevertheless fails to commit to any actual reintroductions. *See supra Background Section.* Nor does the Rule identify, and then analyze the suitability of, any prospective release site(s). *Id.* Consequently, the Rule again fails to advance the conservation of black-footed ferrets.

Finally, the Service's delegation of lead decision-making authority to WGFD over all prospective ferret reintroductions in Wyoming also violates the agency's conservation mandate. As noted above, WGFD neither shares the Service's national conservation interests nor is bound by the ESA, yet has been given the authority to effectively veto and delay additional ferret reintroductions throughout the state, even on federally-managed public lands. *Supra Background, Sec. I.B.* As noted, this subdelegation therefore undermines the duty of all federal agencies to "utilize their authorities" for the conservation of the ferret, such as by protecting and

restoring large swaths of prairie dog habitat on federal lands to support sustainable ferret populations. *See e.g.*, *Gifford Pinchot*, 378 F.3d at 1069 (noting that it is "logical and inevitable" that a species needs more habitat for recovery than is necessary for mere survival). The State's ability to quash and stall any and all future ferret reintroductions in Wyoming also further compounds the species' genetic imperilment. Thus, the Service's delegation of lead decision-making authority to the State in effect reduces the likelihood of establishing self-sustaining wild ferret populations.

For all of these reasons, the Service's Wyoming 10(j) Rule not only fails to advance the recovery of the black-footed ferret, but actually impedes such recovery. These provisions thus "fall without the scope of authority granted to" the Service under the governing ESA recovery provisions and render the challenged 10(j) Rule arbitrary and capricious. *Clark*, 755 F.2d at 613; *Jewell*, 2018 WL 1586651, at *13-17; *Red Wolf Coal.*, 346 F. Supp. 3d at 812-814.

### D. The Service's No Jeopardy Finding is Arbitrary and Capricious.

The ESA's overriding species recovery purpose is also part of an ESA section 7 biological opinion, such as the intra-agency Biological Opinion that the Service provided to itself in this case. 000655-691. In a biological opinion, the Service must assess whether the proposed action "is likely to jeopardize the continued existence" of the species. 16 U.S.C. §1536(a)(2); 50 C.F.R. § 402.14. The phrase "jeopardize the continued existence of" means to engage in an action that "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and *recovery* of a listed species in the wild." 50 C.F.R. § 402.02 (emphasis added). Accordingly, biological opinions must "consider whether the proposed action … could prevent the species from achieving" recovery in addition to survival. *Alaska v. Lubchenco*, 723 F.3d 1043, 1054 (9th Cir. 2013); *see also Nat'l Wildlife Fed'n v. Nat'l Marine*

*Fisheries Serv.*, 524 F.3d 917, 933 (9th Cir. 2008) (rejecting biological opinion that "did not adequately consider the proposed action's impacts on the listed species' chances of recovery"). An agency's reliance on an inadequate, incomplete, or flawed biological opinion to satisfy its section 7 obligations is arbitrary and capricious in violation of the ESA. *Ctr. for Biological Diversity v. BLM*, 689 F.3d 1101, 1127-28 (9th Cir. 2012).

Here, the Service's Biological Opinion and "no-jeopardy" finding is arbitrary and capricious, in violation of the ESA because it failed to ensure the ferret's recovery is not hampered by the Wyoming 10(j) Rule. First, the Service's "no jeopardy" finding is premised, in part, on the ferret's status as "nonessential," *see* 000677, which, as discussed above, is arbitrary and violates the ESA. *See supra Sec. I.A.* Second, the Service's no-jeopardy finding failed to address and consider the myriad ways in which the Wyoming 10(j) Rule, as structured, will likely impede, rather than advance, recovery efforts. *Id.*; *see also* 000677 (summarily concluding that "the proposed action is expected to result in the creation of additional reintroduction areas in Wyoming" despite the fact that the Rule makes no commitment to any actual reintroductions and hands lead decision-making authority over all such reintroductions to a hostile outside entity). These are important aspects of the Wyoming 10(j) Rule that will likely result in significant impacts to the ferret's recovery efforts and, as such, should have been (but were not) discussed and analyzed before issuing a no-jeopardy finding. *See Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988) (rejecting biological opinion that failed to consider important aspects of the problem); *S. Yuba River Citizens League v. NMFS*, 723 F. Supp.2d 1247, 1276 (E.D. Cal. 2010) (same). This failure to analyze the impacts of the Wyoming 10(j) rule in the accompanying Biological Opinion is arbitrary, and as such, so is the "no jeopardy" determination therein. *See Nat'l*

*Wildlife Fed'n*, 524 F.3d at 934 (rejecting biological opinion for failing to adequately consider recovery needs of species).

## II.    THE SERVICE VIOLATED NEPA

NEPA is our "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).[12] It makes environmental protection a part of the mandate of every federal agency. 42 U.S.C. § 4332(1). The cornerstone of NEPA is its requirement that federal agencies "take a 'hard look' at the environmental consequences [of a project] before taking action." *Baltimore Gas & Elec. Co. v. Nat. Resources Def. Council*, 462 U.S 89, 97 (1983) (internal citation omitted). "To ensure that this commitment is 'infused into the ongoing programs and actions of the Federal Government, the act also establishes some important 'action-forcing' procedures.'" *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). These "action-forcing" procedures ensure that: (1) the agency has carefully contemplated a project's environmental impacts, and (2) the "relevant information will be made available," so that the public can "play a role in both the decisionmaking process and the implementation of that decision." *Robertson*, 490 U.S. at 349. Because of NEPA, "important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Id.* "Ultimately, of course, it is not better documents but better decisions that count." 40 C.F.R. § 1500.1(c).

### A.  The Service Failed to Prepare an Environmental Impact Statement.

Federal agencies are required to prepare an "EIS" for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). "If *any* 'significant'

---

[12] The Council on Environmental Quality (CEQ) issued new rules implementing NEPA. 85 Fed. Reg. 43304 (July 16, 2020). The revised rules apply only to NEPA processes begun after September 14, 2020, *id.* at 43339. Citations in this brief are to the applicable former rules.

environmental impacts might result from the proposed agency action then an EIS must be prepared *before* the action is taken." *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983) (emphasis original); *see also Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 13 (2nd Cir. 1997) ("When the determination that a significant impact will or will not result from the proposed action is a close call, an EIS should be prepared."). An EA is a tool that can be used to determine whether a project's impacts are significant enough to warrant an EIS; if not, that conclusion is to be documented in a "finding of no significant impact." 40 C.F.R. § 1501.4. As with all NEPA analyses, agencies must use accurate information and ensure the integrity of their findings. 40 C.F.R. §§ 1500.1(b), 1502.24.

The CEQ regulations explain an action's significance, in determining whether to prepare an EIS, is a measure of both the "context" and "intensity" of the proposed action. 40 C.F.R. § 1508.27; *Humane Soc'y of the U.S. v. Dep't of Comm.*, 432 F. Supp. 2d 4, 13 (D.D.C. 2006). "Considering context is critical because the significance of an action can vary based on the setting and surrounding circumstances." *American Rivers v. FERC*, 895 F.3d 32, 49 (D.C. Cir. 2018). As to intensity, CEQ regulations list several factors that "should be considered" in assessing whether a proposed action triggers the need for an EIS. These factors include: the degree to which the effects are "likely to be highly controversial" and "highly uncertain or involve unique or unknown risks;" the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration; the degree to which the action may adversely affect an endangered or threatened species; "[u]nique characteristics of the geographic area such as proximity to [] ecologically critical areas;" and whether the action threatens a violation of other legal requirements imposed for the protection of the environment. 40 C.F.R. § 1508.27(b). "The presence of one or more of

these factors should result in an agency decision to prepare an EIS." *Humane Soc'y*, 432 F. Supp. 2d at 13 (quoting *Pub. Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1023 (9th Cir.2003)); *see also Nat'l Parks Conserv. Assoc. v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019) ("Implicating *any one* of the [intensity] factors may be sufficient to require the development of an EIS.") (emphasis added). As the D.C. Circuit recently affirmed, the Court's role in a NEPA challenge is to determine whether the agency is "able to make a convincing case" for its finding of no significant impact. *Id*. Here, the broad context of the Wyoming 10(j) Rule and the existence of several intensity factors indicating the Rule's potentially significant environmental effects demonstrate an EIS was warranted.

In this case, however, the Service's EA and associated FONSI never even mention, let alone analyze, the "significance" factors at 40 C.F.R. § 1508.27 that direct federal agencies in assessing whether an EIS is warranted. *See* 000709-776 (Final EA); 000692-695 (FONSI). Even the Service's own rulemaking for section 10(j) procedures expressly acknowledges that each rule designating and establishing a specific experimental population "will be evaluated as to the need for the preparation of an EIS as they are developed." 49 Fed. Reg. 33887 (further stating that the Service will follow the CEQ regulations at 40 C.F.R. Parts 1500-1508 for each 10(j) rulemaking). This wholesale failure to consider NEPA's "significance" finding factors renders the Service's EA and FONSI arbitrary, capricious and otherwise not in accordance with NEPA. *State Farm*, 463 U.S. at 43 (agency decision must be based on relevant factors).

At any rate, multiple "significance" factors were implicated with the Service's proposed statewide 10(j) rule for Wyoming. For example, "significance varies with the setting of the proposed action," 40 C.F.R. § 1508.28, and hence context is critical. *Id*. § 1508.27(a). The "context" for the Service's proposed 10(j) rule was the entire State of Wyoming – a place of

extraordinary importance to the black-footed ferret's recovery in the wild – as opposed to a single, discrete reintroduction site intended for an individual population. *See supra Background Sec. IV, Sec. I.A.*

The proposed statewide 10(j) rule also implicated several "intensity" factors deemed pivotal in the CEQ regulations. 40 C.F.R. § 1508.27(b). For example, designating the entire state a "nonessential" experimental population, which effectively strips away the ESA's substantive protections for the ferret throughout all of Wyoming without committing to any actual reintroductions, gives rise to a great deal of "uncertainty" and "unknown" risks. *Id.* § 1508.27(b)(5). The Service's delegation of lead decision-making authority over any potential reintroductions to an outside entity with interests that are hostile to its own conservation mandates only serves to exacerbate such uncertainties. These are precisely the kind of "uncertainties" and "unknown risks" that should be scrutinized in a full EIS. *Id.*

The precedential nature of a blanket, statewide NEP designation and its preclusive effect on alternative recovery actions also weighed heavily in favor of the need for an EIS. *See id.* § 1508.27(b)(6) ("the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration"). The record shows that the Service was well aware that breaking from its past precedent of developing individual, site- or population-specific 10(j) rules, and instead proposing a blanket, statewide 10(j) rule untethered to any particular to-be-reintroduced population or release site(s) would have other states "clamoring for the same deal." 008412; 008398-399; 008407; 08409 (email noting State of Arizona had already inquired about following same path); 008411.[13] Though adopting

---

[13] Sure enough, the Service recently published a proposed rule that would establish a blanket, NEP for black-footed ferrets spanning over 40.9 million acres in the three states of Arizona, New Mexico and Utah. *See* 86 Fed. Reg. 33613, 33624 (June 25, 2021).

this blanket approach for the Wyoming 10(j) Rule does not bind the Service to doing so for other states, it certainly imparts a precedential impact that could lead to significant environmental effects. *See e.g., Anderson v. Evans*, 371 F.3d 475, 493 (9th Cir. 2004) (project instituted a shift in policy that constituted a precedential effect supporting the need for an EIS). Furthermore, a statewide NEP designation and the agency's supporting rationale that only the captive ferret population is "essential" for the species recovery in the wild, "represents a decision in principle about a future consideration" because it precludes the Service from ever establishing any "essential" experimental population(s) of black-footed ferrets in Wyoming. 40 C.F.R. § 1508.27(b)(6).

The Service's blanket, statewide NEP designation should also have been evaluated for its "cumulative" significance—"[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7); *see also id*. § 1508.7 ("'Cumulative impact' is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."). Specifically, the Service should have evaluated the cumulative significance of a statewide "nonessential" designation, when added to all past NEP designations, as well as reasonably foreseeable demands from other states seeking blanket NEP designations for similarly broad geographies. But again, the Service's EA never contemplated this.

The EA never contemplated how the framework of the proposed statewide 10(j) Rule (*e.g*., the broad geographic area, the lack of commitment to any actual reintroductions, or the delegation of lead decision-making authority over all prospective reintroductions to a state agency) might impact the black-footed ferret and its prospects for recovery in the wild. In fact,

the entire EA is astonishingly devoid of any actual analysis as to the Rule's likely impacts on its focus subject – the ferret – or how the Rule, as structured, would fulfill the Service's ESA recovery mandate. Instead, the EA primarily addresses the 10(j) Rule's likely impacts on other natural resources, private farm and ranch lands, and socioeconomic activities. 000709-776. Aside from those discussions, and without regard to the proposed Rule's particular structure or facets, the EA contains only generalized, conclusory assertions that the Rule will supposedly advance ferret recovery. *See e.g.*, 000743 ("we have assumed that implementation of a statewide 10(j) rule for the ferret would result in recovery efforts sufficient to meet the guidelines for delisting."). These assertions and assumptions are arbitrary and have proven to be wrong. *Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 575 (D.C. Cir. 2016) ("simple, conclusory statements of 'no impact' are not enough to fulfill an agency's duty under NEPA.'") (citation omitted). Besides, a "significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial." 40 C.F.R. § 1508.27(b)(1).

Moreover, given the proposed action's potentially significant impacts on an endangered species and "ecologically critical areas" within Wyoming on which that species depends, as well as the myriad ways in which this action threatens to violate the ESA, additional "intensity" factors also show the need for an EIS. *See e.g.,* 40 C.F.R. § 1508.27(b)(9) (whether the action "may adversely affect an endangered or threatened species."); *id.* § 1508.27(b)(3) ([u]nique characteristics of the geographic area...or ecologically critical areas); *id.* § 1508.27(b)(10) (whether the action threatens a violation of legal requirements imposed for the protection of the environment). In sum, the Service woefully failed to make a "convincing case" that such a sweeping 10(j) Rule for North America's most imperiled mammal would have no significant impact. *See e.g.*, *Semonite*, 916 F.3d at 1082, 1087.

**B. The Service's EA Failed to Take the Requisite "Hard Look" at the Rule's Likely Impacts on the Black-Footed Ferret and the Ferret's Recovery.**

An EA, like an EIS, must take a "hard look" at the environmental consequences of the proposed action, including adequately disclosing and analyzing all its foreseeable direct, indirect, and cumulative effects, as well as objectively evaluating all reasonable alternatives. *Wildearth Guardians v. Bernhardt*, 502 F. Supp. 3d 237, 243 (D.D.C. 2020) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21(1976)), *Union Neighbors United*, 831 F.3d at 569; 42 U.S.C. §§ 4332(2)(C)(i)–(v); 40 C.F.R. §§ 1502.14(a), 1502.16, 1508.7, 1508.8, 1508.14. The information must be of high quality. *Id.* § 1500.1(b). Scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. *Id.*

"[B]ecause NEPA places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action,' the considerations made relevant by the substantive statute driving the proposed action must be addressed in NEPA analysis." *Or. Nat. Desert Ass'n v. BLM*, 625 F.3d 1092, 1109 (9th Cir. 2008) (citation omitted) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 553 (1978)). Here, the substantive statute driving the development of a 10(j) rule is the ESA. But despite NEPA's "hard look" requirement, the Service's EA failed to adequately address how the Wyoming 10(j) Rule would actually achieve the ESA's requirements in light of the Rule's particular, unprecedented facets. Specifically, it did not consider the full-scale impacts to the ferret and its long-term conservation from the Rule's: (1) blanket, statewide NEP designation; (2) lack of commitment to any actual ferret reintroductions and failure to identify any prospective release site(s) and to analyze the suitability thereof for an anticipated reintroduction; (3) reliance on a captive population to wholly replace all experimental, wild ferret populations (should such a loss occur);

(4) foreseeable consequences of subdelegating lead decision-making authority over prospective reintroductions to WGFD, and (5) likely precedential impact. *See supra Sec. I.*

Nor did the Service take a hard look at reasonable alternatives for reintroducing ferret populations in Wyoming or the likelihood that a blanket, statewide 10(j) Rule would disincentivize, maybe even preclude, such alternative approaches. An agency's discussion of alternatives must "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14. The discussion of alternatives is intended to provide a "clear basis for choice among options by the decisionmaker and the public." *Id.* This requirement is critical to serving NEPA's primary purposes of ensuring fully informed decisions and meaningful public participation in environmental analyses and decision-making. *See* 40 C.F.R. § 1500.1(b), (c). Accordingly, "[t]he existence of a viable but unexamined alternative renders an [EA] inadequate." *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1049-53 (9th Cir. 2013).

Here, the Service did not consider any action alternative other than the blanket, statewide 10(j) rule it promised the State in the 2013 MOU. The discussion of Alternative C, for instance, does not actually evaluate a "site-specific 10(j) rule" that identifies and analyzes the discrete location(s) where ferrets would be released, as all the Service's past 10(j) rules have. Rather, the EA's analysis of Alternative C merely mentions a "site-specific 10 (j) rule" as a future option. *See* 000726. And then the EA summarily dismisses that option by claiming the "administrative burden" of developing site-specific 10(j) rules would "substantially impede ferret recovery actions" in Wyoming, despite such site-specific 10(j) rules being precisely what the agency's own 10(j) rulemaking procedures call for and what the Service had always done. *See supra Sec. I.A.1;* 000759 (also ironically implying the Service probably lacked the staffing and funding to keep pace with "the goals of collaborating agencies and landowners.").

The Service also failed to provide an adequate justification for not analyzing other key alternative recovery actions in detail. For instance, the Service should have analyzed the "essential" status alternative, or at the very least, provided adequate justification for why it eliminated the alternative from detailed study. 40 C.F.R. § 1502.14(a). The Service also failed to provide an adequate justification for dismissing reintroductions on federal lands through Section 10(a)(1) "recovery permits" and through SHAs with private landowners. 000727. As the court held in *Jewell*, a 10(j) rule "does not need to be the product of an agreement with state and private stakeholders." *Jewell*, 2018 WL 1586651, at *17. Thus, pointing to the political demands of the State and industry "stakeholders" for nothing other than a blanket, statewide 10(j) rule cannot render these other alternatives "unviable" within the meaning of NEPA. The Service does not need the State's approval to partner with other federal agencies for reintroductions on federal lands. Nor does the Service need the State's approval to enter into SHAs with private landowners that are eager to support the ferret's recovery efforts. Indeed, the Service's own officials expressed concern about the EA "sidestepping" the SHA approach. 008396. Thus, the Service's failure to "rigorously explore and objectively evaluate" these viable alternatives renders the EA inadequate. *W. Watersheds Project v. Abbey*, 719 F.3d at 1049-1053.

Last, the Service also failed to take a hard look at how a statewide 10(j) rule designating the entire State of Wyoming as a NEP for the black-footed ferret, at best, creates a disincentive for non-federal landowners to participate in SHAs as they have in other states; at worst, the statewide NEP designation may entirely preclude reintroductions under SHAs due to the requirement that experimental populations be "wholly separate geographically from nonexperimental populations of the same species." *See* 16 U.S.C. § 1539(j)(1); 008401, 008409-410 (discussing undermining of SHA approach). In the absence of such analysis, one cannot

conclude that the Service took the requisite "hard look" at "every significant aspect" of the Rule's environmental impact.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion for summary judgment and set aside and remand the challenged actions.

Dated: February 17, 2023   Respectfully submitted,

*/s/ Jennifer Schwartz*
Wildearth Guardians
P.O. Box 12086
Portland, OR 97213
Ph: (503) 780-8281
jschwartz@wildearthguardians.org

*/s/ Megan Backsen*
Western Watersheds Project
P.O. Box 6774
Reno NV 89513
Ph: (719) 207-2493
megan@westernwatersheds.org

*/s/ Matthew Sandler*
Rocky Mountain Wild
1536 Wynkoop St. Suite 900
Denver, CO 80202
Ph: (303) 579-5162
matt@rockymountainwild.org

*Attorneys for Plaintiffs*