**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

WILDEARTH GUARDIANS, *et al.*,

              *Plaintiffs*,

      v.

U.S. FISH AND WILDLIFE SERVICE, *et al.*,

              *Defendants*,

      v.

STATE OF WYOMING,

              *Defendant Intervenor.*

Civil Action No. 21-2864 (RDM)

<u>**MEMORANDUM OPINION**</u>

This case is about the black-footed ferret, a species that was thought to be extinct until the remarkable discovery in 1981 of a surviving group of 130 ferrets near Meeteetse, Wyoming. Disease, however, soon killed most of the surviving ferrets, leaving only 18 ferrets, which were removed from the wild and used to establish a captive-breeding program to protect the species. Starting in 1991, the United States Fish and Wildlife Service ("FWS") began approving reintroduction sites at which ferrets from the captive-breeding populations are released into the wild. Every known black-footed ferret in the wild is a product of these reintroduction efforts. Unsurprisingly, the black-footed ferret is listed as an endangered species, and, indeed, was first listed in 1967, even before Congress enacted the Endangered Species Act in 1973.

This case involves a challenge to a rule that the FWS promulgated in 2015 pursuant to Section 10(j) of the Endangered Species Act ("ESA"), which "classif[ied] any reestablished

black-footed ferret population in the State of Wyoming as an NEP," which is the FWS's shorthand for a "nonessential experimental population," 80 Fed. Reg. 66821, 66821 (Oct. 30, 2015) (hereinafter "Wyoming 10(j) Rule").  Section 10(j) of the ESA authorizes the Secretary of Interior (here, acting through the FWS) to permit the release of "experimental population[s]" of endangered or threatened species outside of their current range when doing so "will further the conservation of such species."  16 U.S.C. § 1539(j).  "Before authorizing the release of any population" under this provision, however, the Secretary must "by regulation identify the population and [must] determine, on the basis of the best available information, whether or not [that] population is essential to the continued existence of" the species.  *Id.* at § 1539(j)(2)(B).  A determination that the population is a "nonessential experimental population"—or NEP—relaxes the ESA's prohibitions on taking and the requirement that federal agencies engage in formal consultation with the FWS before taking an action that might affect an endangered species.  80 Fed. Reg. at 66823 (final rule).

WildEarth Guardians, Western Watersheds Project, and Rocky Mountain Wild ("Plaintiffs") challenge the FWS's designation of the reintroduced ferrets as "nonessential," arguing that the designation violates the ESA because (i) the designation encompasses all ferrets throughout the State of Wyoming and is not site-specific, Dkt. 1 at 26–28; (ii) the designation was not based on the best available science, *id.* at 28–29; (iii) the designation fails to provide for the conservation of the species, *id.* at 30–31; and (iv) the FWS impermissibly subdelegated its statutory authority relating to the reintroduction and management of an endangered species to the Wyoming Game and Fish Department ("WGFD"), *id.* at 31–32.  Plaintiffs also allege that the FWS violated the National Environmental Policy Act ("NEPA") by failing to prepare an Environmental Impact Statement ("EIS"), *id.* at 32–33, and by preparing an inadequate

Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI"), *id.* at 33–35, addressing the environmental impacts of the Wyoming 10(j) Rule.

For the reasons explained below, the Court concludes that the Wyoming 10(j) Rule does not violate the ESA; that the rule does not include an improper subdelegation of the FWS's statutory duties; and that the FWS complied with the requirements of NEPA when it adopted the rule. The Court, accordingly, will **DENY** Plaintiffs' motion for summary judgment and will **GRANT** Defendants' and Defendant Intervenor's cross-motions for summary judgment.

## I. BACKGROUND

A.      **Statutory and Regulatory Background**

1.      *Prohibited Acts and Consultation Under the Endangered Species Act*

The Endangered Species Act offers sweeping protection for endangered and threatened species. 16 U.S.C. § 1531 *et seq.* It is, in the words of the Supreme Court, "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," and it affords "endangered species the highest of priorities." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180, 194 (1978). Under the ESA, a species may be listed as either "endangered" or "threatened." *See* 16 U.S.C. § 1533. An endangered species is "any species which is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A threatened species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). Once listed, a species gains significant protections.

Most notably, Section 9 prohibits any person, including private parties, states, and federal agencies, from "tak[ing]" a protected species, except as expressly allowed under the Act. 16 U.S.C. § 1538(a)(1)(B). "Take" is broadly defined to mean "to harass, harm, pursue, hunt, shoot,

wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.*
§ 1532(19). "Harm" to a species, in turn, "may include significant habitat modification or
degradation where it actually kills or injures wildlife by significantly impairing essential
behavioral patterns, including breeding, feeding, or sheltering." 50 C.F.R. § 17.3. A violation of
Section 9's prohibition on taking is punishable by substantial civil and/or criminal penalties. *See*
16 U.S.C. § 1540(a), (b), (g).

Section 7 of the Act requires that federal agencies consult with the FWS (or the National
Marine Fisheries Service ("NMFS") in certain circumstances not at issue here)[1] to "insure that
any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the
continued existence of any endangered species or threatened species or result in the destruction
or adverse modification of habitat of such species which is determined by the Secretary . . . to be
critical." 16 U.S.C. § 1536(a)(2). If a federal agency concludes that its action "may affect listed
species or critical habitat," that agency must engage in "formal consultation" with the FWS. 50
C.F.R. § 402.14(a). Under the formal consultation process, the FWS must: (1) "[r]eview all
relevant information . . . available," which "may include an on-site inspection," (2) "[e]valuate
the current status and environmental baseline of the listed species or critical habitat,"
(3) [e]valuate the effects of the action and cumulative effects on the listed species or critical
habitat," (4) "[a]dd the effects of the action and cumulative effects to the environmental
baseline" in order to "formulate the Service's opinion as to whether the action is likely to
jeopardize the continued existence of listed species," (5) discuss "the basis for any finding in the

---

[1] For ease of reference, the Court will refer exclusively to the FWS and will omit references to
the NMFS that have no bearing on this case. Some of the regulations at issue, however, were
jointly issued by the FWS and the NMFS, which are commonly referred to jointly as "the
Services."

4

biological opinion, and the availability of reasonable and prudent alternatives (if a jeopardy

opinion is to be issued)" to avoid a violation of the ESA; (6) "[f]ormulate discretionary

conservation recommendations," (7) "[f]ormulate a statement concerning incidental take, if such

take is reasonably certain to occur," and (8) "use the best scientific and commercial data

available" in formulating the biological opinion, any alternatives, and other measures."  50

C.F.R. § 402.14(g).  The resulting biological opinion ("BiOp") must, among other things,

determine whether the proposed agency action is "[l]ikely to jeopardize the continued existence

of a listed species or result in the destruction or adverse modification of critical habitat" (a

"jeopardy" BiOp) or "[n]ot likely to jeopardize the continued existence of a listed species or

result in the destruction or adverse modification of critical habitat" (a "no jeopardy" BiOp).  50

C.F.R. § 402.14(h)(1)(iv).

       "Following the issuance of a 'jeopardy' opinion, the [action] agency must either

terminate the action, implement the proposed alternative, or seek an exemption from the Cabinet-

level Endangered Species Committee pursuant to 16 U.S.C. § 1536(e)."  *Nat'l Ass'n of Home*

*Builders v. Defs. of Wildlife*, 551 U.S. 644, 652 (2007).  Following a "no jeopardy biological

opinion," the FWS must issue an incidental take statement ("ITS"), 16 U.S.C. § 1536(b)(4); 50

C.F.R. § 402.14(i), if it concludes that incidental take—*i.e.*, "takings that result from, but are not

the purpose of, carrying out an otherwise lawful activity," 50 C.F.R. § 402.02—is "reasonably

certain to occur," 50 C.F.R. § 402.14(g)(7); *Shafer & Freeman Lakes Env't Conservation Corp.*

*v. FERC*, 992 F.3d 1071, 1080 (D.C. Cir. 2021).  An ITS provides liability protection because

any incidental take that "is in compliance with the terms and conditions specified" by an ITS

"shall not be considered to be a prohibited taking of the species concerned."  16 U.S.C.

§ 1563(o)(2).  *See generally Ctr. for Biological Diversity v. Regan*, __ F. Supp. 3d __, 2024 WL
1602457 (D.D.C. Apr. 12, 2024) (describing the formal consultation process, BiOp, and ITS).

In contrast to the formal *consultation* procedure for listed species, when a species is
merely "proposed to be listed," a federal agency need only "*confer* with the Secretary" regarding
agency actions that are "likely to jeopardize the continued existence of" that species.  16 U.S.C.
§ 1536(a)(4) (emphasis added).  This more limited conferral process involves "informal
discussions" during which "the [FWS] will make advisory recommendations, if any, on ways to
minimize or avoid adverse effects."  50 C.F.R. § 402.10(c).  Unlike formal consultation, the
conferral requirement for proposed species does not require the preparation of a BiOp, the
issuance of a jeopardy or no jeopardy finding, or the issuance of an ITS.  As a result, the
conferral process is significantly less arduous than formal consultation.

2.      *Section 10 of the Endangered Species Act*

In 1982, Congress amended the ESA to provide more flexible rules for the reintroduction
of species using "experimental" populations pursuant to Section 10(j) of the Act.  16 U.S.C.
§ 1539(j); *see also* H.R. Rep. No. 97-567, at 34 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 2817,
2833 (noting how section 10(j) provides broader flexibility).  The ESA defines an "experimental
population" as "any population (including any offspring arising solely therefrom) authorized by
the Secretary for release under [this subsection], but only when, and at such times as, the
population is wholly separate geographically from nonexperimental populations of the same
species."  16 U.S.C. § 1539(j)(1).  "The Secretary may authorize the release (and the related
transportation) of [such an experimental] population (including eggs, propagules, or individuals)
of an endangered species or a threatened species outside the current range of such species if the

Secretary determines that such release will further the conservation of such species." *Id.*

§ 1539(j)(2)(A).

The implementing regulations describe how the Secretary should determine whether

"release will further the conservation of the species." 50 C.F.R. § 17.81(b).[2] In particular, the

Secretary must "use the best scientific and commercial data available to consider:"

> (1)   Any possible adverse effects on extant populations of a species as a result of removal of individuals, eggs, or propagules for introduction elsewhere;
>
> (2)   The likelihood that any such experimental population will become established and survive in the foreseeable future;
>
> (3)   The relative effects that establishment of an experimental population will have on the recovery of the species;
>
> (4)   The extent to which the introduced experimental population may be affected by existing or anticipated Federal or State actions or private activities within or adjacent to the experimental population area; and
>
> (5)   When an experimental population is being established outside of its historical range, any possible adverse effects to the ecosystem that may result from the experimental population being established.

*Id.*

"Before authorizing the release" of an experimental population under Section 10(j), the

Secretary must also decide, based on "the best available information," whether to categorize the

experimental population as "essential" or "nonessential" "to the continued existence of an

endangered species or a threatened species." 16 U.S.C. § 1539(j)(2)(B). A population is

"essential" if its "loss would be likely to appreciably reduce the likelihood of the survival of the

---

[2] This section of the Code was amended on August 2, 2023. In their briefing, the parties use the section headings from the previous version of the regulation, which was in effect during the rulemaking at issue in this case. For ease of reference, the Court will do so as well, and all references in this opinion to "50 C.F.R. § 17.81" refer to the regulation prior to the August 2023 amendments.

species in the wild."  50 C.F.R. § 17.80(b).  "All other experimental populations are to be

classified as nonessential."  *Id.*  As described in the House Committee Report, this inquiry

requires the Secretary to consider "whether the population is of a species that is in imminent

danger of extinction."  H.R. Rep. No. 97-567, at 34.

Designation as a nonessential experimental population has significant implications.  Most

notably, Section 10(j) provides that a nonessential experimental population is treated "as a

species proposed to be listed" for purposes of Section 7, "except when [the action] occurs in an

area within the National Wildlife Refuge System or the National Park System" wherein the

population is treated as a threatened species.  16 U.S.C. § 1539(j)(2)(C)(i).  As a result, except

for agency actions affecting species within the National Wildlife Refuge System and the

National Park System, agencies and the FWS are not required to comply with the formal Section

7(a)(2) consultation process, including the issuance of a BiOp, the making of a jeopardy/no

jeopardy determination, or, if appropriate, the issuance of an ITS.  *See* 16 U.S.C. § 1536(b).  As

explained above, Section 7(a)(4), which applies to species "proposed to be listed," merely

requires agencies "to confer (rather than consult) with the [FWS] on actions that are likely to

jeopardize the continued existence of a species proposed to be listed," and "[t]he results of [such]

a conference [take] the form of conservation recommendations that are optional."  80 Fed. Reg.

19263, 19266 (Apr. 10, 2015) (proposed rule).  Section 10(j) adds further "flexibility" to the

management of NEPs, *id*., moreover, by exempting those populations from otherwise applicable

rules relating to the designation of "critical habitat[s]."  16 U.S.C. § 1539(j)(2)(C)(ii).

Another important distinction exists between most populations of endangered and

threatened species and those designated as experimental—whether essential or nonessential—

under Section 10(j).  As noted above, the ESA generally prohibits any person from "taking"

endangered species.  16 U.S.C. § 1538(a)(1)(B).  There are, however, ways to obtain protection against liability for takings that are "incidental to, and not the purpose of, the carrying out of an otherwise lawful activity."  *Id.* § 1538(a)(1)(B).  Ordinarily, protection against liability for incidental takings can be obtained for actions authorized, funded, or carried out by a federal agency through issuance of an ITS pursuant to Section 7, *see id.* § 1536(o)(2), or for purely private activity, through the development of a conservation plan and issuance of a permit pursuant to Section 10(a)(1)(B), *see id.* § 1539(a)(1)(B).  Both of these "mechanisms offer the promise of liability protection for incidental take if, but only if, those involved abide by the specific measures and standards specified by Congress and the [FWS]," and both "mandate[] robust analyses and standards that the [FWS] must satisfy before permitting incidental take." *Ctr. for Biological Diversity*, __ F. Supp. 3d at __, 2024 WL 1602457, at *5, *9.

Section 10(a)(1)(A), however, offers a more streamlined and certain route to incidental take protection for "acts otherwise prohibited by [the ESA]" when such acts are undertaken "for scientific purposes or to enhance the propagation or survival of the affected species, including, but not limited to, acts necessary for the establishment and maintenance of experimental populations pursuant to" Section 10(j).  16 U.S.C. § 1539(a)(1)(A).  Unlike the usual permit issued under Section 10, the FWS may utilize this special authority without requiring the development of a detailed conservation plan, without providing an opportunity for public comment on that plan, and without finding, among other things, that the conservation plan will, "to the maximum extent practicable, minimize and mitigate the impacts of [any] taking" of the listed species.  *Id.* § 1539(a)(2).  One way that the FWS may authorize the incidental taking of members of an experimental population under Section 10(a)(1)(A) is by authorizing incidental

taking in a Section 10(j) rule, as it did in the Wyoming 10(j) Rule.  *See*, *e.g*., 50 C.F.R.

§ 17.84(g)(5).

There are other ways, however, in which the FWS may authorize the incidental taking of

members of a listed species under Section 10(a)(1)(A).  In 1999, the FWS provided a blueprint

for doing so when it issued its "Safe Harbor Policy."  64 Fed. Reg. 32717, 32718 (Jun. 17, 1999).

That policy is intended to provide "incentives for private and other non-Federal property owners

to restore, enhance, or maintain habitats for listed species" by providing programmatic

incidental-take protection to non-Federal property owners who voluntarily participate in

conservation efforts that achieve "net conservation benefit[s] . . . for listed species covered by the

Agreement[s]."  *Id.* at 32717–18.  To do so, the policy established a structure for future Safe

Harbor Agreements under which the FWS would issue so-called "enhancement of survival"

permits, pursuant to Section 10(a)(1)(A), to non-federal landowners who voluntarily committed

to the proactive conservation efforts spelled out in the agreements.  *Id.* at 32722.

   3. *The National Environmental Policy Act*

NEPA requires federal agencies to take a "hard look" at the environmental consequences

before carrying out federal actions.  *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373–74

(1989).  The statute accomplishes this by imposing procedural requirements that serve "twin

aims."  *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc*., 462 U.S. 87, 97 (1983).  "First,

[NEPA] 'places upon an agency the obligation to consider every significant aspect of the

environmental impact of a proposed action.' . . .  Second, it ensures that the agency will inform

the public that it has indeed considered environmental concerns in its decision[-]making

process."  *Id*. (quoting *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435

U.S. 519, 553 (1978)).  "Where NEPA analysis is required, its role is primarily information-

forcing. . . .  NEPA is not a suitable vehicle for airing grievances about the substantive policies

adopted by an agency, as NEPA was not intended to resolve fundamental policy disputes."

*Mayo v. Reynolds*, 875 F.3d 11, 15–16 (D.C. Cir. 2017) (internal citations and quotation marks

omitted).

NEPA imposes different procedural requirements depending on whether an action is

expected to have significant affects.  For a "major Federal action[] significantly affecting the

quality of the human environment," NEPA requires the lead agency to prepare an environmental

impact statement ("EIS"), which is "a detailed statement" that describes the project's

environmental impact and considers alternatives.  42 U.S.C. § 4332(C).  To determine whether a

proposed action will significantly affect the environment such that an EIS is required, agencies

must prepare an environmental assessment ("EA"), which is a "concise public document" that

considers the action's environmental impacts as well as alternatives to the proposed action.  40

C.F.R. §§ 1508.1(j), 1501.4(b)(2).  When an EIS is not required, the agency must prepare a

"finding of no significant impact" ("FONSI"), *id.* § 1501.6(a)(1), which "includes or summarizes

the EA and briefly explains why the agency believes the action will not have a significant effect

on the environment."  *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 37 (D.C. Cir.

2015).  "Each form of NEPA analysis—EA/FONSI or EIS—requires public notice and

comment, and each is subject to judicial review."  *Id.* (citations omitted).

The Court reviews NEPA challenges under the APA, so its role is "simply to ensure that

the agency has adequately considered and disclosed the environmental impact of its actions and

that its decision is not arbitrary or capricious."  *Sierra Club v. FERC*, 867 F.3d 1357, 1367–68

(D.C. Cir. 2017) (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 308 (D.C. Cir. 2013)).

The Court must assess whether the "deficiencies are significant enough to undermine informed

public comment and informed decision[-]making," *id.* at 1368, but "should not '"flyspeck" an agency's environmental analysis, looking for any deficiency no matter how minor,'" *id.* (quoting *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006)).

**B.   Factual Background**

 1. *Black-footed ferrets*

  The black-footed ferret is a small, carnivorous mammal with a yellowish body, black feet and tail tip, and a black "mask" around its eyes.  Dkt. 48 at 853 (2013 Recovery Plan).  It is the only ferret species native to the Americas, *id.* at 852, and it "was historically found throughout the Great Plains, mountain basins, and semi-arid grasslands of North America wherever prairie dogs occurred," *id.* at 855.  Black-footed ferrets prey on prairie dogs and use prairie dog burrows for shelter.  *Id.* at 854.  Unfortunately, "[f]rom the late 1800s to approximately 1960, both prairie dog occupied habitat and prairie dog numbers were reduced by (1) habitat destruction due to conversion of native prairie to cropland, (2) poisoning, and (3) disease," and the "ferret population declined precipitously as a result."  *Id.* at 858.  In addition to the loss of prey and habitat, disease—notably, canine distemper and sylvatic plague—has also posed an existential threat to the black-footed ferret.  *Id.* at 867–68.

  The black-footed ferret has been listed as an endangered species since 1967, and, upon passage of the ESA 1973, the species was grandfathered in as an ESA-endangered species.  *Id.* at 851.  Moreover, the black-footed ferret is an endangered species without a "designated critical habitat" because it was listed prior to amendments that required critical habitat designations.  *Id.* In the mid-twentieth century the species became so rare that for a time it was thought to have been extinct.  The last wild black-footed ferrets were thought to have died in South Dakota in 1974 and the last captive ferret was thought to have died in 1979.  *Id.* at 858.  In 1981, however,

12

a remnant population of black-footed ferrets was discovered near Meeteetse, Wyoming, and, after most of those ferrets perished from disease outbreaks, the remaining 18 ferrets were captured and used to start a captive-breeding program.  *Id.*  From that small pool, "15 individuals, representing the genetic equivalent of 7 distinct founders, produced a captive population lineage that is the foundation of present recovery efforts."  *Id.*  Prior to adoption of the Wyoming 10(j) Rule in 2015, that lineage had been used to populate 23 reintroductions sites in Arizona, Colorado, Kansas, Montana, New Mexico, South Dakota, Utah, Chihuahua, Mexico, and Saskatchewan, Canada, as well as the Shirley Basin site in Wyoming.  80 Fed. Reg. at 19266.  "No wild populations have been found since the capture of the last Meeteetse ferret despite extensive and intensive rangewide searches," and every known black-footed ferret in the wild was either bred in the captive ferret program or is a decedent of ferrets bred in that program.  *Id.* at 19267.

2. *Block Clearance and 10(j) Rule Request*

In 2012, the Wyoming Game and Fish Department requested that the FWS (1) "block clear" Wyoming for the black-footed ferret and (2) develop a statewide 10(j) rule for black-footed ferrets.  Dkt. 48 at 1032.  Block clearance involves a formal acknowledgement by the FWS that residual, wild members of a listed species no longer exist in a specified area.  *Id.*; *see also id.* at 1037.  The acknowledgement can relieve local stakeholders of their obligation to survey the area to search for the listed species before initiating projects.  *See id.* at 1037.  It also paves the way for a Section 10(j) determination, since the FWS may not authorize the release of an experimental population pursuant to Section 10(j) unless "the [experimental] population is wholly separate geographically from nonexperimental populations of the same species."  16 U.S.C. § 1539(j)(1).  Block clearance makes it clear that all black-footed ferrets in the area going

forward will be considered experimental, reintroduced ferrets wholly geographically separate
from any wild ferrets (because there are no more wild ferrets).

The FWS had already block cleared most of Wyoming in 2004 with the exception of "16
white-tailed prairie dog complexes." Dkt. 48 at 1035. The WGFD's 2012 request sought to
block clear the remaining portions of the State. *Id.* at 1032. In support of its request, the
Wyoming agency attached a 2009 report, *Revaluation* [sic] *of the Block Clearance Process for
the Black-Footed Ferret in Wyoming with Recommendations to the U.S. Fish and Wildlife
Service*, which it had prepared in cooperation with the FWS. *Id.* at 1034. The report concluded
that "it is extremely unlikely that any wild ferret exists in Wyoming that did not originate from a
reintroduced population" and that "the probability of locating a wild free ranging ferret
population in the [remaining] areas [not yet block cleared] is negligible." *Id.* at 1035; *see also id.*
at 1044–45. The report, accordingly, recommended block clearing all of Wyoming. *Id.* at 1035.

The FWS approved the WGFD's block clearance request on March 6, 2013. *Id.* at 996.
After reviewing the report, the FWS determined that "the conclusions presented are sound and
that [the WGFD's] request for statewide block clearance is both warranted and timely." *Id.*
"The block clearance," the FWS explained, "will alleviate the requirement to conduct
presence/absence surveys for black-footed ferrets prior to developing projects." *Id.* The
approval letter described the WGFD and FWS's collaborative block clearance process as a "good
example" of how certain conservation efforts are better addressed outside of the Section 7 formal
consultative process. *Id.* at 997.

The FWS also informed WGFD that it intended to begin the process of developing a
statewide Section 10(j) rule for Wyoming. The FWS had already promulgated two Section 10(j)
rules in 1991 and 2001 designating Shirley Basin, Wyoming, and part of Sweetwater County,

Wyoming, respectively, as black-footed ferret reintroduction sites.  *See* 80 Fed. Reg. at 66824.

Agreeing that "[S]ection 7 consultation requirements alone have not effectively promoted the

conservation of prairie dog habitats in order to support further ferret recovery, and that the

relaxation of [S]ection 7 consultation requirements will not diminish the responsibilities or

efforts of . . . entities involved with ongoing ferret recovery needs," the FWS concluded that it

would "initiate development of a complementary statewide 10(j) 'experimental and nonessential'

rule for Wyoming."  Dkt. 48 at 997.

> 3.       *Safe Harbor Agreement, 2013 MOU, and Recovery Plan*

In October 2013, while the FWS was still contemplating Wyoming's request for state-

wide Section 10(j) rulemaking, the FWS also executed a nationwide programmatic Safe Harbor

Agreement ("SHA") for the black-footed ferret.  Dkt. 48 at 82–123.  The SHA applied not only

to Wyoming but also to the eleven other states that have portions of the historical habitat range

of the black-footed ferret within their borders.  *Id*. at 92.  Pursuant to the SHA, "non-federal

landowners who voluntarily commit to implementing or avoiding specific activities over a

defined timeframe that are reasonably expected to provide a net conservation benefit to species

listed under the Endangered Species Act . . . receive assurances from the Service that no

additional future regulatory restrictions will be imposed or commitments required for [the]

species covered."  *Id.* at 91.  Under the SHA, the FWS also agreed to issue a 50-year

enhancement of survival permit under Section 10(a)(1)(A) of the ESA to the "Black-Footed

Ferret Recovery Coordinator," a FWS employee, who would then enroll non-federal landowners

in the program.  *Id*.  Participating landowners, referred to as "Cooperators," may receive 10-year

Certificates of Inclusion, which convey incidental take protection and provide assurances relating

to certain future restrictions.  *Id*.; *see also* 64 Fed. Reg. 32717.

Later in 2013, while Wyoming's request for a Section 10(j) designation remained pending, the FWS and the WGFD (with the participation of several federal and state governmental "partners") entered into a Memorandum of Understanding ("MOU") for the purpose of identifying the "roles, responsibilities[,] and authorities related to the recovery of ferrets in the State of Wyoming under statewide ferret 10(j) rule," should the FWS adopt such a rule.  Dkt. 48 at 140.  In setting the "guiding principles" and "values which will direct their collaboration," the parties agreed to work collaboratively to "identify, and prioritize, prospective ferret reintroduction sites in Wyoming outside of the [then-]current 10(j) area," and agreed "that future reintroductions of the ferrets will be based on mutually affirmed prioritization of prospective reintroduction sites." *Id.* at 140–41.  They then agreed to certain "roles and responsibilities," which, for the FWS, included serving "as the lead agency for the consideration of a 10(j) rule that could designate ferrets as non-essential and experimental throughout the State of Wyoming," and which, for the WGFD, included facilitating cooperation and communication among the parties to the agreement and "continu[ing] to serve as the lead agency for ferret recovery actions in the State of Wyoming." *Id.* at 142.  The MOU was "effective . . . for a period of (5) years" and was subject to renewal "as mutually agreed upon by the Parties and the Partners." *Id.* at 143.

Around the same time that the FWS executed the MOU, it also issued a second revised nationwide Recovery Plan for the Black-footed Ferret ("Recovery Plan") with the stated goal of "recover[ing] the black-footed ferret such that it no longer meets the ESA's definition of endangered or threatened."  Dkt. 48 at 843.  The Recovery Plan estimated that there were, at that time, at least 418 adult breeding black-footed ferrets at reintroduction sites in the wild and 280 additional animals at captive-breeding sites. *Id.*  The Plan concluded that "downlisting" the

species from endangered to threatened would require establishing 10 successful populations across the U.S. with 1,500 breeding adults—a goal that was 40% complete with respect to the populations and 24% complete with respect to the breeding adults. *Id.* Although it acknowledged that "[t]he species remains vulnerable to several threats, including sylvatic plague and inadequate regulatory mechanisms," *id.*, the Plan estimated that "downlisting of the black-footed ferret could be accomplished in approximately 10 years if conservation actions continue at existing reintroduction sites and if additional reintroduction sites are established," *id*. at 845. The Plan predicted that the species could be "delisted" entirely by 2043 if the actions specified in the Plan occurred, including the creation of six new reintroduction sites annually. *Id.* at 897.

The Recovery Plan itself contemplated the benefits of using Section 10(j) rules to aid black-footed ferret conservation efforts. The Plan explained how "[t]he large number of [Section 7] informal consultations eventually led to the concept of block clearing large expanses of prairie dog occupied habitat to avoid redundant ferret surveys for potential remnant wild ferret populations at each proposed project." *Id.* at 875. And it further explained that "[m]ost reintroduced black-footed ferrets have been released into nonessential experimental population areas as set forth in [S]ection 10(j)" because the "experimental" designation "increases the [FWS's] flexibility and discretion in managing reintroduced endangered species and allows promulgation of regulations deemed appropriate for conservation of the reintroduced species" and the "nonessential" designation "allows additional management flexibility." *Id.* at 876. The Plan also observed that some reintroductions have occurred pursuant to Section 10(a)(1)(A) scientific recovery permits. *Id.* at 877. Overall, the Plan concluded not only that "[t]imely establishment of wild black-footed ferret populations is critical to minimize deleterious effects resulting from too many generations of captive breeding" but also that "[f]ewer black-footed

17

ferret reintroductions would have been initiated during the past 20 years without the added

flexibility of nonessential experimental designations."  *Id.*

      4.    *Proposed and Final Wyoming 10(j) Rule*

      Following the FWS's state-wide block clearance for the black-footed ferret in Wyoming,

the agency "moved forward to develop a statewide 10(j) rule for the black-footed ferret."  Dkt.

48 at 9 (Black-footed ferret 10(j) Rule FAQs).  On December 1, 2014, the FWS issued a

Frequently Asked Questions ("FAQ") document explaining that it was "in the process of

developing a proposed statewide 10(j) rule" that would "designate all ferret populations in the

state as 'non-essential and experimental'" because that "designation provides the greatest

flexibility to manage ferrets while addressing landowner concerns regarding ESA regulations

and the reintroduction of endangered species."  *Id.*

      Then, on April 10, 2015, the FWS published a notice of proposed rulemaking ("NPRM"),

proposing to "reestablish the black-footed ferret under [Section] 10(j) of the [ESA] and to

classify any reestablished population as a nonessential experimental population (NEP)."  80 Fed.

Reg. at 19263.  The NPRM started by stressing the importance of various Section 10(j)

authorities in furthering the agency's black-footed ferret recovery efforts:

> Authorities under section 10(j) of the Act have been successfully used to
> reintroduce black-footed ferrets in other portions of their range, which
> historically included portions of Arizona, Colorado, Kansas, Montana,
> Nebraska, New Mexico, North Dakota, Oklahoma, South Dakota, Texas, Utah,
> and Wyoming, as well as Saskatchewan, Canada, and Chihuahua, Mexico.
> Eleven of 24 reintroduction efforts, including the first ferret reintroduction at
> Shirley Basin, Wyoming, were established pursuant to [S]ection 10(j); seven
> reintroduction efforts were authorized via scientific recovery permits issued by
> the Service under [S]ection 10(a)(1)(A); and four sites were established via the
> SHA.

*Id.* at 19265.  The NPRM analyzed the likelihood that the proposed experimental population will

become established and survive, the relative effects the establishment of an experimental

population will have on the recovery of the species, and how existing or anticipated federal, state, or private activities might affect the experimental population. *Id.* at 19265–69

As relevant here, the NPRM also considered "the best scientific and commercial data available" to "determine whether the experimental population" should be classified as "*essential* or *nonessential* to the continued existence of the species." *Id.* at 19266. As the NPRM explained, "an experimental population is considered essential if its loss would be likely to appreciably reduce the likelihood of survival of th[e] species in the wild," and "[a]ll other populations are considered nonessential." *Id.* (citing 50 C.F.R. § 17.80(b)). Applying this standard, the NPRM "determined that the proposed experimental population would not be essential to the survival of the black-footed ferret in the wild because loss of an experimental population in Wyoming will not affect the 23 reintroduction sites outside of Wyoming in Arizona, Colorado, Kansas, Montana, New Mexico, South Dakota, and Utah; in Chihuahua, Mexico; and in Saskatchewan, Canada." *Id.* That is, "loss of an experimental population in Wyoming" would not, in the FWS's view, "appreciably reduce the likelihood of future survival of the ferret rangewide." *Id.*

The NPRM further supported its proposed "nonessential" determination as follows:

The potential future loss of black-footed ferrets from Wyoming would not affect the species' survival throughout the remaining 90 percent of its range in the wild, or in captivity. We estimate that there are approximately 418 breeding adult ferrets in the wild, including approximately 102 breeding adults in the reintroduced population at Shirley Basin, Wyoming (24 percent of ferrets in the wild); there are a minimum of 280 breeding adults in captivity (U.S. Fish and Wildlife Service 2013a, pp. 22 and 68). Animals lost during reintroduction efforts can be readily replaced through captive-breeding, which produces juvenile ferrets in excess of the numbers needed to maintain the captive-breeding population. Captive-breeding and reintroduction of surplus ferrets have occurred since 1991, with no apparent loss of reproductive capability in the wild observed to date. The loss of an experimental population in Wyoming will not appreciably reduce the likelihood of future survival of the ferret rangewide.

19

> Therefore, the Service is proposing to designate an NEP for the ferret throughout
> Wyoming.

*Id.*  Finally, the NPRM observed that treating the proposed, experimental population as

"nonessential" would "provide additional flexibility because Federal agencies are not required to

consult with [the FWS] under [S]ection 7(a)(2)," *id.*, and would provide "increased management

flexibility, which will encourage landowner participation and alleviate concerns regarding

possible land use restrictions," *id.* at 19269.

After providing an opportunity for notice and comment, the FWS promulgated the final

Wyoming 10(j) Rule.  80 Fed. Reg. 66821 (Oct. 30, 2015); *see also id.* at 66823 (describing the

notice and comment period).[3]  As proposed in the NPRM, the final rule "designate[d] [a] black-

footed ferret . . . nonessential experimental population (NEP) area in the State of Wyoming in

accordance with section 10(j) of the Endangered Species Act."  *Id.* at 66821.[4]  "The boundaries

of the nonessential experimental population include all areas in the State of Wyoming outside of

the Shirley Basin/Medicine Bow Management Area . . . and the small portion of Wyoming

included as part of the Northwestern Colorado/Northeastern Utah Experimental Population

Area."  50 C.F.R. § 17.84(g)(9)(viii).  Taken together, however, the three areas "cover the entire

State of Wyoming," *id.*, and the NEP designation "appl[ies] to all ferrets reintroduced to

---

[3] The final Wyoming 10(j) Rule addressed the relevant public comments as well as three expert
peer reviews.  80 Fed. Reg. at 66829.  The FWS concluded based on the peer reviews that the
proposed rule included "an accurate summation of the best available scientific information on the
biology, current status, and recovery efforts for black-footed ferret, and that the proposed
establishment of an NEP area in Wyoming to facilitate black-footed ferret reintroduction is well
supported by the best available scientific information."  *Id.*

[4] As mentioned above, Shirley Basin, Wyoming, and part of Sweetwater County, Wyoming, had
already been designated as NEP reintroduction sites.  80 Fed. Reg. at 66824.  The combination of
these two previously designated areas and the NEP area designated by the final rule "collectively
cover[s] the entire State of Wyoming."  *Id.*; *see also id.* at 66838 (map of NEP areas).

Wyoming, with the exception of animals found on lands managed by the National Park Service or [the FWS]," 80 Fed. Reg. at 66822.  Where the NEP designation applies, it relaxes both the incidental "take prohibitions and [the] consultation requirements of the [ESA]."  *Id.*  Finally, the final rule provides for a cooperative approach "with other Federal agencies, [the] WGFD, Tribes, landowners, and other stakeholders to develop, implement, and maintain long-term site management before, during and after releases," *id.* at 66825, and contemplates that "[t]he WGFD will serve as the lead agency in the reintroduction and subsequent management of black-footed ferret in Wyoming," while continuing "to coordinate closely with the [FWS] on these restoration efforts," *id.* at 66822.

 To make the NEP designation, the FWS determined that "the population is wholly geographically separate from other populations, and the experimental population is not essential to the continued existence of the black-footed ferret in the wild."  *Id.* at 66821–22.  As it did in the proposed rule, the FWS concluded that the "loss of an experimental population in Wyoming will not affect the captive population or the 24 existing reintroduction sites," which means the "loss of an experimental population in Wyoming will not appreciably reduce the likelihood of future survival of the ferret rangewide."  *Id.* at 66823.  It also noted that any loss would not affect the sustainability of the captive-breeding program because "[o]nly ferrets that are surplus to the needs of the captive-breeding programs are used for reintroduction into the wild."  *Id.* at 66826.

 The FWS further concluded that reintroduction efforts in Wyoming were likely to "result in the successful establishment of a self-sustaining population, which will contribute to the recovery of the species."  *Id.*  The agency expected that the Wyoming 10(j) rule would "result in the creation of additional reintroduction areas in Wyoming."  *Id.*  To ensure the success of those new reintroduction areas, the agency planned to implement "[m]easures to avoid and minimize

the incidental take of black-footed ferrets . . . within reintroduced populations," and to introduce efforts to protect "the black-tailed and white-tailed prairie dog [from] sylvatic plague" to help foster the return of the black-footed ferret, which relies on the prairie dog for food and shelter. *Id.* In addition, the FWS anticipated that the Wyoming 10(j) rule would provide "increased management flexibility, which will encourage landowner participation and [will] alleviate concerns regarding possible land use restrictions." *Id.* Overall, the agency expected the rule to "result in an increase in the reproduction, numbers and distribution of the black-footed ferret." *Id.*

The Wyoming 10(j) Rule was "designed to broadly exempt from the [S]ection 9 take prohibitions any take of black-footed ferrets that is incidental to otherwise lawful activities." *Id.* The FWS provided the exemption because it "believe[s] that such incidental take of members of the NEP associated with otherwise lawful activities is necessary and advisable for the conservation of the species," because there would be "no adverse effects to extant wild or captive black-footed ferret populations," and because the Service "expect[s] that any reintroduction efforts in Wyoming will result in the successful establishment of a self-sustaining population, which will contribute to the recovery of the species." *Id.* In part, the FWS also drew on its "experience at previous reintroduction sites, where incidental take associated with otherwise lawful activities such as ranching and energy development has been low" and "poisoning [of prairie dogs] within a reintroduction site is very restricted" and overseen by site-specific management plans. *Id.* at 66826–27. As the FWS explained in its FAQ, "[t]he Safe Harbor Agreement and the 10(j) [rule] are entirely compatible" because the SHA provides assurances and incidental take authorization "on a case-by-case basis for specific properties where a landowner is interested in reintroducing a listed species" while the 10(j) rule "would designate

reintroduced ferrets as 'nonessential and experimental' throughout the state, thereby removing the incidental take prohibition for all potentially affected landowners." Dkt. 48 at 10.

The final rule also addressed the "release procedures" for the Wyoming NEP area. 80 Fed. Reg. at 66825. The FWS explained that it intended to work with other federal and state agencies, including the WGFD, Tribes, private landowners, and others. *Id.* The FWS would rely on "[p]artners [to] develop annual site-specific reintroduction plans," which they would submit to the FWS "by mid-March as part of an annual ferret allocation process" used to "allocate[] available captive ferrets for release in specific numbers for specific sites." *Id.* These "[r]eintroduction plans will include current estimates of prairie dog numbers and density, disease prevalence and management, and proposed reintroduction and monitoring methods." *Id.* To maximize the reintroduced ferrets' chances of survival, the FWS will first ensure that "all captive-reared ferrets released . . . receive adequate preconditioning in outdoor pens at the National Black-footed Ferret Conservation Center or at another facility approved by the [FWS]," are vaccinated for canine distemper and sylvatic plague, and are "mark[ed] . . . with passive integrated transponder tags," and will then "transport the ferrets to the reintroduction site and release them directly from transport cages into prairie dog burrows." *Id.*

Finally, the FWS justified the final rule in light of the goals set forth in the Recovery Plan. As suggested in the Recovery Plan, the final rule "increases the [FWS's] flexibility and discretion in managing reintroduced endangered species" and "facilitate[s] the establishment of free-ranging populations of ferrets within the species' historical range in Wyoming, thereby contributing to the numerical and distributional population targets laid out in the recovery plan's delisting and downlisting . . . criteria." *Id.* at 66821. According to the final rule, about "100 breeding adult ferrets [were] already established at Shirley Basin" and, as set forth in the

Recovery Plan, the state's downlisting target was about 171 breeding adults and its delisting target was about 341 breeding adults.  *Id.* at 66825.  Meeting the downlisting goal, accordingly, "would require establishing one additional large reintroduction site similar to Shirley Basin or two to three smaller sites," and meeting the delisting goal "would require establishing two large sites, six small sites, or a combination of large, medium, and small sites, in addition to the sites previously established for" downlisting.  *Id.*  As the FWS observed in the final rule, there were "several sites in Wyoming with potential for ferret reintroduction[,] including one site with potential for reintroduction within less than 3 years, 24 sites with potential for reintroduction within 3 to 10 years, and two sites with long-term potential for reintroduction."  *Id.* at 66824. The FWS, accordingly, concluded that "recovery can be achieved through a combination of expansion of ferret populations at existing reintroduction sites and reintroduction of ferrets at new sites, both of which are possible if conservation of prairie dog occupied habitat and disease management are aggressively pursued."  *Id.*  The agency cautioned, however, that recovery "is a dynamic process that requires adaptive management."  *Id.*

5.     *Environmental Assessment & Finding of No Significant Impact*

In conjunction with its consideration of the Wyoming 10(j) Rule, the FWS released an EA for the Rule on October 13, 2015.  *See* Dkt. 48 at 277–344.  As required by NEPA, the EA "analyze[d] potential effects" of the proposed action on "the human environment," "alternatives to the [p]roposed [a]ction," and whether the effects of the proposed action "may be significant." *Id.* at 287.  Among other things, the FWS "reviewed all federally threatened, endangered, proposed, and candidate species known to occur within the action area . . . to determine which species may be impacted by the alternatives."  *Id.* at 296.  Most obviously, the FWS determined that the proposed action "may impact" the black-footed ferret, but it also considered effects on

the greater sage-grouse, which at the time was a candidate species for listing under the ESA.  *Id.* at 296.  The agency also considered how various sensitive wildlife species, farms and ranch lands, and socioeconomics might be affected by the proposed action.  *Id.* at 299–307.

Most of the FWS's analysis of the "environmental consequences" of the proposed action is set forth in the agency's consideration of the various alternatives under consideration.  *Id.* at 308.  The EA briefly explained why the FWS had concluded that the Section 10(j) process was preferable to the use of Safe Harbor Agreements, Section 10 permits, or ITS protection, *id.* at 295 (describing how Wyoming's complicated "checkerboard" of private, state, and federal land ownership makes those tools "less effective means to provide regulatory relief in order to advance ferret recovery" and stakeholders viewed a 10(j) rule as a prerequisite to their involvement), but it focused primarily on a comparison of three alternatives:  Alternative A, under which the FWS would take no action; Alternative B, under which the agency would issue the proposed, statewide black-footed ferret Section 10(j) rule; and Alternative C, under which the agency would issue site-specific Section 10(j) rules in Wyoming on a case-by-case basis, as the FWS had done for the Shirley Basin area.  *Id.* at 308–26.  The EA also consider the "cumulative effects" of each of the three alternatives.  *Id.* at 326–30.

The FWS concluded that under Alternative A, the no-action alternative, "no additional adverse or beneficial effects to the black-footed ferret would be anticipated to occur."  *Id.* at 308.  In contrast, the FWS concluded that Alternative B, the proposed statewide Section 10(j) rule, "is expected to result in beneficial effects to the ferret, prairie dogs, and other associated wildlife species," although "some short-term adverse impacts to some environmental factors may occur."  *Id.* at 311.  The EA "anticipated that future reintroductions would be carried out in cooperation with the WGFD," that "some mortality may result from transportation and handling of ferrets,"

that although the "survival rates for reintroduced ferrets" are low "it only takes a few ferrets to establish a wild population," and that some "[i]ncidental take of reintroduced ferrets could . . . occur through vehicle or equipment collisions," but "such . . . incidents" are rare "due to the nocturnal habits of the ferrets." *Id.* at 312–13.  The EA also concluded that any impact on the greater sage-grouse from the proposed, statewide rule was "likely to be minimal and highly localized." *Id.* at 313–14.

The EA also concluded that the environmental consequences of Alternative C, the development of site-specific Section 10(j) rules, "would be similar to those described for the proposed action," but "[b]ecause of the administrative burden associated with the development of multiple site-specific rules, beneficial impact would accrue over an extended period of time as compared to the [p]roposed [a]ction." *Id.* at 321.  The EA also expressed concern that "the implementation of site-specific [Section] 10(j) rules for the ferret may be an inadequate mechanism to address State and local concern regarding the potential for ferrets to disperse from within 10(j) areas to adjacent Federal and non-federal lands" given that if "ferrets disperse to lands outside an existing 10(j) area, they would be regarded as species listed as 'endangered' under the Act" and taking would be prohibited. *Id.* at 325–26.  Federal actors or landowners participating in federal programs would accordingly need to undertake Section 7 consultations in order to receive incidental take protection. *Id.* at 326.

In addressing the cumulative effects of the three alternatives, the EA concluded that "it is not anticipated that implementation of the [p]roposed [a]ction, given the minimal scale of future foreseeable recovery actions within the [a]ction [a]rea, would result in any substantive impact" and it "would not contribute any cumulative impact to resources of concern in the human environment within the [a]ction [a]rea." *Id.*  In contrast, the EA concluded that "implementation

26

of the No Action Alternative[] or Alternative C . . . may adversely impact socioeconomic condition within the [a]ction [a]rea" because of "the inadequacy of mechanisms to provide relief from regulatory burden associated with the [ESA]." *Id.* As the EA explained, "these alternatives are unlikely to receive [the] interagency support" required "to advance ferret recovery." *Id.*

Based on the analysis set forth in the EA, the FWS made a Finding of No Significant Impact with respect to the issuance of a statewide Section 10(j) rule. *See* Dkt. 48 at 273–76. The FWS explained that it selected the proposed rule over the alternatives because "it allows implementation of recovery efforts on non-federal lands within the historic range of the black-footed ferret to proceed more quickly than Alternative C, which would rely on the development of individual 10(j) rules on a case-by-case basis," and because both Section 10(j) alternatives "would encourage the recovery of the black-footed ferret to a greater extent than the no-action alternative." *Id.* at 274. The FWS also relied on its 2015 BiOp evaluating the proposed Wyoming 10(j) Rule, discussed below, which "concluded that the implementation of the Alternative B would not jeopardize the continued existence of, or adversely modify the designated critical habitat of, any federally listed or candidate species." *Id.* at 276. The FWS concluded that "the statewide designation of black-footed ferrets in the State of Wyoming as nonessential and experimental under a [Section] 10(j) rule is not a major federal action which would significantly affect the quality of the human environment" and that, "[a]ccordingly, preparation of an environmental impact statement on the proposed action is not required." *Id.*

4. *Biological Opinion*

In considering the final Wyoming 10(j) Rule, the FWS also prepared a BiOp, *see* Dkt. 48 at 238–72, which concluded that "the issuance of a new federal rule to designate non-essential experimental population status for the black-footed ferret in the State of Wyoming in accordance

with section 10(j) of the ESA, is *not likely to jeopardize* the continued existence of the black-footed ferret," *id.* at 240 (emphasis added).  Unlike most BiOps, in which the ITS is a central feature, "incidental take [was] already exempted by the [proposed Section] 10(j) rule, [so] the incidental take statement in th[e] [BiOp] d[id] not need to exempt any incidental take." *Id.* at 258–59.  The BiOp did anticipate that incidental take would occur from transportation, marking and monitoring, collisions with vehicles, plague and prairie dog management efforts (including sickening from secondary poisoning and accidental shooting during lethal prairie dog control), routine landowner activities (including livestock grazing and ranch operations), and from prairie dog management.  *Id.* at 259.  In total, the BiOp "anticipate[d] incidental take of up to 45 percent of black-footed ferrets during the first year after reintroductions and up to 12 percent of black-footed ferrets annually per reintroduction site for reintroduction efforts."  *Id.* at 260.  But the BiOp nonetheless concluded that "issuance of a new federal [Section] 10(j) rule to designate nonessential experimental population status for the black-footed ferret in the State of Wyoming . . . is not likely to jeopardize the continued existence of the" species because: (1) "[t]he proposed action is expected to result in the creation of additional reintroduction areas in Wyoming," which "will result in an increase in the reproduction, numbers and distribution of the black-footed ferret;" (2) "[b]lack-footed ferrets used for reintroduction in Wyoming under the NEP are not essential to the survival of the species;" (3) "[m]easures to avoid and minimize the incidental take . . . will be implemented;" and (4) "[t]he proposed action will likely constitute a beneficial effect for the black-tailed and white-tailed prairie dog," which "will result in an increase in the reproduction, numbers and distribution of the black-footed ferret."  *Id.* at 257–58.

Finally, as relevant here, the BiOp offered further insight into how the proposed reintroduction process would operate:

> The Wyoming Game and Fish Department (WGFD), in cooperation with the [FWS], will lead efforts to identify, establish, and monitor new reintroduction sites. Future reintroduction sites will be identified in collaboration with private landowners, local governments and other stake holders including, but not limited to USDA-Department of Agriculture Animal Plant Health Inspection Service (APHIS), Bureau of Land Management (BLM), Forest Service (FS), Natural Resources Conservation Service (NRCS), and Wyoming Department of Agriculture, pending availability of funding and staff resources. Participation in black-footed ferret recovery by private landowners will be entirely voluntary.

*Id.* at 245. More generally, the BiOp observed that "[t]he changes in status under the proposed action are meant to provide flexible management of the species and [to] facilitate reintroduction and accelerated recovery" and that the "[b]est available data and the recovery plan indicate [that] black-footed ferret reintroduction . . . in Wyoming is biologically feasible and will promote recovery of the species." *Id.* at 246.

## C.    Procedural Background

Plaintiffs brought this action on October 28, 2021—just two weeks shy of six years after the final rule took effect—asserting three claims. They first allege that the FWS violated the ESA and the APA by issuing a "statewide [Section] 10(j) rule untethered to any particular release population for the State of Wyoming," by failing to use the best available science and information in designating the experimental black-footed ferret population in Wyoming as "nonessential," and by failing to provide for the conservation of the species in the Wyoming 10(j) Rule. Dkt. 1 at 26–31 (Compl. ¶¶ 73–87). Second, they allege that the Wyoming 10(j) Rule "impermissibly subdelegates authority to the State of Wyoming and [the] WGFD to lead ferret recovery and reintroductions in the State" in violation of the ESA and the APA. *Id.* at 31–32 (Compl. ¶¶ 88–92). Third, they allege that the FWS violated NEPA and the APA by failing to prepare an environment impact statement addressing the environmental effects of the Wyoming 10(j) Rule and by failing to prepare an adequate EA and FONSI. *Id.* at 33–35 (Compl.

¶¶ 92–106).  They request that the Court declare invalid and set aside the Wyoming 10(j) Rule,

along with the associated EA/FONSI and BiOp, and remand the matter to the FWS further

proceedings.  *Id.* at 35.

After Plaintiffs filed suit, the FWS moved to transfer the case to the District of Wyoming.

Dkt. 12.  The Court denied that motion but granted the State of Wyoming's motion for leave to

intervene as a party-defendant.  Min. Entry (Mar. 11, 2022).  Plaintiffs then moved to complete

or supplement the administrative record, Dkt. 25, which the Court granted in part and denied in

part, *see* Min. Order (August 12, 2022).  The parties' cross-motions for summary judgment are

now before the Court.  *See* Dkt. 38 (Plaintiffs), Dkt. 40 (FWS), Dkt. 42 (Wyoming).

## II.  LEGAL STANDARD

"[W]hen a party seeks review of agency action under the APA[,] the district judge sits as

an appellate tribunal."  *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (quoting *Am.

Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).  The general standard for

summary judgment set forth in Rule 56 of the Federal Rules of Civil Procedure does not apply to

a review of agency action.  But summary judgment nonetheless "serves as the mechanism for

deciding, as a matter of law, whether the agency action is supported by the administrative record

and otherwise consistent with the APA standard of review."  *Sierra Club v. Mainella*, 459 F.

Supp. 2d 76, 90 (D.D.C. 2006) (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir.

1977)).  In other words, "[t]he entire case on review is a question of law."  *Marshall Cnty.

Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).  Judicial review of both

ESA and NEPA claims is available pursuant to section 706 of the APA.  *See Bennett v. Spear*, 520 U.S. 154, 175 (1997); *Mayo*, 875 F.3d at 19.

A reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  "The arbitrary and capricious standard is deferential; it requires that agency action simply be 'reasonable and reasonably explained.'" *Cmtys. for a Better Env't v. EPA*, 748 F.3d 333, 335 (D.C. Cir. 2014) (quoting *Nat'l Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009)); *see also Kennecott Greens Creek Mining Co. v. Mine Safety & Health Admin.*, 476 F.3d 946, 954 (D.C. Cir. 2007) ("[The] standard of review under the arbitrary and capricious test is only reasonableness, not perfection.").  A "court is not to substitute its judgment for that of the agency" if the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Airmotive Eng'g Corp. v. Fed. Aviation Admin.*, 882 F.3d 1157, 1159 (D.C. Cir. 2018) (alterations in original) (internal quotation marks omitted) (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

"The Court's review, however, must be 'searching and careful.'" *Colo. River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 199 (D.D.C. 2012) (quoting *Nat'l Env't. Dev. Ass'n's Clean Air Project v. EPA*, 686 F.3d 803, 810 (D.C. Cir. 2012)).  "An agency decision is arbitrary and capricious if it 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Cablevision Sys. Corp. v. FCC*, 649 F.3d 695, 714 (D.C. Cir. 2011) (quoting *State Farm*, 463 U.S. at 43).  Just as the Court may not

"substitute [its] judgment for that of the agency" to set aside an agency action, *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009), it also typically may not "affirm an agency decision on a ground other than that relied upon by the agency," *Manin v. Nat'l Transp. Safety Bd.*, 627 F.3d 1239, 1243 (D.C. Cir. 2011).

## III. ANALYSIS

### A.    Standing

Although Defendants do not contest Plaintiffs' standing, the Court has an independent duty to ensure that it has jurisdiction over each claim at issue before turning to the merits.  *See Maalouf v. Islamic Rep. of Iran*, 923 F.3d 1095, 1107 (D.C. Cir. 2019).  To establish standing, a plaintiff must meet the three elements of the "irreducible constitutional minimum of standing"— that is, they must "show (1) an injury in fact that is 'concrete and particularized' and 'actual or imminent'; (2) that the injury is fairly traceable to the defendant's challenged conduct; and (3) that the injury is likely to be redressed by a favorable decision."  *Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 19 (D.C. Cir. 2011) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  "An association has standing to sue under Article III of the Constitution of the United States only if (1) at least one of its members would have standing to sue in his own right; (2) the interest it seeks to protect is germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the member to participate in the lawsuit*."  Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 182 (D.C. Cir. 2017) (internal quotation marks and citation omitted).

Here, the second and third conditions for associational standing are easily satisfied.  With respect to the second condition, Plaintiffs are non-profit organizations that share a common mission of protecting and restoring the wildlife in the American West, *see* Dkt. 1 at 4–5 (Compl.

¶¶ 10–12), and the interest at stake in the litigation—the protection of the black-footed ferret—is germane to this mission.  And, with respect to the third condition, the claims at issue do not require the participation of any member of the organizations, and Plaintiffs seek forms of relief—an order declaring the agency action unlawful and vacating that action—that do not differentiate between their members.

The Court also concludes that at least one member of the organizational Plaintiffs would have standing to sue in his or her own right.  "[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." *Lujan*, 504 U.S. at 562–63.  Here, "Plaintiffs' members, staff, and supporters are dedicated to ensuring the long-term survival and recovery of the black-footed ferret throughout its historic range;" they "live and/or recreate in or near areas historically occupied by black-footed ferret and the 2015 Wyoming nonessential experimental population area, and use the area for purposes of hiking, camping, [and] observing wildlife such as the black-footed ferret;" and they "enjoy observing, attempting to observe, and studying black-footed ferrets in the wild, including within the 2015 Wyoming nonessential experimental population area."  Dkt. 1 at 5 (Compl. ¶¶ 13–16). These allegations are backed up with declarations from individual members of the organizational Plaintiffs, which establish that those members have both professional and personal aesthetic and recreational interests in protecting and reestablishing the black-footed ferret population in Wyoming.  *See* Dkt. 38-1 at 2, 4, 7, 9–11 (Molvar Decl. ¶¶ 6–7, 15, 20–29); Dkt. 38-2 at 2–3, 5 (Mueller Decl. ¶¶ 4, 8–9, 12); Dkt. 38-3 at 1, 3–4, 6–8 (Nichols Decl. ¶¶ 3, 5–7, 9–10, 16).

Plaintiffs also plausibly allege that the challenged actions in this case—promulgation of the statewide Wyoming 10(j) Rule and the accompanying EA/FONSI—have caused, and will continue to cause, their member to suffer concrete and redressable injuries.  In making that

assessment, the Court must "accept as valid the merits of [the plaintiff's] claims," *FEC v. Cruz*, 142 S. Ct. 1638, 1647 (2022), so the Court must assume for present purposes that the FWS unlawfully designated all black-footed ferret in the State of Wyoming as members of a nonessential, experimental population, and unlawfully authorized the incidental take of those animals.  Against that backdrop, Plaintiffs plausibly allege that the FWS's actions have contributed, and will continue to contribute, to the loss of the species and the failure of recovery efforts.  The Executive Director of the Western Watersheds Project declares, for example, that the NEP designation will frustrate recovery of the black-footed ferret by permitting incidental "'take,' including killing or injuring them, and destroying the prairie dog colonies on which they depend," Dkt. 38-1 at 6–7 (Molvar Decl. ¶ 18), and that the Wyoming "10(j) Rule deprioritizes reintroductions on federal lands in Wyoming that offer some of the best potential habitat for black-footed ferrets, like the Thunder Basis National Grasslands," *id.* at 7 (Molvar Decl. ¶ 19); *see also id.* at 7–9 (Molvar Decl. ¶ 22–29).  Plaintiffs' other declarants offer similar appraisals of the effects of the Rule.  *See* Dkt. 38-2 at 4–5 (Mueller Decl. ¶ 11); Dkt. 38-3 at 4–7 (Nichols Decl. ¶¶ 11–16)

As the D.C. Circuit has observed, injury to "an aesthetic interest in the observation of animals" resulting from "government action that allegedly threatened to diminish the overall supply of an animal species" is sufficient to establish standing.  *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 437 (D.C. Cir. 1998).  "[T]he causation requirement for constitutional standing is met when a plaintiff demonstrates that the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries," and plausibly alleges that the agency action was unlawful.  *Id.* at 440.  For similar reasons, when a plaintiff alleges—as Plaintiffs have alleged here—that the challenged action is causing ongoing injury, a court order vacating that

action (or remanding the case to the agency for further consideration of that action) will generally redress the alleged injury.

Plaintiffs' NEPA claim, moreover, alleges an archetypal procedural injury for which the redressability and imminence requirements are relaxed. *WildEarth Guardians*, 738 F.3d at 305. Plaintiffs have standing to bring that claim because the requirement that the FWS take a hard look at the environmental impacts of its proposed action and prepare an EIS, if needed, bears a clear nexus to the agency's substantive decision to promulgate the Wyoming 10(j) Rule, which is itself connected to the conservation of the species that Plaintiffs seek to study and observe. *Cf. id.* at 306; *see also Sierra Club*, 827 F.3d at 67.

The Court, accordingly, concludes that Plaintiffs have met their burden of establishing standing to sue.

**B.    Endangered Species Act**

1.    *Nonessential experimental population designation*

As Plaintiffs acknowledge, "Congress recognized that in most circumstances, experimental populations will likely be deemed nonessential." Dkt. 38 at 27 (citing 49 Fed. Reg. 33885, 33888 (Aug. 27, 1984); H.R. Rep. No. 97-835, at 34 (1982) (Conf. Rep.)); *see also* S. Rep. No. 97-418, at 9 (1982). Plaintiffs raise three arguments, however, for why the NEP designation for the Wyoming black-footed ferret population was improper:  First, they argue that Section 10(j) rules are "meant to be developed on a 'case-by-case basis' . . . 'to address the needs for each particular population proposed.'" Dkt. 38 at 27 (quoting 49 Fed. Reg. at 33886). In their view, the designation at issue here, which covers most of Wyoming and applies to future releases in those portions of the State, fails that test. *Id.* at 29.  Second, they argue that the decision whether to treat the population as essential was based on "political considerations" and

a "desire for management flexibility." *Id.* at 31.  In their view, these considerations ran afoul of the requirement that the FWS rely exclusively on "the best available science." *Id.*  Third, they argue that the FWS improperly relied on the captive-breeding population in deciding whether the population was essential.  *Id.* at 34.  In their view, by relying on the captive-breeding population, the FWS ignored "the ESA's primary goal" to promote and preserve the ability of listed species to survive "in the wild," *id.* at 34, and it ignored the regulatory definition of "essentiality" of an "experimental population," *id.* at 35, which looks to whether loss of the population "would be likely to appreciably reduce the likelihood of the survival of the species *in the wild*," 50 C.F.R. § 17.80(b) (emphasis added); *see also id.* § 17.81(c)(2); *id.* § 402.02.

The Court will consider each argument in turn.

      a.   <u>Case-by-case designations</u>

To start, the Court is unpersuaded by Plaintiffs' contention that Section 10(j) and its implementing regulations precluded the FWS from designating a state-wide (or almost-state-wide[5]) experimental population of black-footed ferrets.  Section 10(j) itself says only one thing about the geographic scope of the designation: "the term 'experimental population' means any population . . . authorized by the Secretary for release under paragraph (2), but only when, and at such times as, *the population is wholly separate geographically from nonexperimental populations of the same species*."  16 U.S.C. § 1539(j)(1) (emphasis added).  That geographic restriction is necessary because Section 10(j) applies unique rules (relaxing both incidental take restrictions and consultation requirements) to experimental populations, and, without the

---

[5]  As explained above, the 2015 Wyoming 10(j) Rule did not include the Shirley Basin/Medicine Bow Management Area and the portion of Wyoming included in the Northwestern Colorado/Northeastern Utah Experimental Population Area, since those areas were previously designated.

geographic separation requirement, members of the public and regulators would be unable to distinguish between members of the experimental and nonexperimental populations.  Because the FWS had previously issued a "block clearance" determination for the black-footed ferret throughout the State of Wyoming, Dkt. 48 at 1032, moreover, the agency had no difficulty in finding that a state-wide, black-footed ferret experimental population would be—and would remain—"wholly separate geographically" from any nonexperimental population (if any) of black-footed ferret.  That determination was consistent with the statute and was well supported by the record.

In Plaintiffs' view, a second feature of the statutory text supports their argument. Pointing to Section 10(j)(2)(B), they note the FWS is required to "identify" "by regulation" "the population" and to "determine . . . whether or not such population is essential to the continued existence of" the species, 16 U.S.C. § 1539(j)(2)(B).  Plaintiffs argue that this "'essentiality' determination requires the [FWS] to consider factors specific to an actual, to-be-released experimental population and the discrete location where such population will be found," Dkt. 38 at 29.  But, again, they overstate what the text actually says.  To be sure, the statute requires the FWS to "*identify the population*" and to "determine . . . whether or not *such population* is essential."  16 U.S.C. § 1539(j)(2)(B) (emphasis added).  Identifying a population, and determining whether that population is essential, however, does not mean that the Section 10(j) rule must identify the "actual, to-be-released" members of that population or the "discrete location" where the members of that population will be released, and it does not preclude the release of members of the specified population over time and at different sites.  To the contrary, Section 10(j) expressly contemplates that the "population" will include the "offspring" of existing members—that is unidentifiable, future (as opposed to "actual") members of the

population—and the regulations refer to specimens "released or to be released," 50 C.F.R.

§ 17.81(c)(1); *see also id*. § 17.81(a) ("has been or will be released").  The phrases "actual, to-

be-released" and "discrete location" are Plaintiffs' words, not Congress's.

Rather than requiring a separate Section 10(j) rule for each discrete release of members of

the designated population, Section 10(j)(2)(B) serves a purpose similar to the geographic

separation requirement; it allows regulators and members of the public to distinguish the

experimental members of the species from the nonexperimental members.  As explained in the

House Conference Report, the purpose of this requirement is to "provide notice as to which

populations of endangered or threatened species are experimental."  H.R. Rep. No. 97-835, at 34.

Plaintiffs offer no reason to believe that, beyond serving that important goal, the identification

requirement was intended to curtail the "greater flexibility" and "managerial discretion" that

Congress intended to confer upon "the Secretary to better conserve and recover endangered

species," *United States v. McKittrick*, 142 F.3d 1170, 1174 (9th Cir. 1998) (internal quotation

marks and citation removed); *see also Wyoming Farm Bureau Fed. v. Babbitt*, 199 F.3d 1224,

1234 (10th Cir. 2000).

Moving from the statutory text to the regulations, Plaintiffs argue that the FWS's state-

wide (or almost-state-wide) designation in the Wyoming 10(j) Rule conflicts with the regulatory

definition of "population."  Dkt. 38 at 28–29.  As used throughout the ESA implementing

regulations, the term "population"—in general and without any specific focus on Section 10(j)—

"means a group of fish or wildlife in the same taxon below the subspecific level, in *common

spatial arrangement* that interbreed when mature."  50 C.F.R. § 17.3 (emphasis added).  In

Plaintiffs' view, "[t]he entire State of Wyoming, which is over 62.6 million acres, . . . cannot

conceivably meet the 'common spatial arrangement' component of" this definition, Dkt. 38 at 29

n.6, particularly given (1) the goal, set forth in the Recovery Plan, of maintaining only "70,000 acres of prairie dog occupied habitat for ferret reintroductions" and (2) the fact that "the ferret is not a wide-ranging, migratory species," *id.* at 30.

Plaintiffs, once again, read too much into the relevant text.  To be sure, the phrase "common spatial arrangement" denotes some geographic *relationship*.  But it does not dictate a particular geographic *scope*, nor does it preclude the FWS from promulgating Section 10(j) rules using "different scales, depending on the individual species at issue," Dkt. 40-1 at 24, as it has done on numerous occasions, *see*, *e.g.*, 67 Fed. Reg. 52420, 52423 (Aug. 12, 2002) (designating experimental populations of four fish species for a segment of the Tellico River in Tennessee); 71 Fed. Reg. 42298, 42301 (July 26, 2006) (designating an experimental population of the northern aplomado falcon for all of Arizona and New Mexico); 77 Fed. Reg. 16712, 16714 (Mar. 22, 2012) (designating an experimental population of the American burying beetle for the 3,030-acre Wah'kon-tah Prairie in Missouri); 79 Fed. Reg. 26175, 26187 (May 7, 2014) (designating an experimental population of wood bison for an area covering more than half of Alaska).

Plaintiffs cite two cases, neither of which supports their argument—and which, if anything, support an expansive view of the "spatial arrangement" requirement.  The first of these cases, *Forest Guardians v. U.S. Fish and Wildlife Service*, 611 F.3d 692 (10th Cir. 2010), addressed a 2005 rule designating an NEP of northern aplomado falcons in New Mexico and Arizona.  Notably, the rule covered a vast area, including "all of New Mexico and Arizona," and it did so even though the FWS proposed to release the falcons "only within New Mexico."  *Id.* at 700.  Yet, neither the FWS nor the Tenth Circuit was troubled by the geographic scope of the rule, nor were they troubled by the failure of the FWS to issue a separate Section 10(j) rule for each future release.  The agency and the court were, instead, concerned with the statutory

requirement that the experimental population remain "wholly separate geographically from [any] nonexperimental populations."  16 U.S.C. § 1539(j)(1).  It was only in service of that statutory condition that the agency and the court considered whether the presence of a single, nesting pair of nonexperimental falcons in New Mexico, and a small group of falcons located about 100 miles away in Mexico, constituted a potentially overlapping, nonexperimental population.  *Forest Guardians*, 611 F.3d at 706; *see also* 71 Fed. Reg. 42298, 42300 (July 26, 2006).  Both the agency and the court answered that question in the negative (1) because the single pair of nonexperimental falcons seen in New Mexico was not self-sustaining (and thus did not biologically qualify as a population), and (2) because the "25 to30 breeding falcon pairs in Mexico" were at least "100 miles [] or more south of the United States border" and thus lay beyond the jurisdiction of the FWS.  *Id.* at 42300–01.  As the FWS explained, "the existence of a group in Mexico should not preclude conservation and management of falcons in the United States in order to achieve species recovery."  *Id.* at 42301.

The second case, *Wyoming Farm Bureau Federation v. Babbitt*, 199 F.3d 1224 (9th Cir. 2000), is to similar effect.  In that case, the FWS promulgated two Section 10(j) rules authorizing the release of experimental populations of the Northern Rocky Mountain Wolf into Yellowstone National Park and central Idaho.  59 Fed. Reg. 60252 (Nov. 22, 1994).  The plaintiffs challenged the rules on the ground that "individual wolves may leave . . . Canada and Montana and enter the experimental population areas," *Wyoming Farm*, 199 F.3d at 1233, raising the question whether the presence of a nonexperimental "individual dispersing" wolf, *id.* at 1234—the eponymous "lone wolf"—would violate the geographic separation requirement, 16 U.S.C. § 1539(j)(1).  In answering this question, the Ninth Circuit first emphasized that "Congress deliberately left the resolution of this type [of] management/conservation issue to the Department" and anticipated

that each experimental population would have "its own set of special rules so that the Secretary [would have] more managerial discretion." *Wyoming Farm*, 199 F.3d at 1234. The court then upheld the FWS's conclusion that, "by definition[,] lone dispersers do not constitute a population or even part of a population, since they are not in 'common spatial arrangement' sufficient to interbreed with other members of a population." *Id.* As the court further explained, "it is highly unlikely [that] a lone wolf will encounter another solitary wolf of the opposite sex and reproduce for two years running." *Id.* But, even more importantly, the court reasoned that "[t]his interpretation of the 'geographic separation' requirement . . . is consistent with the language and objectives of the Endangered Species Act as a whole." *Id.* The court, accordingly, upheld the FWS's determination the potential presence of "individual dispersing wolves" would not violate Section 10(j)'s "geographic separation" requirement." *Id.* at 1235–36.

Thus, rather than limiting the geographic scope of the NEP designations at issue, *Forest Guardians* and *Wyoming Farm Bureau* both featured NEPs occupying vast areas and both focused on whether the designations adequately ensured geographic *separation* between experimental and nonexperimental populations. Here, the FWS concluded—even more definitively—that the statewide Wyoming 10(j) Rule would not violate the geographic separation requirement because, unlike in *Forest Guardians* and *Wyoming Farm Bureau*, "the species has been extirpated from the State since 1987," and thus *no* nonexperimental black-footed ferret will be found in the relevant geographic area. 80 Fed. Reg. at 66824 (final rule). The FWS further found that the statewide approach was preferable to engaging in the type of case-by-case rulemaking that Plaintiffs endorse.

As the agency explained, (1) the development of an applicable Section 10(j) rule "is a critical step in the eventual recovery of the black-footed ferret, as it will help facilitate

reintroductions of the species on non-federal lands while providing regulatory assurances that will encourage greater private landowner participation in the black-footed recovery," and (2) the statewide rule would allow for "implementation of recovery efforts on non-federal lands within the historic range of the black-footed ferret to proceed more quickly than" would be possible if the agency were, instead, to "rely on the development of individual [Section] 10(j) rules on a case-by-case basis." Dkt. 48 at 274 (FONSI). Nothing in the text of the statute or in the regulatory definition of a "population" forecloses this approach, which embraces the type of managerial flexibility that Congress intended to grant the FWS in order "to better conserve and recover endangered species." *Wyoming Farm*, 199 F.3d at 1234 (internal quotation marks and citation omitted). Moreover, to the extent that Plaintiffs contend that a smaller geographic area would have better served the purposes established in the Recovery Plan—in part because the ferret is "not a wide-ranging" species—that contention merely reflects a policy disagreement that is not actionable under the ESA or the APA. Dkt. 38 at 30. The FWS has explained that a large portion of the State of Wyoming includes appropriate reintroduction sites; that the agency requires flexibility given the need to elicit the support of private landowners and the susceptibility of the species to disease; and that "ferrets could disperse" outside their anticipated range. *See*, *e.g.*, 80 Fed. Reg. at 66823–24 (final rule), Dkt. 48 at 292–93 (EA). The FWS's policy judgment that a Wyoming-wide designated area would be more conducive to ferret recovery than a la carte designations is thus reasoned and supported by the record. *See State Farm*, 463 U.S. at 43 ("a court is not to substitute its judgment for that of the agency" but must ensure that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation").

Finally, Plaintiffs argue that 50 C.F.R. § 17.81(c) supports their view that Section 10(j) requires site-specific (or release-specific) rules.  That section provides that any regulation promulgated under Section 10(j) must, among other things, include (1) an "[a]ppropriate means to identify the experimental population, including . . . its actual or proposed location;" (2) "[a] finding . . . on whether the experimental population is, or is not, essential to the continued existence of the species in the wild;" and (3) "[m]anagement restrictions, protective measures, or other special management concerns of that population."  50 C.F.R. § 17.81(c) (emphasis added); *see also* Dkt. 38 at 30.  None of these requirements, however, precludes issuance of a statewide Section 10(j) rule, as the Wyoming 10(j) Rule itself demonstrates.

Starting with the second and third of these requirements, the Court can discern no reason why the FWS cannot, at least at times, address these requirements on a statewide basis, as it did here: the Wyoming 10(j) Rule persuasively addresses whether the experimental population is nonessential on a statewide basis, 80 Fed. Reg. at 66823, and it details release procedures, *id.* at 66825, and management considerations and protective measures that will apply throughout the State, *id*. at 66826–27.  That, then, leaves Plaintiffs' argument that the Rule fails to provide an "[a]ppropriate means to identify the experimental population."  50 C.F.R. § 17.81(c).  But as explained above, the Rule unambiguously sets the proposed location of the NEP as "Statewide, with the exception of the two areas where a NEP designation for black-footed ferret already exists," and it further describes how "[s]uitable habitat ferret reintroduction will likely be limited to Albany, Big Horn, Campbell, Carbon, Converse, Crook, Fremont, Goshen, Hot Springs, Johnson, Laramie, Lincoln, Natrona, Niobrara, Park, Platte, Sheridan, Sublette, Sweetwater, Uinta, Washakie, and Weston Counties because these counties have sufficient prairie dog habitat

to support viable ferret populations."[6]  80 Fed. Reg. at 66824.  This is all that the regulatory text requires, and it easily satisfies the regulatory purpose of "avoid[ing] law enforcement problems stemming from the inability to distinguish between fully protected species of the [nonexperimental] population from lesser protected specimens of the experimental population." 49 Fed. Reg. 1166 (Jan. 9, 1984); 49 Fed. Reg. 33885, 33886 (Aug. 27, 1984).

Plaintiffs' contention that the FWS improperly designated an experimental NEP covering most of the State of Wyoming and authorizing future releases fails on both the law and facts.

   b. <u>Best available information</u>

Plaintiffs' contention that the Wyoming 10(j) Rule was not based on the "best available information" fares no better.  Under Section 10(j), the FWS must categorize the experimental population as "essential" or "nonessential" based on "the best available information."  16 U.S.C. § 1539(j)(2)(B).  The implementing regulations, in turn, require that "[a]ny regulation promulgated" under Section 10(j) must include "[a] finding, based solely on the best scientific and commercial data available, and the supporting factual basis, on whether the experimental population is, or is not, essential to continued existence of the species in the wild."  50 C.F.R. § 17.81(c)(2).  Plaintiffs argue that the FWS "failed to heed this clear directive" by basing its nonessential determination on "political considerations [and] a desire for management flexibility."  Dkt. 38 at 31.  The Court is unpersuaded for several reasons.

---

[6] The Wyoming 10(j) Rule also identifies the criteria for determining which "sites in Wyoming are suitable for reintroduction of black-footed ferrets."  80 Fed. Reg. at 66824.  The Rule further explains that locating appropriate reintroduction sites will require "[i]dentification of interested and willing landowners," a "biological evaluation of each site's potential to support at least 30 ferrets," and the "creation of site-specific management plans."  *Id.* at 66831.  And the Rule commits to providing "opportunities for public involvement" in reintroduction efforts, which "may include but is not limited to . . . [p]ublic meetings."  *Id.* at 66831–32.

To start, Plaintiffs mischaracterize the agency's consideration of whether the experimental "population is essential to the continued existence of the species," 16 U.S.C. § 1519(j)(2)(B).  The FWS explained in both the proposed and final rule that it was required to "determine whether the experimental population is essential or nonessential" on the basis of "the best scientific and commercial data available."  80 Fed. Reg. at 19266 (proposed rule); 80 Fed. Reg. at 66823 (final rule).  Both the proposed and final rules explain that this determination turns on whether loss of the population "would be likely to appreciably reduce the likelihood of survival of th[e] species in the wild."  80 Fed. Reg. at 19266 (proposed rule); 80 Fed. Reg. at 66823 (final rule).

The FWS then determined that any loss of experimental populations in Wyoming would not be likely to reduce the survival of the black-footed ferret in the wild.  As the FWS explained in the final rule:

> We have determined that any future experimental populations of black-footed ferrets in Wyoming would not be essential to the continued existence of the species in the wild.  This determination has been made because loss of an experimental population in Wyoming will not affect the captive population or the 24 existing reintroduction sites in Arizona, Colorado, Kansas, Montana, New Mexico, South Dakota, Utah, and Wyoming; in Chihuahua, Mexico; and in Saskatchewan, Canada.  Therefore, loss of an experimental population in Wyoming will not appreciably reduce the likelihood of future survival of the ferret rangewide.

80 Fed. Reg. at 66823.

The proposed rule reached the same conclusion, and it included the following additional analysis:

> All reintroduction efforts are undertaken to move a species toward recovery.  Recovery of the black-footed ferret will require participation by at least 9 of the 12 States within the species' historical range (U.S. Fish and Wildlife Service 2013a, p. 6).  Wyoming contains 10 percent of the species' historical range in the United States (Ernst *et al.* 2006, table 1) and an even higher percentage of habitat that is currently available—more than 3 million ac (1,215,000 ha) of

prairie dog occupied habitat (Van Pelt 2013, pp. 8 and 14).  Therefore, the State could play a significant role in the species' recovery.  However, this does not mean that ferret populations in Wyoming are "essential" under section 10(j) of the Act.

The potential future loss of black-footed ferrets from Wyoming would not affect the species' survival throughout the remaining 90 percent of its range in the wild, or in captivity.  We estimate that there are approximately 418 breeding adult ferrets in the wild, including approximately 102 breeding adults in the reintroduced population at Shirley Basin, Wyoming (24 percent of ferrets in the wild); there are a minimum of 280 breeding adults in captivity (U.S. Fish and Wildlife Service 2013a, pp. 22 and 68).  Animals lost during reintroduction efforts can be readily replaced through captive-breeding, which produces juvenile ferrets in excess of the numbers needed to maintain the captive-breeding population.  Captive-breeding and reintroduction of surplus ferrets have occurred since 1991, with no apparent loss of reproductive capability in the wild observed to date.  The loss of an experimental population in Wyoming will not appreciably reduce the likelihood of future survival of the ferret rangewide.

80 Fed. Reg. at 19266.

Finally, in responding to comments from peer reviewers, the FWS again emphasized that its nonessential determination was "based on the best scientific and commercial data available," 80 Fed. Reg. at 66830, and it explained that the determination whether an experimental population is essential is distinct from questions of recovery and delisting, *id.* at 66831.

None of the discussion of the essentiality determination found in the proposed or final rule mentions "political considerations" or "management flexibility."  Instead, Plaintiffs point to a handful of passages in the final rule, the EA, and internal FWS documents that, in their view, show that the essentiality determination was not premised on the best available scientific and commercial data.  Dkt. 38 at 32–33.  But none of those passages do the work that Plaintiffs suggest they do.  The two passages found in the final rule, for example, address the Section 10(j) designation more broadly, explaining that the successful reintroduction of the black-footed ferret in Wyoming will require the cooperation and assistance of stakeholders—including private landowners—and that the Section 10(j) designation "will encourage landowner participation and

[will] alleviate concerns regarding possible land use restrictions."  80 Fed. Reg. at 66826; *see also id.* at 66831 ("Stakeholders in Wyoming essentially viewed the implementation of a Statewide 10(j) rule as a prerequisite to participation in any ferret recovery actions in the State").

The other materials that Plaintiffs cite are to similar effect.  The EA, for example, observes that designating the population "as nonessential and experimental" has the effect of treating the population as "proposed for listing" for purposes of Section 7 and removing the prohibition on incidental take.  Dkt. 48 at 289.  The EA further explains, moreover, that removing the prohibition on incidental take will facilitate "voluntary participation in recovery actions while ensuring that the concerns of private landowners, related to [] regulatory burdens, are addressed effectively."  *Id.*; *see also id*. at 294.  Notably, it does not say that the reason the FWS designated the population as nonessential was "political" or to promote "management flexibility."  To the contrary, the NEP determination has no bearing on the take limitation, and, although the determination did have an effect on the Section 7 consultation requirement, Plaintiffs point to no evidence that the FWS made the NEP determination for that reason and without regard for the best available science and commercial data.

Finally, even if the Court could properly consider the internal draft documents that Plaintiffs cite—rather than relying on the reasons provided by the agency in the proposed rule, the final rule, and the EA—Plaintiffs' argument would fare no better.  Those documents, once again, discuss the need for a Section 10(j) rule in order to encourage local and landowner support for the reintroduction efforts, *see* Dkt. 48 at 1188–90, but they also address the Section 10(j) rule as a whole, without singling out the essentiality determination, and they do not assert that the FWS determined that the population is nonessential for any reason other than the reasons provided in the public-facing materials.

Although Plaintiffs focus on the essentiality determination in pressing this argument, the argument also fails when expanded to apply to the experimental-population determination. Although the text of Section 10(j) does not address the question, the regulations require that, "[b]efore authorizing the release as an experimental population of any population . . . of an endangered or threatened species," the FWS must find "that such release will further the conservation of the species."  50 C.F.R. § 17.81(b).  The regulations then provide that, "[i]n making [that] finding," the FWS must "use the best scientific and commercial data available to consider" a range of factors, including "[t]he likelihood that any such experimental population will become established and survive in the foreseeable future."  *Id.* § 17.81(b)(2).  But notably, the regulations do not say that these considerations are exclusive or that the FWS must ignore other potential barriers to success, including resistance from the local government and landowners.  To the contrary, as the FWS explained when promulgating the implementing regulations, Section 10(j) is designed for "those instances where the involved parties are reluctant to accept the reintroduction of an endangered or threatened species without the opportunity to exercise greater management flexibility on the introduced population."  49 Fed. Reg. at 33888.  The regulations, moreover, expressly require that the FWS consider how actions by federal, state, and private stakeholders will affect the populations with and without a 10(j) rule.  *See* 50 C.F.R. § 17.81(b)(4) (instructing the FWS to consider "[t]he extent to which the introduced experimental population may be affected by existing or anticipated Federal or State actions or private activities within or adjacent to the experimental population area").  In this way, the regulations anticipate a more multifaceted analysis than permitted by other sections of the ESA, which focus exclusively on the scientific evidence.  *See* 49 Fed. Reg. at 33888 ("When selecting a site for reintroduction, biological concerns will be given primary consideration;

however, all relevant factors, including economic considerations, will be weighed before any action is proposed.").  That result is unsurprising given Section 10(j)'s embrace of flexibility and cooperation when necessary to promote conservation.

As this Court observed in *Defenders of Wildlife v. Jewell*, "the presence of political pressure alone says nothing about whether the FWS's scientific data was indeed the 'best available.'"  70 F. Supp. 3d 183, 194 (D.D.C. 2014).  Here, as in *Defenders of Wildlife*, Plaintiffs fail to identify any scientific evidence that the FWS failed to consider.  Nor does the FWS's cognizance of stakeholder interests, *see* Dkt. 38 at 33, render the rule arbitrary or capricious.  Rather, as the FWS explains, it used the best available scientific and commercial data to make a biological finding that the Wyoming 10(j) populations were nonessential, and then considered "the political and public acceptance issues that accompany the reintroduction of black-footed ferrets."  Dkt. 40-1 at 32.  Factors such as acceptance by local landowners and co-existence with prairie dogs are key considerations in the viability of black-footed ferret conservation efforts and the statute does not require the FWS to ignore such realities in its attempts to successfully reintroduce the species.  *Id.*

Plaintiffs rely on *Center for Biological Diversity v. Jewell*, in which the district court sustained in part challenges to FWS's's 2015 revision of a pre-existing Section 10(j) rule for the Mexican gray wolf.  No. 16-cv-94, 2018 WL 1586651, at *23 (D. Ariz. Mar. 31, 2018).  Not only is that decision not binding on this Court, but Plaintiffs also overread the decision.  Although the court correctly reasoned that "there is no indication that the management flexibility afforded to the agency under Section 10(j) was intended to displace the ESA's broader conservation purpose, or that it overrides the duty to use the best available science," *id.* at *16, the court did not conclude that the FWS must consider only scientific information and must

ignore practical considerations, such as whether landowners will agree to participate. The court simply pointed out that the FWS must not pursue those management goals to such a degree that they undermine the statute's underlying conservation interest or to override "the scientific integrity of the agency's findings." *Id.* at *15–16. There, the agency referenced "management flexibility" to justify its pursuit of a short-term solution that "fail[ed] to further the long-term recovery of the Mexican gray wolf." *Id.* at *16. Here, in contrast, Plaintiffs fail to identify any basis to conclude that the FWS permitted an interest in management flexibility to undermine the goal of conserving and restoring the black-footed ferret or to override the best available scientific and commercial data.[7]

Accordingly, Plaintiffs' best-available-information argument fails as well.

c.  Reliance on the captive-breeding population

Plaintiffs also challenge the substance of the FWS's essentiality determination, arguing that the agency impermissibly relied on the captive population of black-footed ferrets in finding that the experimental population authorized for release by the Wyoming 10(j) Rule is not "essential to the continued existence" of the species. 16 U.S.C. § 1539(j). This argument fails for several reasons, starting with Plaintiffs' efforts to sidestep what the FWS actually determined.

According to Plaintiffs, the FWS improperly "relied on the captive black-footed ferret population as its basis for concluding that all experimental, wild populations are 'nonessential.'" Dkt. 38 at 34. In their view, the FWS erred because "the ESA's primary goal is recovery" of listed species "in the wild," and, under the statute, the FWS must "'determine recovery based on

---

[7] The *Center for Biological Diversity* court also struck down the revised Section 10(j) rule's essentiality determination for the Mexican gray wolf, but it did so for reasons that have no purchase here: the FWS failed to make a new essentiality determination and, instead, relied on the stale determination made years earlier. 2018 WL 1586651, at *18–21.

the viability of species, *not in captivity but in the wild*.'"  *Id.* at 34–35 (quoting *Center for Biological Diversity*, 2018 WL 1586651, at \*4) (emphasis added in Plaintiffs' brief).  They further argue that the ESA implementing regulations require the FWS to premise its essentiality determination on the "the continued existence of the species '*in the wild*.'"  *Id.* at 35 (quoting 50 C.F.R. § 17.80(b)) (emphasis added in Plaintiffs' brief).  And they argue that the FWS's essentiality determination was "at odds with the best available science" because relying on the captive population, standing alone, creates an "extreme genetic bottleneck" and because maintaining a wild population of ferrets in Wyoming is crucial to the success of the reintroduction efforts and the recovery of the species.  *Id.* at 36–37.

But in pressing each of these arguments, Plaintiffs ignore the fact that the FWS did not rely on the captive population alone in finding that the experimental population is not essential to the continued existence of the species.  In the proposed rule, the agency wrote as follows:

> We have determined that this proposed experimental population would not be essential to survival of the black-footed ferret in the wild *because loss of an experimental population in Wyoming will not affect the 23 reintroduction sites outside of Wyoming in Arizona, Colorado, Kansas, Montana, New Mexico, South Dakota, and Utah; in Chihuahua, Mexico; and in Saskatchewan, Canada*. Therefore, loss of an experimental population in Wyoming will not appreciably reduce the likelihood of future survival of the ferret rangewide.

> All reintroduction efforts are undertaken to move a species toward recovery. Recovery of the black-footed ferret will require participation by at least 9 of the 12 States within the species' historical range (U.S. Fish and Wildlife Service 2013a, p. 6).  *Wyoming contains 10 percent of the species' historical range in the United States* (Ernst et al. 2006, table 1) and an even higher percentage of habitat that is currently available--more than 3 million ac (1,215,000 ha) of prairie dog occupied habitat (Van Pelt 2013, pp. 8 and 14).  Therefore, the State could play a significant role in the species' recovery. However, this does not mean that ferret populations in Wyoming are "essential" under section 10(j) of the Act.

> *The potential future loss of black-footed ferrets from Wyoming would not affect the species' survival throughout the remaining 90 percent of its range in the wild, or in captivity*. We estimate that there are approximately 418 breeding adult

ferrets in the wild, *including approximately 102 breeding adults in the reintroduced population at Shirley Basin, Wyoming* (24 percent of ferrets in the wild); there are a minimum of 280 breeding adults in captivity (U.S. Fish and Wildlife Service 2013a, pp. 22 and 68). *Animals lost during reintroduction efforts can be readily replaced through captive-breeding, which produces juvenile ferrets in excess of the numbers needed to maintain the captive-breeding population.* Captive-breeding and reintroduction of surplus ferrets have occurred since 1991, with no apparent loss of reproductive capability in the wild observed to date. *The loss of an experimental population in Wyoming will not appreciably reduce the likelihood of future survival of the ferret rangewide.* Therefore, the Service is proposing to designate an NEP for the ferret throughout Wyoming.

80 Fed. Reg. at 19266 (emphasis added).

In short, the proposed rule did not rely exclusively on the captive population in finding that the experimental population was nonessential. To the contrary, it found that "an experimental population in Wyoming" would "not appreciably reduce the likelihood of future survival of the ferret rangewide" because any threat to the experimental population would "not affect the 23 reintroduction sites outside of Wyoming"—that is, throughout "the remaining 90 percent of [the ferret's] range in wild—*and* would not affect the ferrets that remain "in captivity." *Id.* The agency further explained that Shirley Basin—a preexisting reintroduction site in Wyoming with its own Section 10(j) determination—separately accounts for "24 percent of ferrets in the wild," and that "[a]nimals lost during reintroduction efforts can be . . . replaced through the captive-breeding population." *Id.* Accordingly, although the FWS considered the captive-breeding program, it blinks reality to assert that the agency based its nonessentiality finding "on the captive black-footed ferret population," Dkt. 38 at 34.

The final rule, although less detailed, reaffirmed the agency's analysis. The FWS once again found that the experimental population was not essential to the continued existence of the species "because loss of an experimental population in Wyoming will not affect the captive population or the 24 existing reintroduction sites in Arizona, Colorado, Kansas, Montana, New

Mexico, South Dakota, Utah, and Wyoming; in Chihuahua, Mexico; and in Saskatchewan, Canada." 80 Fed. Reg. at 66823.

Nor was it improper for the FWS to consider the availability of the captive population to replace "'animals lost during reintroduction.'" *Id.* at 66830. To the contrary, that consideration "reflects the very real conservation status of the black-footed ferret," where "loss of the captive population could be catastrophic to the species, whereas the reverse is not true." *Id.* And it also recognizes that, "[u]nfortunately, there are few alternatives for the black-footed ferret at this time." *Id.* That approach is consistent with the statutory directive, which requires the FWS to consider whether the experimental "population is essential to the continued existence of the species." 16 U.S.C. § 1539(j)(2)(B). It is also consistent with the governing regulations, 50 C.F.R. § 17.80(b), because using the breeding program to replace animals lost in reintroduction ensures that the reintroduced population—that is, "the species in the wild"—will attain the same size that it would have achieved had the animal not been lost.

It is not until the final paragraph in this section of their brief that Plaintiffs make mention of the 23 reintroduction sites outside of Wyoming—or 24 sites when Shirley Basin is included. Dkt. 38 at 37. Plaintiffs' sole retort, however, merely (1) notes that the FWS has previously found that each of these populations was also nonessential and then (2) argues that it was "arbitrary for the agency to point to reintroduction sites in other states (and countries) to downplay the impact of the of the hypothetical loss of Wyoming when the loss of those populations . . . also poses no risk to the ferrets' ability to survive in the wild." Dkt. 38 at 37. But Plaintiffs fail to explain why that is so. The sites are located across a geographically disperse area, and there is no reason to believe that losses at one site will affect another. Nor do Plaintiffs point to evidence that any of the 24 other populations are at risk of loss. *See* Dkt. 38 at

37.   Nothing in the statute, regulations, or common sense require the agency to designate at least one population of a listed species as essential.  To the contrary, it is difficult to fathom what non-arbitrary criteria the agency might use to conclude that the black-footed ferrets reintroduced in South Dakota and Utah are nonessential, while identical ferrets reintroduced (from the same captive, genetic stock) in Wyoming are essential.

The FWS's explanation that all black-footed ferrets—both captive-bred and wild—are descended from the captive-bred pool also demonstrates how this case differs from *Center for Biological Diversity v. Jewell*, in which the challenged Section 10(j) rule failed to adequately consider and protect against future loss of genetic diversity.  2018 WL 1586651, at *15.  Here, the FWS did not make that same mistake.  It considered future genetic viability and recognized the scientific reality that black-footed ferrets are currently reliant on the captive-breeding population in order to add new reintroduction sites.  Further, the captive-breeding population used to develop and supplement reintroduction sites comes from the same genetic lineage as the experimental populations.  Given that reality, designating any experimental black-footed ferret population as nonessential, and relying on the captive-breeding program to replace any animals lost during reintroduction, will not itself impair the genetic diversity of the species.  *See also* 80 Fed. Reg. at 66830 (final rule) (response to comment 4).

Accordingly, Plaintiffs' challenge to the FWS's reliance on the captive-breeding program to further support its nonessential population finding also fails.

2.   *Subdelegation of authority to the WGFD*

Plaintiffs also argue that the Wyoming 10(j) Rule impermissibly subdelegated decision-making authority to the WGFD.  The parties agree that federal agencies "may not subdelegate to outside entities—private or sovereign—absent affirmative evidence of authority to do so."  *U.S.*

*Telecom Ass'n v. FCC*, 359 F.3d 554, 566 (D.C. Cir. 2004); Dkt. 40-1 at 34.  But that does not foreclose an agency from receiving "legitimate outside party input into agency decision-making processes."  *U.S. Telecom Ass'n*, 359 F.3d at 566.  That type of input can take a variety of forms, including "(1) establishing a reasonable condition for granting federal approval; (2) fact gathering; and (3) advice giving."  *Id.*  The first category—establishing reasonable conditions— recognizes that an agency "may condition its grant of permission on the decision of another entity, such as a state, local, or tribal government, so long as there is a reasonable connection between the outside entity's decision and the federal agency's determination."  *Id.* at 567.  By way of example, an agency might condition the issuance of a permit "on the applicant's acquisition of an analogous permit from" a local government with regulatory authority.  *Id.*  The second category—fact gathering—requires little discussion.  When a federal agency needs to decide whether and how to act, it may look to outside sources to obtain relevant information, so long as the provision of that information does not itself involve federal-decision-making authority.  *Id.*  The third category—outside advice—recognizes that federal agencies may look to outside entities "for advice and policy recommendations, provided the agency makes the final decisions itself," *id.*, and the advice-giving function does not tread any required notice and comment process.  "An agency may not, however, merely 'rubber-stamp' decisions made by others under the guise of seeking their 'advice.'"  *Id.* at 568.

Here, the parties paint very different pictures of the State's role in designating release sites and managing the experimental population.  According to Plaintiffs, the Wyoming 10(j) Rule violates the subdelegation doctrine because the FWS "was very much aware that the 2013 MOU puts the State of Wyoming 'in the driver's seat' for deciding on future ferret reintroductions in the state," Dkt. 38 at 39, and "the Wyoming 10(j) Rule adopts the framework

of the 2013 MOU," *id.* at 40.  Plaintiffs further contend that "the Rule allows the State to indefinitely delay or deny additional reintroductions in Wyoming, [thereby] impeding ferret recovery and incentivizing a 'race to the bottom' approach among the 12 states for contributing to the Recovery Plan's downlisting and delisting goals."  *Id.* at 41.  The FWS, in contrast, posits that the Wyoming 10(j) Rule merely designates the WGFD as the "on-the-ground lead," given the state agency's "'long history with black-footed ferret conservation and recovery, leadership in successful reintroduction in Shirley Basin . . . , intimate knowledge of local biological conditions, and familiarity with local landowners and other stakeholders.'"  Dkt. 40-1 at 35 (quoting final rule).  But the FWS also stresses that it "retain[s] oversight authority for all black-footed ferret populations, including in Wyoming;" that it alone is authorized to approve "[a]ny site-specific management plan[] . . . before ferrets are allocated to any reintroduction sites;" that it "alone determines, based on reintroduction proposals, which reintroduction sites receive captive-born ferrets for release into the wild;" that it must approve any relocation or removal of ferrets from the wild; and that, despite Plaintiffs' assertions to the contrary, the WGFD lacks "'veto' power over any proposed introduction sites."  *Id.* at 36–37 (citing final rule).  For the reasons explained below, the Court concludes that the FWS has the better of the argument.

In *National Park and Conservation Association v. Stanton*, environmental groups challenged the National Park Service's ("NPS") management plan for the Niobrara National Scenic River in Nebraska as impermissibly subdelegating authority to the Niobrara Council.  54 F. Supp. 2d 7, 9–11 (D.D.C. 1999).  The Council was comprised of thirteen local and industry representatives plus one FWS representative and one NPS representative, and it was established as separate from the NPS, although the NPS retained the power to terminate the Council if the NPS determined that the Council was not adequately protecting the river in accordance with the

terms of their cooperation agreement. *Id.* at 10–11. The Court recognized that subdelegations by federal agencies to private parties may be valid if the agency "retains final reviewing authority," but as applied to the facts of the Niobrara Council, the Court concluded that the "NPS retains virtually no final authority over the actions—or inaction—of the Council." *Id.* at 19. The Court, accordingly, agreed with the plaintiffs that the NPS had impermissibly subdelegated its authority. *Id.* at 20–21.

Here, in contrast, the FWS retains the necessary oversight authority. The final Wyoming 10(j) Rule includes the following response to a comment raising the same concern that animates Plaintiffs' argument:

> The Service will maintain authority for black-footed ferrets under the Act until the species is recovered and subsequently delisted. That said, as is true for nearly every endangered species recovery effort, recovery is a collaborative effort with success depending on the coordination and collaboration of a multitude of partners working towards a common goal. The WGFD is anticipated to play a lead role in recovery for the black-footed ferret in Wyoming under this 10(j) rule, likely conducting the actual on-the-ground ferret reintroduction and management work. This situation is in no way unprecedented, as on-the-ground reintroduction efforts under 10(j) are often managed by non-Service groups, including state agencies, non-governmental organizations, and Tribes. The Service considers participation by the WGFD invaluable to this recovery effort given their long history with black-footed ferret conservation and recovery, leadership in successful reintroductions in Shirley Basin (also under a 10(j) rule), intimate knowledge of local biological conditions, and familiarity with local landowners and other stakeholders.

80 Fed. Reg. at 66829. This balance is consistent with Section 10(j), which, as the FWS explains, is designed as a "a cooperative framework 'to encourage efforts to establish' experimental populations in the face of potential local 'public opposition.'" Dkt. 40-1 at 34 (quoting H.R. Rep. No. 97-567, at 34). It is also consistent with the implementing regulations, which, in 2015, provided that a Section 10(j) rule "shall, to the maximum extent practicable, represent an agreement between the [FWS], the affected State and Federal agencies and persons holding any interest in land which may be affected by the establishment of an experimental

population."  50 C.F.R. § 17.81(d).  And, most importantly, the Wyoming 10(j) Rule makes clear

that the FWS "will maintain authority for black-footed ferrets under the Act."  80 Fed. Reg. at

66829 (final rule).  Ensuring the "involvement of state fish and wildlife agencies in the

regulatory process is crucial" to successful reintroduction efforts, H.R. Rep. No. 97-567, at 34,

but, as the Wyoming 10(j) Rule clarifies, that involvement does not divest the FWS of ultimate

oversight responsibility.

This cooperative approach, which relies on the expertise and local knowledge of the

WGFD and other "partners" without divesting the FWS of ultimately oversight responsibility, is

explained in detail throughout the proposed and final rules.  As explained in the proposed rule,

Wyoming state law vests the WGFD with responsibility "to provide an adequate and flexible

system for the control, management, protection, and regulation of all Wyoming wildlife,"

including the black-footed ferret, which is a "protected animal" under Wyoming law.  80 Fed.

Reg. at 19270.  Consistent with this state-law responsibility, the proposed rule recognizes that

the WGFD will "have primary management responsibilities for ferret reintroductions in

Wyoming."  *Id.* at 19268.  But those responsibilities constituted just one part of a cooperative

enterprise.  The proposed rule, for example, contemplated that the FWS "will cooperate with

other Federal agencies, [the] WGFD, Tribes, landowners, and other stakeholders to develop,

implement, and maintain long-term site management before, during, and after releases;" that

these "partners" would "collect habitat data for site evaluation . . . and develop management

plans for prairie dogs and plague prior to any release of black-footed ferrets;" that these

"partners" would "develop annual site-specific reintroduction plans and submit them to the

[FWS] by mid-March as part of an annual ferret allocation process;" that these plans would

include detailed information specified by the FWS; that the FWS would "coordinate closely with

[the] WGFD and other partners in the management of any black-footed ferrets in Wyoming;" and that "[m]anagement of ferret populations in the proposed Wyoming NEP area would be guided by provisions in management plans developed in cooperation with" the WGFD and various other federal and state entities.  *Id.* at 19269.

The final rule, in turn, clarifies that these "partners"—including the "WGFD, Tribes, landowners, and other stakeholders"—will submit their proposed "annual site-specific reintroduction plans" to the FWS, which the FWS will then use to make its ferret allocation decisions.  80 Fed. Reg. at 66825.  Similarly, the final rule clarifies that any proposed "management plans must be approved by the [FWS] before ferrets are allocated to any reintroduction sites."  *Id.* at 66827; *see also id.* at 66829 (the FWS will "determine[], based on reintroduction proposals, which reintroduction sites receive captive born ferrets . . . for release into the wild").  And the final rule clarifies that the FWS "must be kept apprised of any post allocation changes in project design, direction, management, or field implementation of ferret reintroduction projects" and that "[n]o ferrets may be translocated, relocated, or removed from the wild . . . without prior [FWS] notification and authorization."  *Id.* at 66829–30.

In short, fairly construed, the Wyoming 10(j) Rule adopts a cooperative approach that leaves untouched the FWS's "authority for black-footed ferrets under the [ESA] until the species is recovered and subsequently delisted."  *Id.* at 66829.  In exercising that authority, however, the FWS has elected to draw on the expertise and input of an array of "partners" and has left the day-to-day management of the reintroduction sites to the WGFD.  It has maintained authority, however, to approve each reintroduction site and each management plan before releasing the captive ferrets, and it has maintained authority to approve or disapprove any "post allocation changes in project design," *id*.  By proceeding in this manner, the FWS has not sought to shirk or

blur the lines of the agency's ultimate "accountability" or to pass ultimate authority to those who "may pursue goals inconsistent with those of the agency and the underlying statutory scheme." *U.S. Telecom Ass'n*, 359 F.3d at 565–66.

Plaintiffs do not take issue with much of this line of reasoning, but they argue that the Wyoming 10(j) Rule, nonetheless, constitutes an improper subdelegation because it allows the WGFD to "veto" any release site or release by either declining to submit a proposed site-specific reintroduction plan or by exercising its right under the 2013 MOU, in which the FWS and the WGFD "agree[d] that future reintroductions of the ferret will be based on mutually affirmed prioritization of prospective reintroduction sites," Dkt. 48 at 141. That argument overstates both the WGFD's authority under the Wyoming 10(j) Rule—which is all that is challenged in this case—and the legal consequences of conditioning reintroduction on some level of buy-in by the WGFD or other "partners" in the reintroduction effort.

To start, as the FWS observes, Plaintiffs do not challenge the lawfulness of the MOU in this action, and the Court has already outlined what the Wyoming 10(j) Rule does—and does not—require. The FWS's response to a comment in the final rule, merely observing that the Wyoming 10(j) Rule is "consistent with"—that is, compatible with—the 2013 MOU, 80 Fed. Reg. at 66829, does not alter the terms of the Rule or confer a "veto" right on the WGFD that is not otherwise embodied in the Rule. That is particularly so where, as here, the portion of the 2013 MOU mentioned in the response merely reflects a "[g]uiding principle[]" or "value" of ensuring that "state and national ferret recovery objectives" are served by the agreement to mutually prioritize potential reintroduction sites, *id.* at 140–41. Any question regarding the meaning of the Wyoming 10(j) Rule—as opposed to the MOU—is put to rest by the very next passage of the FWS's response to the comment at issue. The agency clarifies that the FWS will

determine—based on the reintroduction proposals submitted by any or all of the "partners" described in the final rule—"which reintroduction sites receive captive born ferrets . . . for release into the wild," and that its decisions will be made "based on the biological and scientific merit of the proposals, the suitability of proposed reintroduction sites, management capabilities of reintroduction programs, comprehensiveness of site work plans, the overall contribution to species recovery each project represents, and other considerations that may be unforeseen." 80 Fed. Reg. at 66829.

Most significantly, as the FWS explains, not only is there nothing wrong with conditioning reintroduction on the support and collaboration of the WGFD and other "partners" in the State, there are compelling reasons to do so. As the D.C. Circuit has observed, an agency's reliance on (1) "a reasonable condition for granting federal approval," (2) "fact gathering," and (3) receipt of "advice" does not constitute an impermissible subdelegation of regulatory authority. *U.S. Telecom Ass'n*, 359 F.3d at 566. Here, all three of these considerations come into play. To start, as the FWS explains in final rules, local buy-in and input is essential to the success of a reintroduction effort. Successful management plans, for example, have allowed "landowners and land managers to the opportunity to cooperatively decide the number and distribution of prairie dogs (and corresponding ferrets) that may occur on privately owned and leased lands" and have obtained annual "landowner approval of human activities necessary for actions specified in th[e] plan." 80 Fed. Reg. at 66832. The FWS has also made efforts, more generally, to obtain either support or non-opposition from local agencies, landowners, and land managers. *Id.* The need for buy-in from state authorities, moreover, is particularly important where, as here, the WGFD has "independent authority over the subject matter," *Assiniboine & Sioux Tribes of the Fort Peck Indian Reservation v. Bd. of Oil & Gas*

*Conservation of the State of Montana*, 792 F.2d 782, 795 (9th Cir. 1986) (quoting *United States v. Mazurie*, 419 U.S. 544, 557 (1975)).  Consistent with that interest, the governing regulations require that any rule promulgated pursuant to Section 10(j) maximize, to the extent possible, agreement "between the [FWS], the affected State and Federal agencies."  50 C.F.R. § 17.81(d). "[A] federal agency entrusted with broad discretion to permit or forbid certain activities may condition its grant of permission"—here, permission to release members of the NEP into the wild—"on the decision of another entity, such as a state, local, or tribal government, so long as there is a reasonable connection between the [state agency's] decision and the federal agency's determination."  *U.S. Telecom Ass'n*, 359 F.3d at 567.  For the reasons explained above, the Wyoming 10(j) Rule passes that test.

Conditioning approval of reintroduction sites on the receipt of a well-supported proposal from the WGFD or another "partner" also falls within the fact-gathering and advice-receiving exceptions to the bar on subdelegation.  Here, the FWS is not delegating its authority to those who submit acceptable proposals but, rather, is relying on those with unique knowledge and resources to perform the necessary background work.  Without that input, the agency lacks a basis to act.  Among other things, the "WGFD has the personnel and resources to collect habitat data for site evaluations and foster relationships with landowners who would be receptive to facilitating a successful reintroduction[,] [enabling it] to identify the best potential sites."  Dkt. 40-1 at 37; *see also* 80 Fed. Reg. at 66829 (final rule).  The FWS's reliance on the WGFD to identify and vet potential reintroduction sites is consistent with *U.S. Telecom Association*, which explains that "a federal agency may use an outside entity, such as a state agency or a private contractor, to provide the agency with factual information" and may also "turn to an outside entity for advice and policy recommendations, provided the agency makes the final decision

itself." 359 F.3d at 567–68.  Even where, as here, the agency cannot act until provided with that factual information and advice, such an arrangement is within legal bounds as long as the agency does not "merely 'rubber-stamp' decisions made by others under the guise of seeking their [factual input or] 'advice.'"  *Id.* at 568.

The Court, accordingly, concludes that the 10(j) Rule does not impermissibly subdelegate the FWS's regulatory authority to the WGFD or any other "partner" in the reintroduction process.

### 3.  *Conservation of the species*

Next, Plaintiffs challenge the Wyoming 10(j) Rule on the basis that it fails to promote the conservation of the black-footed ferret.  In order to authorize the release of an experimental population (essential or nonessential) of a species pursuant to Section 10(j), the FWS must first "determine[] that such release will further the conservation of [the] species."  16 U.S.C. § 1539(j)(2)(A).  Plaintiffs argue that the Wyoming 10(j) Rule hinders rather than advances the species' recovery because it creates a blanket NEP rule for the entire state, does not commit to any specific reintroductions or release sites, and subdelegates ultimate reintroduction authority to the WGFD.  Dkt. 38 at 42.

Plaintiffs first argue that the blanket Wyoming 10(j) Rule allows the FWS to forgo designating a critical habitat, forecloses the designation of any "essential" populations in Wyoming, and undermines the possibility for reintroductions using Section 10(a)(1) permits.  None of these arguments is convincing.  To start, the black-footed ferret was grandfathered into the ESA, and it has never had a designated critical habitat.  *See* 50 C.F.R. § 424.12(e).  Plaintiffs offer no reason why the agency would need to designate such a habitat to provide for the conservation of the species, nor do they offer any reason why it would be necessary to designate

an experimental population as essential.  To the contrary, in enacting Section 10(j), Congress anticipated that, "in most cases, experimental populations will not be essential."  H.R. Rep. No. 97-835, at 34.  A nonessential designation provides the FWS with "broad flexibility . . . to protect [the] species" by developing "special regulations for each experimental population that will address the particular needs of that population."  H.R. Rep. 97-567, at 34.  And, if at some later date the FWS determines that the species would benefit through the designation of a critical habitat or essentiality, or through a reintroduction using Section 10(a)(1) permits, it can initiate a rulemaking at that time to revisit its black-footed ferret conservation strategy in Wyoming.

For similar reasons, the Court is unconvinced that the Wyoming 10(j) Rule fails to provide for the conservation of the species merely because it leaves the designation of particular reintroductions or release sites for future determination.  For the reasons explained above, the Court is persuaded that the FWS reasonably determined that adopting a blanket rule would facilitate the reintroduction and conservation of the species, and it is not the Court's role to substitute its judgment for that of the agency.  *See Airmotive Eng'g Corp.*, 882 F.3d at 1159.  Moreover, although the Wyoming 10(j) Rule does not commit to a specific site or reintroduction, it does lay out a detailed framework for evaluating and implementing future proposals.  The FWS reasonably concluded that this approach was "necessary to secure needed cooperation of the State, landowners, and other interests in the affected area," 80 Fed. Reg. at 66828, would "result in the creation of additional reintroduction areas in Wyoming," and ultimately would lead to "an increase in the reproduction, numbers and distribution of the black-footed ferret," *id.* at 66826.  Plaintiffs simply repeat the refrain that the Rule "fails to commit to any actual reintroductions," *see, e.g.*, Dkt. 38 at 43, but they offer no meaningful response to the FWS's explanation that, by avoiding the quagmire of site-by-site, release-by-release Section 10(j) rules,

the Wyoming 10(j) Rule facilitates future reintroductions (and thus recovery of the species) in a way that would not otherwise be possible.  *See, e.g.*, 80 Fed. Reg. at 66828; *see also id.* at 66831 (describing how "implementation of this rule is only a first step" and how, although no specific sites have yet been approved, "WGFD has reported that a number of landowners have approached them expressing interest in establishing a ferret population on their land following implementation of the 10(j) rule").

Finally, the Court has already explained that the Wyoming 10(j) Rule does not impermissibly subdelegate responsibilities to the WGFD.  The Court is also unpersuaded that designating the WGFD as "the lead agency in the reintroduction and subsequent management of black-footed ferret in Wyoming," *id.* at 66822, was inconsistent with the FWS's duty to provide for the conservation of the species.  Notably, the final rule uses the language of "lead agency" rather than "primary management responsibilities," as suggested by one of the peer reviewers, *see* Dkt. 48 at 548–49, and clarifies that the FWS retains "authority for black-footed ferrets" under the ESA "until the species is recovered and subsequently delisted."  80 Fed. Reg. at 66829. Plaintiffs argue that the WGFD's role is problematic because the "WGFD neither shares the [FWS's] national conservation interests nor is bound by the ESA," Dkt. 38 at 43, but Wyoming law classifies the black-footed ferret as "a protected animal," and the WGFD "defines the ferret as a 'species of greatest conservation need,'" 80 Fed. Reg. at 19270.  The Court can discern no tension between the objectives of the WGFD under state law and the FWS under the ESA. Plaintiffs may be frustrated—at this late date—by the pace of reintroductions, *see* Dkt. 38 at 23–24, but that does not render the FWS's decision in 2015 to promulgate the Wyoming 10(j) Rule arbitrary or capricious in light of the information it had before it at the time.

4.    *No jeopardy finding*

Plaintiffs also reframe their objections to the Wyoming 10(j) Rule as objections to the BiOp, which evaluated the proposed rule and concluded that it was not likely to jeopardize the continued existence of the species.  Dkt. 38 at 44; *see* Dkt. 48 at 257–58 (BiOp).  Plaintiffs' arguments against the BiOp are the same as those against the Rule, and they fail for same reasons explained above.  Plaintiffs are also incorrect that the BiOp failed to consider the proposed rule's impact on the species' recovery.  In accordance with ESA Section 7(a)(2), the BiOp analyzed the direct, indirect, and cumulative effects of the proposed 10(j) Rule, *see* Dkt. 48 at 251–57, and reasonably concluded that—even with no specific reintroductions or release sites specified in the rule, and even with the WGFD in the lead role, *see id.* at 245—the overall effect of the action was "not likely to jeopardize the continued existence of the black-footed ferret," *id.* at 257–58.  As the State of Wyoming aptly observes, Plaintiffs "continue to insist that the statewide 10(j) Rule will 'impede' recovery efforts but again do not substantiate this claim and ignore the net benefit of the [FWS's] decision" to adopt a blanket, statewide rule.  Dkt. 42 at 40.

*    *    *

For all of these reasons, Plaintiffs' arguments under the ESA and the APA are unavailing.

## C.    **National Environmental Policy Act**

Finally, Plaintiffs argue that the FWS's environmental assessment of the proposed rule violated NEPA because it improperly analyzed whether the proposed action would result in a "significant" environmental impact, failed to take a "hard look" at whether the action would significantly affect the quality of the human environment, and failed adequately to consider alternatives.  Dkt. 38 at 46–54.

1.    *Finding of No Significant Impact*

Plaintiffs first argue that the agency incorrect concluded that the proposed action would not significantly affect the quality of the human environment and thus erred in failing to prepare an EIS.  Dkt. 38 at 46.  Under the regulations in place at the time the FWS acted, agencies were required to consider the "context" and "intensity" of the proposed action in assessing the significance of the proposed action.  40 C.F.R. § 1508.27 (2015).[8]  Plaintiffs argue that the EA and FONSI that the FWS prepared were arbitrary, capricious, and not in accordance with NEPA because they failed to discuss these factors.  Dkt. 38 at 48.  Specifically, they argue that the EA failed appropriately to consider (1) the "context" of the "entire State of Wyoming—a place of extraordinary importance to the black-footed ferret's recovery," *id.* at 48–49 (citing 40 C.F.R. § 1508.27(a)); (2) the "intensity" of the "'uncertain' and 'unknown' risks" of providing an NEP designation and delegating authority to the WGFD without committing to specific reintroductions, Dkt. 38 at 49 (quoting 40 C.F.R. § 1508.27(b)(5)); (3) the "intensity" of the "precedential nature" of the statewide designation, Dkt. 38 at 49 (citing 40 C.F.R. § 1508.27(b)(6)); (4) the "intensity" produced because it "represents a decision in principle about a future consideration," Dkt. 38 at 50 (quoting 40 C.F.R. § 1508.27(b)(6)); and (5) the cumulative significance of the action, Dkt. 38 at 50 (citing 40 C.F.R. § 1508.27(b)(7)).

In response, the FWS notes that, even though the EA does not use the precise language of "context" and "intensity," it substantively addressed each of these concerns.  Dkt. 40-1 at 45–46.  The Court, in turn, must avoid "elevat[ing] form over substance" in assessing NEPA challenges and must, instead, focus on the content of the EA in evaluating its adequacy.  *Sierra Club*, 867

---

[8] The regulations were amended on July 16, 2020, effective September 14, 2020.  *See* 85 Fed. Reg. 43359.

F.3d at 1370.  Here, the Court has little difficulty concluding that the EA did, in fact, consider the "context" of creating a statewide rule for Wyoming.  It addressed Wyoming's status as one of the twelve states in the historic range of the black-footed ferret and analyzed the proposed action in light of the historic and continuing prairie dog and greater sage-grouse ranges in the State.  Dkt. 48 at 285–86, 289, 296–99.  It also considered the context of the 2013 block clearance letter for the State of Wyoming, which determined that it is exceedingly unlikely that any wild ferrets exist in the State that are not the product of the FWS's reintroduction efforts.  *Id.* at 286, 297.  The EA also evaluated the specific features of land area, *id.* at 306, and land use, *id.* at 307, in Wyoming.  In short, although the agency did not use the word, it did, in fact, consider the "context" of the proposed action.

Plaintiffs next argue that the EA failed to consider the "intensity" of the "uncertain" and "unknown" risks of the Wyoming 10(j) Rule.  On Plaintiffs' view, the EA did not assess the uncertainty resulting from the Rule's failure to commit the FWS to specific reintroductions.  Dkt. 38 at 49.  But Plaintiffs never explain what risks the EA ignored, and uncertainty, untethered to any related risk, is not inherently problematic.  The Court's role in evaluating a NEPA challenge is not to "flyspeck" the agency's analysis but, rather, to determine whether the agency's environmental analysis contains "deficiencies [that] are significant enough to undermine informed public comment and informed decision[-]making."  *Sierra Club*, 867 F.3d at 1368.  Here, the FWS's EA evaluated each of the three alternatives and identified the likely environmental consequences of each alternative—both with respect to the goal of ultimately delisting the black-footed ferret and with respect to effects on other wildlife (including the greater sage-grouse), farm and ranch lands, environmental justice, and socioeconomics.  Dkt. 48

at 296–307.  Those risks were both foreseeable and susceptible to reasonable evaluation, even without knowing precisely when and where each reintroduction or release would occur.

Plaintiffs also argue that the EA should have evaluated the precedential effect of the FWS's action, because other states may also want statewide designations; they point, for example, to correspondence in the record in which agency personnel raised the concern that it was likely that other states would "clamor for . . . the same deal."  Dkt. 38 at 49; Dkt. 48 at 1203. But the fact that other states might also seek a statewide Section 10(j) rule says little about the so-called precedential effect of the Wyoming 10(j) Rule, which was premised on the specific circumstances present in Wyoming, including the block clearance and the agency's prior success (working with the WGFD) at the Shirley Basin site.  Indeed, the very internal documents that Plaintiffs invoke in support of this argument explain that Wyoming was a "special case," Dkt. 48 at 1199, and that a statewide Section 10(j) rules might not be appropriate in other states "that do not have a significant pattern of interspersed landownership," *id.* at 1198.  Against this backdrop, there is no reason to believe that the Wyoming 10(j) Rule would lead to a cascade of similar rules, such that the FWS should have considered this potential cascade as a potential consequence of the proposed rule.

Finally, Plaintiffs argue that the EA's discussion of cumulative impacts was insufficient because it did not address the significance of the NEP designation in light of past NEP designations or "reasonably foreseeable demands from other states" seeking such designations. Dkt. 38 at 50.  As to future designations, this argument fails for the reasons provided above; there is no reason to believe that the Wyoming 10(j) rule established a precedent that would prevent the FWS from evaluating future requests on the own merit.  And, as to past designations, the EA adequately accounted for the prior NEP designations in Wyoming when assessing the

significance of the proposed action.  *See, e.g.*, Dkt. 48 at 320 (describing how new reintroduction sites would add to the existing Shirley Basin 10(j) area); *id.* at 327 (accounting for the existing 10(j) areas in comparing the alternatives).

The Court, accordingly, concludes that the EA adequately considered the significance factors and reasonably found that the proposed rule would have no significant impact on the human environment and that preparation of an EIS was not otherwise required.

2.      *"Hard look" at effects on the black-footed ferret*

Plaintiffs further argue the EA was arbitrary and capricious because it failed to take a "hard look" at the effects of the proposed rule on endangered species.  Dkt. 38 at 52 (citing *Oregon Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1109 (9th Cir. 2010)).  They argue, in particular, that the "EA failed to adequately address how the Wyoming 10(j) Rule would actually achieve the ESA's requirements in light of the Rule's . . . (1) blanket, statewide NEP designation; (2) lack of commitment to any actual ferret reintroductions and failure to identify any prospective release site(s) and to analyze the suitability thereof for an anticipated reintroduction; (3) reliance on a captive population to wholly replace all experimental, wild ferret populations (should such a loss occur); (4) foreseeable consequences of subdelegating lead decision-making authority over prospective reintroductions to WGFD; and (5) likely precedential impact."  Dkt. 38 at 52.

The Court has already addressed each of these argument at length, and little else remains to be said—other than that Plaintiffs may not simply repackage their ESA arguments as NEPA claims.  *See Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 569 (D.C. Cir. 2016) (explaining that "the Service's obligations are not identical" pursuant to NEPA and the ESA in part because NEPA's mandate is "essentially procedural" whereas the ESA's is substantive).

The question for the Court under NEPA is whether the agency engaged in informed decision-making about the environmental impacts of the proposed rule. *Cf. WildEarth Guardians*, 738 F.3d at 303 (noting that NEPA "requires informed decision[-]making" and "'not necessarily the best decision'" (quoting *New York v. NRC*, 681 F.3d 471, 476 (D.C. Cir. 2012)). Moreover, even though NEPA does not require an agency to duplicate its ESA analysis in an EA, here, the FWS did consider the reasonably foreseeable environment impacts of the proposed rule—and the two alternative options—in the EA. *See* Dkt. 48 at 296–97, 308, 311–13, 321–22. This included analysis both of how the FWS anticipated the ferret reintroductions would contribute to meeting the Recovery Plan's delisting criteria and of the adverse impacts that the FWS reasonably foresaw. *Id.* at 308, 311–13, 321–22. In short, the FWS took a "hard look" at the relevant environmental consequences, including the consequences for the ferret reintroduction program itself, and thus satisfied its obligations under NEPA.

### 3.    *Consideration of reasonable alternatives*

Finally, Plaintiffs take more particular aim at the EA's consideration of the relevant alternatives. NEPA requires agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(H). "Although a consideration of alternatives is required regardless of whether the agency issues a FONSI, the relevant regulations provide that the consideration of alternatives in an Environmental Assessment need not be as rigorous as the consideration of alternatives in an EIS." *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1323 (D.C. Cir. 2015) (citing 40 C.F.R. § 1508.9(b) (instructing the agency to include "brief discussions" of reasonable alternatives in the EA); *id.* § 1502.14(a) (instructing the agency to "[r]igorously explore and objectively evaluate all reasonable

alternatives" in an EIS)).  "The agency 'bears the responsibility for deciding which alternatives to consider' and need only follow a 'rule of reason,' which governs 'both *which* alternatives the agency must discuss, and the *extent* to which it must discuss them.'"  *Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*, 636 F. Supp. 3d 33, 61 (D.D.C. 2022) (emphasis in original) (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991)).  Whether an alternative is reasonable must be viewed "in light of [the agency's] objectives."  *Myersville*, 783 F.3d at 1323 (alteration in original) (quoting *Theodore Roosevelt Conserv. P'ship v. Salazar*, 661 F.3d 66, 72 (D.C. Cir. 2011)).

Here, the FWS explained in the EA that the "purpose" of the proposed action was to "advance the recovery of the ferret" in Wyoming, Dkt. 48 at 287, and the "need" for the proposed action turned, at least in part, on "facilitating voluntary participation in recovery actions while ensuring that the concerns of private landowners, related to the Act['s] regulatory burden, are addressed effectively," *id.* at 289.  Informed by this purpose and need, the FWS decided to compare three alternatives in the EA: (A) no action, (B) a statewide Section 10(j) rule, and (C) site-specific Section 10(j) rules.  Dkt. 48 at 293–94.  The FWS also considered but decided not to advance other alternatives, including "the use of programmatic or individual Safe Harbor Agreements, Section 10 permits, and Incidental Take Statements (ITS) associated with a Biological Opinion as part of a Section 7 consultation."  *Id.* at 295.  Plaintiffs object, first, that the EA's analysis of the third alternative—site-specific 10(j) rules—was too cursory and, second, that the EA should have considered additional alternatives.  Dkt. 38 at 53–54.  The Court is unpersuaded.

On Plaintiffs' telling, the EA "summarily dismisses" Alternative C (the adoption of site-specific Section 10(j) rules) based on their predicted administrative burden, even though site-

specific Section 10(j) rules are "what the Service had always done." *Id* at 53. That argument, however, ignores the pages of analysis in the EA devoted to reviewing the environmental consequences of this alternative, *see* Dkt. 48 at 321–26, and the pages spent comparing those consequences to the other alternatives, *id.* at 327–30. Plaintiffs may disagree with the rationales advanced by the FWS, but "NEPA is not a suitable vehicle for airing grievances about the substantive policies adopted by an agency, as NEPA was not intended to resolve fundamental policy disputes." *Indian River County, Fla. v. U.S. Dep't of Transp.*, 945 F.3d 515, 522 (D.C. Cir. 2019). "NEPA does not work by mandating that agencies achieve particular substantive environmental results . . . [but rather] by focusing Government and public attention on the environmental effects of proposed agency action." *Marsh*, 490 U.S. at 371. Because "NEPA does not compel a particular result," even if the agency finds "an alternative is environmentally superior, it nevertheless may be entitled under the circumstances not to choose that alternative." *Myersville*, 783 F.3d at 1324.

Plaintiffs' second objection presents a slightly closer question. They argue that the FWS failed to adequately justify its decision not to engage in a more detailed consideration of additional alternatives. Dkt. 38 at 54. To be sure, there may be situations in which an unexplained failure to consider a "viable but unexamined" alternative in an EA is arbitrary and capricious. *Cf. Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 877 (9th Cir. 2022) (holding that the agency violated NEPA by providing no explanation in an EA for not considering certain viable alternatives raised in public comments). But here, the Service provided a reasoned explanation for eliminating other alternatives from consideration. *See* Dkt. 48 at 295. First, the FWS explained that it determined that "a statewide 10(j) rule is the most appropriate tool to comprehensively and efficiently address" Wyoming's "checkerboard" pattern

of federal, state, and private land ownership while facilitating ferret reintroductions.  *Id.*  Second, it explained that "[s]takeholders viewed the implementation of a statewide 10(j) rule as a pre-requisite to participation in any ferret recovery actions in the State of Wyoming."  *Id.*

These rationales suffice because they are reasonably connected to the agency's objectives of facilitating voluntary participation and ensuring the regulatory burden did not impede recovery efforts.  *Id.* at 289; *cf. Red Lake Band*, 636 F. Supp. 3d. at 61–62 (holding that the agency did not act arbitrarily or capriciously when not considering alternatives rejected by the state partner).  Plaintiffs' contrary belief that Section 10(a)(1) permits with Safe Harbor Agreements and/or essential Section 10(j) designations might have provided adequate management flexibility and been more likely to advance ferret recovery, Dkt. 44 at 29, does not render the EA inadequate.  To the contrary, NEPA does not dictate results, and Plaintiffs have not shown that the agency's decision to advance only three alternatives was devoid of reason.  It bears emphasis, moreover, that the agency was evaluating alternatives within an EA rather than in an EIS, and, as the Ninth Circuit recently observed:  "[I]t makes little sense to fault an agency for failing to consider more environmentally sound alternatives to a project which it has properly determined, through its decision not to file an impact statement, will have no significant environmental effects anyway."  *Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1066 (9th Cir. 2023) (quoting *Sierra Club v. Espy*, 38 F.3d 792, 803 (5th Cir. 1994)).  Ultimately, although framed as a NEPA challenge, Plaintiffs simply disagree with the FWS's decision about how best to facilitate the reintroduction of the black-footed ferret in the State of Wyoming.  The agency's preferred approach, however, fell well within its discretion and was both reasoned and adequately explained.  Nothing more is required.

*   *   *

The Court, accordingly, concludes that the FWS acted in accordance with the requirements of NEPA and that the agency's EA and FONSI were neither arbitrary nor capricious.

**CONCLUSION**

For the foregoing reasons, the Court will **DENY** Plaintiffs' motion for summary judgment, Dkt. 38; will **GRANT** the FWS's cross-motion for summary judgment, Dkt. 40; and will **GRANT** the State of Wyoming's cross-motion for summary judgment, Dkt. 42.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  September 5, 2024

75